ACCEPTED
14-15-00178-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
12/21/2015 11:31:57 AM
CHRISTOPHER PRINE
CLERK

# NO. 14-15-00178-CV

RECEIVED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
12/21/2015 11:31:57 AM
CHRISTOPHER A. PRINE
Clerk

**IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS**

**PRESBYTERY OF NEW COVENANT, INC.,**

Appellant

v.

**FIRST PRESBYTERIAN CHURCH OF HOUSTON**,

Appellee

**AMICUS BRIEF OF
FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO
IN SUPPORT OF APPELLEE
FIRST PRESBYTERIAN CHURCH OF HOUSTON**

On Appeal from the 234th Judicial District Court
of Harris County, Texas
Trial Court Cause No. 2014-30354

David B. West
State Bar No. 21196400
DWest@dykema.com
Ellen B. Mitchell
State Bar No. 14208875
EMitchell@dykema.com
DYKEMA COX SMITH
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500 – Telephone
(210) 226-8395 – Telecopier

# TABLE OF CONTENTS

Page(s)

INDEX OF AUTHORITIES..................................................................................... iii

IDENTIFICATION OF AMICUS CURIAE ..........................................................2

DISCLOSURE OF FEE SOURCE .......................................................................2

ISSUE PRESENTED ...........................................................................................2

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT AND AUTHORITIES.......................................................................5

I.      The Trust Clause of the Book of Order of the Presbyterian Church (USA) should be reviewed under the neutral principles of law methodology set out in *Masterson*...................................................................5

II      Injunctive relief is essential to protect judicial review of church property rights.......................................................................................10

III.    The language of the injunction is constitutional......................................... 19

CERTIFICATE OF COMPLIANCE .................................................................... 25

CERTIFICATE OF SERVICE ..........................................................................26

Page(s)

**Cases**

*Carrollton Presbyterian Church v. Presbytery of South Louisiana*,
77 So.3d 975 ................................................................................19, 20, 21, 22

*Carrollton Presbyterian Church v. Presbytery of South Louisiana of
Presbyterian Church (U.S.A.)*
172 S.W.3d 1, 2015 (La. Ct. App. 2015), writ denied, 171 So.3d
257 (La. May 22, 2015) ...............................................................................18

*Disabato v. South Carolina Association of School Administrators*,
404 S.C. 433, 746 S.E.2d 329 (2013) ..........................................................21

*First and Calvary Presbyterian Church v. John Calvin Presbytery*,
Cause No. 1531-CC00924, In the Circuit Court of Greene County,
Missouri .......................................................................................................21

*First Presbyterian Church of Greenwood, Inc. v. Presbytery of St.
Andrew, Presbyterian Church U.S.A., Inc.*,
Cause No. G15-0064, In the Chancery Court of Leflore County,
Mississippi ...................................................................................................21

*First Presbyterian Church of Houston v. Presbytery of New Covenant,
Inc.*,
2014-30354, 234th Judicial District Court, Harris County, Texas.....................21

*First Presbyterian Church of San Antonio v. Mission Presbytery*,
Cause No. 2015-CI-07858, 73rd Judicial District Court, Bexar
County, Texas ..........................................................................................8, 20

*First Presbyterian Church PCUSA of Starkville, Mississippi v.
Presbytery of St. Andrew, Presbyterian Church U.S.A., Inc.*,
Cause No. 2015-0151-D, In the Chancery Court of Oktibbeha
County, Mississippi ......................................................................................21

*First Presbyterian Church of Schenectady v. United Presbyterian
Church*,
62 N.Y.2nd 110, 120, 121, 476 N.Y.S. 2nd 86, 464 N.E.2d 454
(1984)...........................................................................................................21

*First Presbyterian Church of Wichita Falls v. Palo Duro Presbytery*,
  Cause No. 182,783-B, 78th Judicial District Court, Wichita
  County, Texas ...................................................................................................21

*Fluker v. Hitchens*,
  419 So.2d 445 (La. 1982) ..................................................................................21

*Harris v. Quinn*,
  134 S.Ct. 2618 (2014)........................................................................................21

*Highland Park Presbyterian Church, Inc. v. Grace Presbytery, Inc.*,
  Cause No. DC-13-10605, 298th Judicial District Court, Dallas
  County, Texas ...................................................................................................21

*Highland Park Presbyterian Church, Inc. v. Grace Presbytery, Inc.*,
  Civil Action No. 3:13-CV-3813-B, United States District Court,
  Northern District of Texas, Dallas Division......................................................21

*Jones v. Wolf*,
  443 U.S. 595 (1979).....................................................................................22, 23

*Khaledi v. H.K. Global Trading, Ltd.*,
  126 S.W.3d 273 (Tex. App.–San Antonio 2003, no pet.) ..................................23

*Masterson* v. *Diocese of Northwest Texas*,
  422 S.W.3d 594 (Tex. 2013) ........................................... 2, 3, 4, 5, 6, 7, 8, 9, 22

*NACCP v. Alabama*,
  357 U.S. 449 (1958)...........................................................................................21

*New Covenant Presbyterian Church, Inc. v. MP of South Louisiana of
  the Presbyterian Church (USA)*,
  Suit Number 602832; Section 27, 19th Judicial District Court, East
  Baton Rouge Parish, Louisiana.......................................................................... 21

*Presbytery of Beaver Builder v. Middlesex*,
  489 A.2nd 1317, 1324 (PA 1985)......................................................................21

*Presbytery of Donegal v. Calhoun,*
  999 PA. Cmwlth 300, 513 A.2nd 531 (1986)....................................................21

iv

*Presbytery of New York v. McGee, Presbyterian Church (U.S.A.)Permanent Judicial Council* (2014) .......................................................7

*Robert v. United States Jaycees*,
468 U.S. 609 (1984).................................................................................21

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976).............................................................................19, 22

*Tom v. Presbytery of San Francisco, Presbyterian Church (U.S.A.)Permanent Judicial Council* (2012) .......................................................7

**Rules**

TEX. R. APP. P. 9.4(i)(1) .................................................................................25

**Statutes**

TEX. BUS. ORG. CODE § 2.101(19)....................................................................4

TEX. BUS. ORG. CODE §§ 22.105-22.107 .................................................8

**Other Authorities**

BLACK'S LAW DICTIONARY, Eighth Edition .............................................4

U.S. CONST., Amend. I.......................................................4, 19, 21, 23

**NO. 14-15-00178-CV**

---

**IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS**

---

**PRESBYTERY OF NEW COVENANT, INC.,**

Appellant,

v.

**FIRST PRESBYTERIAN CHURCH OF HOUSTON**,

Appellee

---

**AMICUS BRIEF OF
FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO
IN SUPPORT OF APPELLEE
FIRST PRESBYTERIAN CHURCH OF HOUSTON**

---

TO THE HONORABLE FOURTEENTH COURT OF APPEALS AT HOUSTON,

NOW COMES First Presbyterian Church of San Antonio ("FPC San Antonio") and submits this Amicus Brief in Support of Appellee First Presbyterian Church of Houston ("FPC Houston") to assist the Fourteenth Court of Appeals in resolving the questions before it in this appeal.

1

## IDENTIFICATION OF AMICUS CURIAE

First Presbyterian Church of San Antonio is a church located in San Antonio, Texas and is a non-profit corporation organized under the laws of the State of Texas.

## DISCLOSURE OF FEE SOURCE

The fees for preparation of this Amicus Brief are being paid by First Presbyterian Church of San Antonio.

## ISSUE PRESENTED

The issue presented is whether First Presbyterian Church of Houston holds title to its property free and clear of a claim of beneficial interest by the Presbyterian Church (U.S.A.).

## SUMMARY OF ARGUMENT

In the past five years, several hundred local churches have withdrawn or attempted to withdraw from membership in the PCUSA. The question is whether, in doing so, the local church retains ownership of its property. This is the same question addressed by the Supreme Court of Texas in *Masterson v. The Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013). In addressing this question, the Supreme Court affirmed the use of "neutral principles of law" as the legal methodology to be applied to such decisions, rather than the "deference" to the

2

denomination on property matters. *Id*. at 596. Under the neutral principles methodology, ownership of disputed property is determined by applying generally applicable law and legal principles, including evidence such as deeds to the properties, terms of the local church charter (certificates of formation and bylaws), and relevant provisions of governing documents of the denomination. *Id*. at 604.

The PCUSA, through its presbyteries, has systematically attempted to circumvent the *Masterson* methodology in this and other proceedings. It flatly rejects the right of a particular church (1) to avail itself of the protection of the courts[1]; (2) to obtain a declaration of its rights and interests in its property through a review of the deeds and corporate formation documents*;* or (3) to have Texas trust law applied to the legal documents of the particular church and the constitution of the PCUSA, particularly the Trust Clause, as described below. Presbytery of New Covenant ("New Covenant") attempts to define property rights as an "ecclesiastical" matter[2] so that only the denomination can adjudicate church property rights and civil courts must defer to its determination as "ecclesiastical action." *See* Appellant's Reply Brief at 24. In doing to, it essentially asks the

---

[1] "…FPC did not just abandon the GRD process; it torpedoed that process by sneaking down to the courthouse, filing a lawsuit, and obtaining an ex parte TRO …The Trial Court should have …dismissed this case." Reply Brief at 23.

[2] "FPC violated a fundamental tenet of PC(USA)'s religious doctrine when FPC rejected the religious principle that 'the right in and to all property within [the denomination's] ecclesiastical jurisdiction belongs to the Church as a whole—the entire denomination." Brief of Appellant at 25.

3

courts to ignore neutral principles of law and adopt the deference to church hierarchy methodology rejected by the Supreme Court of Texas. *Id.*

In this case, the PCUSA also asks the court to set aside injunctive relief because it "prohibits [the presbytery] from taking ecclesiastical action mandated by its religious beliefs in violation of its First Amendment rights." Reply Brief at 24. The ecclesiastical action it seeks to exercise is the right to "decide whether a church should be dissolved as a PC(USA) congregation." Reply Brief at 27. It contends, without citation, that "dissolution" has a specialized "theological" meaning. In fact, dissolution is a legal term[3] and is one of the powers of a domestic entity under Texas law. TEX. BUS. ORG. CODE 2.101(19).[4] The denomination claims an interest in the property of FPC Houston—despite the content of the deeds and corporate formation documents—based upon an archaic, inapplicable provision of the 1925 PCUS Form of Government of the Book of Church Order (the predecessor denomination of the PCUSA) stating that if a church is dissolved under certain circumstances, title to the property shall transfer to the presbytery. Brief of Appellant at 4.

---

[3] "Dissolution" is defined as the act of bringing to an end; termination; and the termination of a corporation's legal existence by expiration of its charter, by legislative act, by bankruptcy or by other means. BLACK'S LAW DICTIONARY, Eighth Edition.

[4] Also included in the powers of a domestic entity are (1) the right to sue and defend suit in the entity's business name; (3) the right to acquire, receive, own, hold, improve, use and deal in and with the property or an interest in the property; (12) the right to conduct its business; (14) the right to elect or appoint officers; and (17) the right to adopt and amend governing documents for managing the affairs of the entity. FPC Houston is a Texas non-profit corporation as well as a religious entity affiliated with a denomination. TEX. BUS. ORG. CODE 2.101.

4

If the court were to set aside the injunction, New Covenant would be free to exercise its alleged constitutional right to "dissolve" FPC Houston.  Reply Brief at 12, 13, 16, 25.  It claims it could then seize FPC Houston's property for violating the putative "religious" principle that the "right in and to all property within [the denomination's ecclesiastical jurisdiction belongs to the Church as a whole—the entire denomination."  Reply Brief at 25 (Emphasis added.)  In other words, by exercising its legal rights under *Masterson*, a local church is deemed by the PCUSA to have violated ecclesiastical doctrine, thereby entitling the presbytery to dissolve the local church and seize its assets.   This overreaching grab of church property by the denomination is contrary to the neutral principles of law set forth in the *Masterson* decision and should be soundly rejected.

## ARGUMENTS AND AUTHORITIES

I. **The Trust Clause of the Book of Order of the Presbyterian Church (USA) should be reviewed under the neutral principals of law methodology set out in *Masterson*.**

In *Masterson v. Diocese of Northwest Texas*, the Supreme Court of Texas adopted "neutral principles of law" as the legal methodology to be applied when there is a dispute over ownership of church property.  *Masterson,* at 596.  Under the neutral principles methodology, ownership of disputed property is determined by applying generally applicable law and legal principles, including evidence such as deeds to the properties, terms of the local church charter (certificates of

5

formation and bylaws), and relevant provisions of governing documents of the denomination. *Id*. at 604.

To the best of FPC San Antonio's knowledge, the PCUSA is the only one of seventeen Presbyterian denominations to assert a claim of interest in the property of member churches.[5] The PCUSA asserts an interest in the property of local churches through a provision in the Book of Order (part of the constitution of the PCUSA) known as the "Trust Clause," which states:

> All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a congregation or of a higher council or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

CR 3774 (G-4.0203 of the Book of Order). The Trust Clause is the only provision in the PCUSA's Book of Order which expressly purports to give the PCUSA a beneficial interest in the property of local churches.

The PCUSA not only asserts the Trust Clause as the basis for its claim of a beneficial interest in the property of the local church, it requires presbyteries to enforce this clause against any church that desires to leave the denomination. The PCUSA has issued opinions or directives outlining the duties of presbyteries when a particular church seeks to withdraw from the denomination :

---

[5] The Evangelical Presbyterian Church (EPC) and ECO: A Covenant Order of Evangelical Presbyterians (ECO) expressly disclaim any interest in the property of the local churches.

6

When a congregation asks to be dismissed to another denomination, the presbytery has a fiduciary obligation to enforce the Trust Clause to initiate a monetary payment for dismissal. *Tom v. Presbytery of San Francisco* (2012) (General Assembly Permanent Judicial Council). *See* Exhibit "A."

A presbytery must obtain a valuation of the financial assets of the property at stake when deciding whether to allow a church to leave the denomination. *Id.*

If a presbytery fails to carry out the constitutional responsibilities, the synod (the regional arm of the PCUSA) may be required to intervene. *Advisory Opinion: Note 19* (PCUSA). *See* Exhibit "B."

Even if a church and a presbytery reach an agreement on dismissal and the amount to be paid, that decision is not binding on the PC(USA). *See Presbytery of New York v. McGee* (2014) (General Assembly Permanent Judicial Council). *See* Exhibit "C."

Thus, the Trust Clause not only forms the basis of the PCUSA's claim of interest in the property of the local churches, all presbyteries in the denomination are required to enforce it. New Covenant recently adopted a new policy that requires a local church to accept the Trust Clause as a condition to participating in the dismissal process. *See* Exhibit D at lines 38-41.[6]

In the instant case, FPC Houston filed suit for declaratory judgment asking the court to declare, under *Masterson*, whether the Trust Clause is valid under Texas law. The trial court correctly granted summary judgment for FPC Houston,

---

[6] "If a session chooses not to follow this Gracious Reconciliation and Dismissal Procedure, undertakes actions attempting to revoke adherence to G-4.0203 of the Book of Order, or files suit in civil court against the Presbytery of New Covenant, then it will be treated as a church in schism" (lines 281-381); "the Presbytery of New Covenant understands that church property is held in trust for the PC (U.S.A.)" under section G-4.0203 of the Book of Order) (lines 85-87); and prior to dismissal, there must be a binding contract that reflects the "financial settlement of the congregation's responsibilities under the provisions of G-4.0203" (lines 210-219).

7

holding, under the neutral principles of law methodology, that FPC Houston holds title to its property free and clear of any trust for the benefit of the PCUSA.

New Covenant appears to have abandoned its claim under the Trust Clause for purposes of this appeal and instead argues the novel theory that if a church takes actions to protect its property, it has violated church doctrine. This allegedly entitles the presbytery to dissolve the church and seize its property under a 1925 provision of the predecessor denomination. Reply Brief at 12, 13, 16, 25, 27.

The denomination's abandonment of the Trust Clause as a viable legal theory under Texas law is not unique to this case, nor is its attempt to find an alternative theory on which to lay claim to the property of local churches in Texas. In *First Presbyterian Church of San Antonio v. Mission Presbytery*, Cause No. 2015-CI-07858, filed in the 73rd Judicial District Court of Bexar County, Texas, FPC San Antonio also sought a declaration that the Trust Clause is invalid under Texas law and that FPC San Antonio owns its property free and clear of any claim of ownership of the PCUSA. At the hearing on the temporary injunction held on August 26-27, 2015, Mission Presbytery, like New Covenant, abandoned the argument (for purposes of that hearing) that the Trust Clause gives the presbytery a beneficial interest in property of a local church.[7] Instead, five members of FPC

---

[7] Although New Covenant has abandoned its claim under the Trust Clause for purposes of this appeal, it contends FPC Houston committed a wrongful act by amending the articles and by-laws to rescind the Trust Clause. Similarly, Mission Presbytery has claimed that FPC San Antonio fraudulently amended its articles of incorporation and bylaws by excluding reference to the PCUSA. Both churches acted within their rights as non-profit

8

San Antonio (working with Mission Presbytery and represented by its lawyers), asked the court to (1) impose a "constructive charitable trust" for the benefit of the denomination and (2) enter a temporary injunction preventing FPC San Antonio from using its property for the benefit of any denomination other than the PCUSA. *See Defendant's Verified Original Counterclaim, Intervenors' Verified Original Petition in Intervention, and Defendant's and Intervenors' Application for Temporary and Permanent Injunction*, attached as Exhibit "E." The argument for this equitable remedy was that the five Intervenors made charitable contributions to FPC San Antonio while it was associated with the PC(USA); the contributions had become "intermingled" with all of the church assets; church funds were used to maintain real property; and, therefore, all of the church assets must remain with the denomination. The trial court rejected this theory and denied Mission Presbytery's and the Intervenors' request for injunctive relief. *See* Exhibit "F."

While PCUSA's theories vary from case to case, the endgame is the same: no church may leave the denomination with its property. Even if the presbyteries choose not to argue the Trust Clause in selected court cases, the individual churches are entitled to a declaration of their property rights under the neutral principles of law methodology of *Masterson*. Moreover, a local church needs to know the validity of the Trust Clause so that it can determine whether to

---

corporations. *See Masterson v. Diocese of Northwest Texas*, 422 S.W.3d 594, 609-10 (Tex. 2013) (local church's corporate powers were not restricted by its affiliation with hierarchical church organization, and thus the church members were free to amend its bylaws); TEX. BUS. ORG. CODE §§ 22.105-22.107.

voluntarily enter into a presbytery's dismissal process or seek a court declaration of its rights under Texas law. The court should review the Trust Clause in accordance with the methodology set out in *Masterson* and affirm the decision of the trial court that, under the facts set forth in this case, the PC(USA) has no interest in FPC Houston's property under Texas law. *See* Appellee's Brief.

## II. Injunctive relief is essential to protect judicial review of church property rights.

Under the PCUSA Book of Order, a presbytery is empowered to implement the asserted trust because it has authority to "dismiss" a congregation to another Reformed body (Presbyterian-type denomination). *PCUSA Book of Order, G-3.0303b.; PCUSA Advisory Opinion: Note 19*, Exhibit B. In enforcing the Trust Clause, the presbytery claims authority to appoint an administrative commission or listening team to "assume original jurisdiction" over a session whenever the presbytery determines that the session is unable or unwilling to manage its affairs as presbytery thinks appropriate. By assuming original jurisdiction, the presbytery claims it can replace the local church's existing governing body, the session. *Id.* In doing so, it further claims it can take control of local church property, even if it cannot take title to the property. Presbyteries in Texas have often exercised this asserted authority, particularly when a local church expresses a desire to leave the PCUSA.

10

First Presbyterian Church, Ingram, Texas. After The Rev. Ray Tear inquired about the process for a church to leave the denomination, Mission Presbytery sent a "listening team" to the church. The "listening team" recommended formation of an "administrative commission" which brought charges against the pastor. The administrative commission also assumed original jurisdiction over the finances of the church. *See* Depositions of Rev. Ray Tear, Rev. Hector Reynoso, Exhibits "G" and "H."

First Presbyterian Church, Edinburg, Texas. Mission Presbytery sent a listening team" to the church with the authority to remove the pastor, take control of church property and the finances. The Rev. Tom Johnson, who was part of that team, described its extensive powers as "just about anything we wanted to do." The listening team removed the pastor and took control of the church property and finances. The church was later closed. Testimony of Rev. Tom Johnson, Exhibit "I."

El Principe de Paz, Mercedes, Texas; Iglesia Presbiteriana Getsemani, San Benito, Texas; San Pablo Presbyterian Church, Mission, Texas.
After seeing the experience of the churches in Ingram and Edinburg, The Rev. Hector Reynoso, The Rev. Thomas C. Johnson and most of the members of their three churches elected not to go through the presbytery

11

procedures for dismissal from the denomination.  They left the PCUSA by "renunciation of jurisdiction."  This meant they walked away from all of their church property and formed new churches.  Not satisfied with retention of all of the churches' assets, however, representatives of Mission Presbytery went to the bank in Mercedes, Texas and claimed an interest in the account of the <u>newly formed</u> church, the successor to El Principe de Paz.  The assets (a mere $2,000) were frozen for a week, making it impossible for the church to pay its pastor or rent on the new church building.  Testimony of Rev. Hector Reynoso, Exhibit "H."

**First Presbyterian Church of San Antonio**.  FPC San Antonio filed suit for declaratory judgment on May 12, 2015.  The Honorable John D. Gabriel granted a temporary restraining order (TRO) preventing Mission Presbytery from taking a number of actions, including exercising original jurisdiction through an Administrative Commission.  *See* Exhibit "J."  The language of the TRO is identical to that used in the permanent injunction signed by the trial court in this action.

Shortly thereafter, Mission Presbytery formed a committee to investigate a claim from a member of presbytery (another pastor) that Interim Senior Pastor Ronald Scates had breached his ordination vows.  Mission Presbytery

12

and the Intervenors also filed a counterclaim asserting a claim for injunctive relief and asked the court to impose a constructive charitable trust on all of the assets of FPC San Antonio.

On August 26-27, 2015, the court held a hearing on both applications for injunctive relief. On October 12, 2015, Judge Gabriel denied both applications for temporary injunction. The Judge's Notes state that the Court was denying the applications based on a "finding of no imminent danger." *See* Exhibit "K." The Judge's Notes also state that "any changes in that status, however, may be reconsidered by this Court."

Mission Presbytery filed a motion for reconsideration of the court's ruling after FPC San Antonio scheduled a congregational meeting to vote on whether to disaffiliate from the PCUSA. The vote was scheduled for November 1, 2015. On October 23, 2015, the Court denied the Intervenors' Emergency Motion for Reconsideration, allowing FPC San Antonio to proceed with the vote.

The very next day, Mission Presbytery voted to do what the Court would not allow and appointed an Administrative Commission with, among other things, the following authority:

13

Item 1: To take all necessary steps, if it becomes evident that the church is in "schism," to discern the "true church" within the Presbyterian Church (U.S.A.) in this matter [G-4.0207];

Item 2 To have access to all church records [G-3.0107], including but not limited to: membership rolls, minutes of Session and all boards and committees, minutes of congregational meetings, financial records, the church website, membership directories, newsletters, and materials distributed for sessional or congregational information;

Item 3 To have access to relevant records having to do with corporate officers, corporate articles, bylaws, and/or charters, including changes to any of these during the last 10 years [G-3.0108];

Item 5 If it becomes necessary, to assume original jurisdiction over the Session [G-3.0303e], with full authority and power to (a) provide for worship, sacraments, and continuing pastoral care of all members of the congregation, in the spirit of the Gospel of Christ; (b) to receive and act on requests from members to be transferred or deleted from the rolls; (c) to have authority to call necessary congregational meetings, and to obtain current and accurate membership lists from the church for this purpose. (emphasis added).

Meeting Minutes of Mission Presbytery, October 24, 2015, attached hereto as Exhibit "L."

On October 28, 2015, FPC San Antonio filed its motion for reconsideration of the denial of its application for temporary injunction, based upon Mission Presbytery's formation of the Administrative Commission. Mission sent letters to the pastors of FPC San Antonio stating they may have renounced

14

jurisdiction. This would mean the pastors could not serve as pastors at FPC San Antonio.

On Friday, October 30, 2015, at 4:30 p.m., Judge John D. Gabriel granted the motion and issued a temporary injunction preventing Mission Presbytery from exercising original jurisdiction over FPC San Antonio. The language of the Temporary Injunction, a true and correct copy of which is attached as Exhibit "M," is identical to that of the permanent injunction in the instant case.

Had the trial court not granted the temporary injunction, Mission Presbytery could have threatened to replace the session of FPC San Antonio and assume control of the property and assets of the church and the corporate governance of the church. Indeed, if the presbytery had attempted to replace the session of FPC San Antonio, the new session could have non-suited the lawsuit and effectively precluded any court from ever deciding the property question. The trial judge had previously denied FPC San Antonio's request for a temporary injunction because he did not find an imminent danger. *See* Exhibit "K." This may have been based on presbytery's statements it was not threatening administrative action.[8] As soon

---

[8] During the temporary injunction hearing, counsel representing the presbytery argued that FPC's fears that Presbytery would use an Administrative Commission to begin asserting rights over FPC's property were unfounded and entirely without evidence. The Rev. William Poe, the Interim Stated Clerk for Mission Presbytery, testified that

15

as the TRO was lifted, however, the presbytery took immediate action to try to take control of the church.

Despite statements to the contrary in both the Houston and San Antonio cases, a presbytery is required by the PCUSA rulings cited above to enforce the Trust Clause and protect the denomination's alleged beneficial interest in the property of the local church. In the absence of a court injunction, presbyteries have asserted ecclesiastical remedies against the local churches to preclude the churches' rights to a judicial determination of their property rights under Texas law.

The alleged "ecclesiastical" powers of a presbytery clearly infringe on the property rights of the local church. But for the temporary injunction entered by Judge Gabriel in the FPC San Antonio case, Mission Presbytery's administrative actions would have changed the status quo in the following ways:

> Item 1 gave the Administrative Commission authority to declare the "true church" and specifically cites G-4.0207 of the PCUSA Book of Order. Section G-4.0207 states that the faction identified by the Presbytery as the "true church" *is entitled to the property;*

> Item 2 demanded that the Presbytery be given access to all church records and its website, and specifically cited G-3.0107, yet the text of G-3.0107 plainly declared that, "minutes and all other official records of councils *are the property* in perpetuity of said councils or their legal successors;"

---

he was not aware of any intent by Mission Presbytery to restrict FPC San Antonio from performing any of its ministries in the future. *See* Exhibit "N" at 56.

Item 3 demanded Presbytery have access to various corporation records, specifically citing G-3.0108.  Section G-3.0108 says nothing at all about records of a civil corporation.  It is restricted only to ecclesiastical records of a "council" (defined at G-3.0101 not as civil entities but as the ecclesiastical bodies of session, presbytery, synod, and the General Assembly.  In any event, ***"personal property"*** ***encompasses "records"***, whether corporate or ecclesiastical;

Item 5 also would disturb the status quo of FPCSA's real property.  It would empower the administrative commission to assume original jurisdiction over the session, which is the governing body of FPCSA.  According to G-3.0303e, which item 5 specifically cited, <u>an administrative commission that assumes original jurisdiction over a session assumes "the full power of session."</u>  (Emphasis added.)  The responsibilities of the session are set forth at G-3.0201c, and include ***"managing the physical property of the congregation…"***

*See* Exhibit "L."

Therefore, when an administrative commission assumes original jurisdiction to seize control of a church's local governing body, it necessarily seizes the day-to-day management of its property as it is ordinarily used and controlled by the local church.  Rather than taking title to the assets directly, Mission Presbytery would have taken control of the assets and governance of the non-profit corporation.  The effect would be the same:  to significantly alter the status quo.

The PCUSA encouraged the presbyteries to take administrative action in a carefully defined strategy laid out in 2012.  The Office of the General Assembly at PCUSA headquarters in Louisville, Kentucky issued a Legal Strategy Memoranda to guide and direct presbyteries on how to implement the denomination's trust

claim over churches that are considering leaving the PCUSA. *See* Exhibit "O." It advises the use of administrative commissions to effect seizure and control of local church property, freezing local church assets, filing *lis pendens*, sending letters to the local church's banks and insurers, changing the locks and securing the grounds, replacing local church leadership and determining the religious background of any judge assigned to adjudicate a civil case.

Injunctive relief has been necessary to stop such action by the PCUSA against churches in other states. In *Carrollton Presbyterian Church v. Presbytery of South Louisiana of Presbyterian Church* (U.S.A.), 172 S.W.3d 1, 12, (La. Ct. App 2015), *writ denied*, 171 So.3d 257 (La. 2015), the Presbytery (under the same Synod as Presbytery of New Covenant and Mission Presbytery) was sanctioned $390,000.00 for attempting to interfere with the trial court's injunction by attempting to dissolve the local church and for discovery abuses. The formation of the administrative commission in that case was similar to the action taken against FPC San Antonio. The only sure way to protect a church against loss of control of its assets and local governance is by protecting a church's procedural rights through issuing an injunction. Injunctive relief is essential to the protection of the status quo and the right of a local church to obtain judicial review of its substantive property rights.

**III.    The language of the injunction is constitutional.**

The language of FPC Houston's permanent injunction does not unconstitutionally infringe upon the First Amendment rights of New Covenant. There are many instances throughout the U. S., including Texas, where courts have acted to prevent property usurpation by presbytery-appointed administrative commissions so that the court would have an opportunity to resolve the property issues. New Covenant's reliance on *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), is misplaced. In *Milovojevich*, the civil corporation that owned and controlled the property was chaired by the bishop. The national denomination selected the bishop—an exceptional case where resolution of the property issue was made expressly dependent on a religious question. In the case at bar, there are no analogous facts. In stark contrast with *Milovojevich*, this case presents a *Masterson*-type inquiry in which the court can review the corporate documents of the non-profit corporation, the deeds to the property and the constitution of the denomination and determine the rights and interests in the property under trust and corporation law. *Masterson* at 604.

The language of FPC Houston's permanent injunction is identical to that of the temporary injunction signed in the FPC San Antonio case and in *Carrollton Presbyterian Church v. Presbytery of South Louisiana*, 77 So.3d 975; 2011 (La.

19

App. 1 Cir., 2011).  In the latter case, the presbytery of South Louisiana contended, as New Covenant now contends, that the various prohibitions in the injunction interfered with the internal ecclesiastical governance of the presbytery and the powers granted to presbytery by the Book of Order.  However, after carefully considering the text of the Injunction the Louisiana court concluded:

> [W]e find no unconstitutional breach by the district court.  The injunctive relief is narrowly focused and restricted to actions affecting the property that is the subject matter of this litigation … The prohibited actions enumerated in the Injunction are specifically limited to instances affecting the instant church property dispute. Thus, we find no error.

*Id.* at 984.  The presbytery subsequently sought writs to the Louisiana Supreme Court and to the U.S. Supreme Court, which were denied.  With this judicially-approved template, identically worded injunctions have subsequently been approved by at least ten other judges, state and federal, in courts in Louisiana, Mississippi, Missouri, and Texas.[9]

---

[9] *New Covenant Presbyterian Church, Inc. v. MP of South Louisiana of the Presbyterian Church (USA)*; Suit Number 602832; Section 27, 19th Judicial District Court, East Baton Rouge Parish, Louisiana; *First Presbyterian Church PCUSA of Starkville, Mississippi v. Presbytery of St. Andrew, Presbyterian Church U.S.A., Inc.*; Cause No. 2015-0151-D, In the Chancery Court of Oktibbeha County, Mississippi; *First Presbyterian Church of Greenwood, Inc. v. Presbytery of St. Andrew, Presbyterian Church U.S.A., Inc.;*  Cause No. G15-0064, In the Chancery Court of Leflore County, Mississippi; *First and Calvary Presbyterian Church v. John Calvin Presbytery*; Cause No. 1531-CC00924, In the Circuit Court of Greene County, Missouri; *First Presbyterian Church of Wichita Falls v. Palo Duro Presbytery*; Cause No. 182,783-B, 78th Judicial District Court, Wichita County, Texas; *Highland Park Presbyterian Church, Inc. v. Grace Presbytery, Inc.*; Cause No. DC-13-10605, 298th Judicial District Court, Dallas County, Texas; *Highland Park Presbyterian Church Inc. v. Grace Presbytery, Inc.;* Civil Action No. 3:13-CV-3813-B, United States District Court, Northern District of Texas, Dallas Division; *First Presbyterian Church of Houston v. Presbytery of New Covenant, Inc.*; Cause No. 2014-30354, 234th Judicial District Court, Harris County, Texas; and *First Presbyterian Church of San Antonio v. Mission Presbytery*, Cause No. 2015-CI-07858, filed in the 73rd Judicial District Court of Bexar County, Texas.

In *Carrollton Presbyterian Church*, the Synod of the Sun demonstrated its propensity to overrule a presbytery's judgment and force the presbytery to seek original jurisdiction over the local church to gain control of the property. 77 So. 3d at 981. Therefore, even if the presbytery is true to its word and does not seek to appoint an administrative commission to seize original jurisdiction over the local church, the Synod can force the presbytery's hand. [10]

Ultimately, the objective of the PCUSA is to prevent churches from leaving the denomination with their property. A congregation, however, has a right under the First Amendment of the U. S. Constitution to voluntarily affiliate with another denomination.[11]   New Covenant similarly argues that the injunction unconstitutionally involves the court system and violates its First Amendment rights by requiring it to allow FPC Houston to remain part of the PCUSA. This claim is entirely without merit. Nothing in the injunction prevents the presbytery

---

[10] Presbytery of New Covenant, Inc., Mission Presbytery, and Presbytery of South Louisiana of Presbyterian Church (U.S.A.) are all members of Synod of the Sun, the same synod which was sanctioned in the *Carrollton Presbyterian Church* case.

[11] Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of liberty. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny. *NACCP v. Alabama,* 357 U.S. 449, 460-61 (1958). *See also*, *Robert v. United States Jaycees*, 468 U.S. 609, 623 (1984); *Disabato v. South Carolina Association of School Administrators*, 404 S.C. 433, 445, 746 S.E.2d 329, 335 (2013); *accord Harris v. Quinn*, 134 S.Ct. 2618, 2629 (2014). Subsequent court decisions made clear the logical corollary of the right to associate: the right *not* to associate, just as one who decides to speak also has the right to decide what not to say. Many courts have acknowledged the voluntary nature of denominational membership by a local church. *See*, *Presbytery of Beaver Builder v. Middlesex*, 489 A.2nd 1317, 1324 (PA 1985); *Accord Presbytery of Donegal v. Calhoun¸* 999 Pa. Cmwlth 300, 513 A.2nd 531 (1986); *Presbytery of Donegal v. Wheatley,* 99 Pa. Cmwlth 312, 513 A.2d 538 (1986). *See also*, *First Presbyterian Church of Schenectady v. United Presbyterian Church*, 62 N.Y.2nd 110, 120, 121, 476 N.Y.S. 2nd 86, 464 N.E.2d 454, *cert denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). *See also*, *Fluker v. Hitchens*, 419 So.2d 445 (La. 1982) ("Whatever authority a hierarchical organization may have over associated local churches is derived solely from the local church's consent.").

21

from exercising its right to disassociate from a particular church under the First Amendment.

This does not mean, however, that a court of law cannot consider the rights of the parties in the property of the local church. That is precisely the question *Masterson* addressed. The Supreme Court of Texas rejected the "deference" to the denominational hierarchy approach and adopted the "neutral principles of law" methodology to be used in disputes over ownership of church property. *Masterson* at [2]. The injunction in this case is narrowly tailored to protect property rights. The portion of the injunction pertaining to ministers or members of the church is limited to action that "pertains to ownership, control, use or disposition of" property. The injunction also states that a presbytery may take "ecclesiastical action for a non-pretextual ecclesiastical cause that is unrelated to the litigation or any property issues." *See* Permanent Injunction. (Emphasis added.) The language of the injunction is clearly limited to property issues.

This court has jurisdiction—and, in fact, the obligation—to determine the rights and interests of the parties to this dispute as regards the property of FPC Houston. Courts are to "decide *non-ecclesiastical issues such as property ownership* based on the same neutral principles of law applicable to other entities, *Jones v. Wolf*, 443 U.S. 595, 603-04 (1979), while deferring to religious entities' decisions on ecclesiastical and church polity questions. *See Serbian E. Orthodox*

22

*Diocese v. Milivojevich*, 426 U.S. 696, 708 (1976)." *Id.* (emphasis added) The Supreme Court has expressly held that questions of property ownership are not ecclesiastical in nature, as argued by the PCUSA. The injunction states that a presbytery may take "ecclesiastical action for a non-pretextual ecclesiastical cause that is unrelated to the litigation or any property issues."

The courts also must protect the procedural right of a church to obtain a legal determination of its substantive property interests.[12] Accordingly, courts must address whether an applicant is entitled to preservation of the status quo pending trial on the merits. *Khaledi v. H.K. Global Trading, Ltd.*, 126 S.W.3d 273, 279-80 (Tex. App.–San Antonio 2003, no pet.) (citation omitted). As demonstrated above, without the protection of an injunction, the PCUSA will send listening teams or administrative commissions to the churches to assume control of church property and governance of the non-profit corporation. In so doing, the local church will be prevented from seeking a determination of its rights and interests in its property. Local churches must have legal protection for their procedural rights as well as their substantive property rights. Otherwise, the substantive rights will be lost. Injunctions are required to preserve the status quo; to protect the congregation's right of free association under the First Amendment

---

[12] In *Jones v. Wolf*, the Augusta-Macon Presbytery had appointed an administrative commission whose "assumption of original jurisdiction" and concomitant seizure of property control was necessarily blocked by the courts. Otherwise, the application of neutral principles of law to resolve the property dispute would have been a moot issue and the U.S. Supreme Court would not have remanded the case for further proceedings consistent with its opinion. *Jones* at 597, 598.

of the U.S. Constitution; to protect the right of self-governance under the Texas Business Organization Code; and to assure access to the courts for a determination of substantive property rights. In summary, local churches need injunctive relief to prevent the agents of the PCUSA from usurping their legal rights under the pretext that property rights constitute religious doctrine.

Respectfully submitted,


DYKEMA COX SMITH
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500 – Telephone
(210) 226-8395 – Facsimile



/s/ David B. West
David B. West
State Bar No. 21196400
Ellen B. Mitchell
State Bar No. 14208875
Counsel for First Presbyterian
Church of San Antonio

24

## CERTIFICATE OF COMPLIANCE

The undersigned certifies this brief complies with the type-face and length requirements of amended rule 9.4 of the Texas Rules of Appellate Procedure. Exclusive of the exempted portions stated in amended rule 9.4(i)(1), the brief contains 5,952 words, as calculated by Microsoft Word 2010, the program used to prepare this document.

Date:  December 18, 2015

/s/ David B. West
David B. West

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Amicus Brief of First Presbyterian Church of San Antonio In Support of Appellant First Presbytery Church of Houston has been forwarded to all counsel and parties of record listed below by certified mail, return receipt requested, on this the 18th day of December, 2015.

Reagan M. Brown
Reagan.brown@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas  77010
*Counsel for Appellant Presbytery of New Covenant, Inc.*

Adam P. Schiffer
aschiffer@sohjlaw.com
Kenneth P. Held
kheld@sohjlaw.com
Penelope Nicholson
pnicholson@sohjlaw.com
SCHIFFER ODOM HICKS & JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, Texas  77002
*Counsel for Appellant Presbytery of New Covenant, Inc.*

Kristin L. Smith
Kristin.smith@bgllp.com
Tony L. Visage
Tony.visage@bgllp.com
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas  77002
*Counsel for Presbyterian School*

David M. Gunn
dgunn@beckredden.com
Erin H. Huber
ehuber@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas  77010
*Counsel for Appellee, First Presbyterian Church of Houston*

Thomas W. Paterson
tpaterson@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas  77002
*Counsel for Appellee, First Presbyterian Church of Houston*

Kent C. Krause
kkrause@cdklawfirm.com
CRADDOCK DAVIS & KRAUSE LLP
3100 Monticello Avenue, Suite 550
Dallas, Texas  75205

Lloyd Lunceford
Lloyd.lunceford@taylorporter.com
TAYLOR, PORTER, BROOKS & PHILLIPS
451 Florida Street, Eighth Floor
Baton Rouge, Louisiana 70801

/s/ David B. West
David B. West

4842-9167-7739.4

27

# Exhibit A

# PERMANENT JUDICIAL COMMISSION
## OF THE GENERAL ASSEMBLY
## PRESBYTERIAN CHURCH (U.S.A.)

| | | |
|---|---|---|
| Wilber Tom, David Hawbecker, and Thomas Conrad, Appellants (Complainants), | ) ) ) ) | Decision and Order Remedial Case 221-03 |
| v. | ) ) | |
| Presbytery of San Francisco, Appellee (Respondent). | ) ) | |

## Arrival Statement

This filing before the Permanent Judicial Commission of the General Assembly (GAPJC or this Commission) is an appeal of a Decision of the Permanent Judicial Commission of the Synod of the Pacific (SPJC) rendered on March 23, 2012. The Notice of Appeal was received by the Stated Clerk of the General Assembly on May 10, 2012.

## Jurisdictional Statement

This Commission finds that it has jurisdiction, that Appellants have standing to file the Appeal, that the Appeal was properly and timely filed, and that the Appeal states one or more of the grounds for appeal under D-8.0105.

## Appearances

Wilbert Tom, David Hawbecker, and Thomas Conrad (Appellants), were represented by JoAn Blackstone. Presbytery of San Francisco (Presbytery or Appellee) waived its appearance at the hearing and chose to rely on its written submissions.

## History

Presbytery formed a workgroup on December 11, 2008, to develop a policy regarding any church located in the Presbytery that wished to be dismissed from the Presbyterian Church (U.S.A.) (PC(U.S.A.)). Scott Farmer (Farmer), Senior Pastor, Community Presbyterian Church of Danville (Danville) served on that workgroup. While the exact date is unknown, it is not disputed that Danville had begun discussions regarding the dissolution of their relationship with the PC(U.S.A.) at the time of Farmer's selection to the policy workgroup.

Presbytery, at its September 15, 2009, stated meeting, adopted what was known as the "Gracious Dismissal Policy" (GDP) as a result of the recommendation of the policy workgroup. While the GDP acknowledged *Book of Order* G-8.0201 (now G-4.0203) (the Trust Clause) that

1

provides all property held by or for a congregation "is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)," the GDP interpreted the Trust Clause "to reflect the church's organic unity as it fulfills 'The Great Ends of the Church,' strengthening its ability to guide its member churches into their witness to the broader community." The GDP found that it was "the right of a congregation to seek and request dismissal with its property to another reformed denomination." The GDP also set forth that the Trust Clause was not to be used as a weapon to threaten civil action against a congregation over issues of conscience.

To mitigate financial impact on mission and ministry of Presbytery, the GDP requested the congregation seeking dismissal to pay Presbytery annually for five years: (1) funds to offset declining per capita and (2) funds to offset a declining contribution to the mission budget. The GDP did not mention payment of any other funds to Presbytery, such as payment for the value of the congregation's real property and other assets.

Five months after the adoption of the GDP by Presbytery, the session of Danville, of which Farmer was moderator, notified Presbytery in February 2010 of its intention to seek dismissal to the Evangelical Presbyterian Church (EPC). Pursuant to the GDP, a Presbytery Engagement Team (PET) was appointed by Presbytery during its stated meeting on April 13, 2010, to work with the session and congregation of Danville to effect reconciliation, if possible, or to negotiate the terms of the dismissal. Also pursuant to the terms of the GDP, Danville formed a Special Committee of the Congregation (SCC), on which Farmer participated, to negotiate with PET. During a called congregational meeting on September 12, 2010, Danville voted to seek dismissal from the PC(U.S.A.) pursuant to the terms negotiated by PET and SCC. The terms of the negotiation were subject to approval by Presbytery.

According to the testimony of members of PET, the GDP did not include a requirement to consider the value of the congregational property for the use and benefit of the PC(U.S.A.). Under the terms of the final agreement reached with PET, Danville agreed to make a lump sum payment of $108,640 to Presbytery to compensate for declining per capita. Additionally, Danville agreed to pay $42,000 per year for five years to support targeted PC(U.S.A.) ministries, missions and ministers. No other monies were contemplated or discussed by PET with SCC.

At its November 9, 2010, stated meeting, Presbytery conditionally approved the terms of the dismissal as set forth by PET and SCC. The resolution provides:

The effective date of [Danville's] dismissal will be November 10, 2010. If there is no stay or filing of a complaint during a 90-day waiting period, consistent with the interval identified in the Presbyterian Church (U.S.A.) *Book of Order* for the filing of stays and complaints, full implementation will occur on February 9, 2011.

At that same meeting, Presbytery voted to suspend the GDP. Subsequently, Presbytery adopted a new GDP which is not relevant to this appeal.

On February 2, 2011, within the 90-day time frame approved by Presbytery, Appellants filed a remedial complaint against Presbytery with the SPJC. On June 4, 2011, SPJC answered all the preliminary questions affirmatively under D-8.0105. An amended complaint was filed on October 14, 2011.

2

Trial was held on March 22, 2012. At the beginning of the trial, Appellants moved to disqualify a commissioner pursuant to D-7.0401b(2), alleging that the commissioner was predisposed to rule against Appellants as evidenced by the "tenor of his comments" set forth in an October 6, 2011, email. The motion was denied by SPJC.

During the trial a number of documents were offered for inclusion in the record. These documents included the PC(U.S.A.)'s *Amicus Curiae* Brief before the California Supreme Court and the Annual Statistical Report of Danville which had been sent to the Stated Clerk of Presbytery. The moderator sustained Presbytery's objections to the admission of these documents. The Appellants objected to the admission of other documentary evidence, including an email from a PET member summarizing her conversation with a representative of the Department of Constitutional Services within the Office of the Stated Clerk. Appellants' objections were overruled.

Additionally, while questioning a witness, a commissioner stated, "The agreement that you struck between the Presbytery and CPC Danville, my home church, also referred to as CPC, so Central, however, has several points in it with subpoints." Neither party made an objection regarding disqualification of this commissioner at that time for any possible conflict of interest, if the commissioner meant by his comment that Danville was his "home church."

On March 23, 2012, SPJC ordered that the action of Presbytery on November 9, 2010, dismissing Danville pursuant to the terms of the agreement, be affirmed.

On May 7, 2012, Appellants mailed their Notice of Appeal to the GAPJC and all other appropriate recipients. During the Presbytery stated meeting on May 8, 2012, the PET reported that the new implementation date of the agreement would fall between May 21 and May 26, 2012. Appellants believe that PET, at this stated meeting, was aware of the Notice of Appeal to the GAPJC.

On May 18, 2012, the GAPJC issued its preliminary order finding that it had jurisdiction, that the Appellants had standing to file the Appeal, that the Appeal was properly and timely filed, and that the Appeal stated one or more of the grounds for appeal under D-8.0105. Notice of such GAPJC decision accepting the Appeal was timely mailed to the parties. On May 21, 2012, Presbytery executed quitclaim deeds to Danville and Danville paid the per capita and mission funds pursuant to the agreement.

### Specifications of Error

*Specification of Error No. 1:* *(Appellants' Specification of Error No. 1) The proceedings of the Synod Permanent Judicial Commission (SPJC) were irregular, in that the decision is inconsistent with substantial evidence from the testimony of witnesses at the trial, that in determining the terms of its dismissal of a large suburban church the Presbytery of San Francisco (Presbytery) failed to consider or to understand the meaning of the property trust clause (G-4.0202, formerly G-8.0201) or that the church property in question was in fact unequivocally owned by the Presbyterian Church (U.S.A.).*

3

<u>This Specification of Error is sustained.</u>

*See the rationale below Specification of Error 7.*

*<u>Specification of Error No. 2:</u> (Appellants' Specification of Error No. 10) The SPJC erred in constitutional interpretation, in that it failed to apprehend or give effect to the plain meaning of the language of the express trust now at G-4.0203 (formerly G-8.0201) in the context of a church seeking dismissal, that all property held by a congregation "is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."*

<u>This Specification of Error is sustained.</u>

*See the rationale below Specification of Error 7.*

*<u>Specification of Error No. 3:</u> (Appellants' Specification of Error No. 11) The SPJC erred in constitutional interpretation, in that it failed to consider or give effect to a relevant Authoritative Interpretation (AI) of the Book of Order (Request 9-88), an answer provided by the General Assembly of 1988 on the recommendation of the Advisory Committee on the Constitution (ACC) which, in the context of a presbytery's response to a church seeking dismissal, interprets the property trust clause to require proper consideration to be given to the interests of the Presbyterian Church (U.S.A.) as provided in Chapter VIII. This AI goes on to say, "in particular, G-8.0201 recognizes the principle that all property for or by a particular church is held in trust for the use and benefit of the Presbyterian Church (U.S.A.) Thus the Presbyterian Church (U.S.A.) is a party in interest when a presbytery takes action with respect to a request to dismiss a church with its property."*

<u>This Specification of Error is sustained.</u>

*See the rationale below Specification of Error No. 7.*

*<u>Specification of Error No. 4:</u> (Appellants' Specification of Error No. 12) The SPJC erred in constitutional interpretation, in that it failed to consider or give effect to a subsequent AI of the property trust clause, in an answer provided by the General Assembly in 1989 on the recommendation of the ACC: "When dealing with a request by a church for dismissal with its property pursuant to G-11.0103i and G-11.0103y, the presbytery is responsible for exercising the express trust provisions of G-8.0201 recognizing and protecting the interests of the Presbyterian Church (U.S.A.). Separate consideration should be given to the questions of dismissing the congregation, the disposal of property, and the relationships of ministers of Word and Sacrament." "Each request for dismissal should be considered in the light of the particular situation and circumstances involved."*

<u>This Specification of Error is sustained.</u>

*See the rationale below Specification of Error No. 7.*

*<u>Specification of Error No. 5:</u> (Appellants' Specification of Error No. 13) The SPJC erred in constitutional interpretation, in that it disregarded testimony of members of the Presbytery's*

4

*PET who had negotiated the terms of dismissal of the CPCD and whose recommendation the Presbytery had adopted. This testimony demonstrated, among other things, a consistent failure to understand the meaning of the property trust clause as expressed in the Book of Order, a failure to have read or considered relevant Authoritative Interpretations of the Constitution, an apparent failure to understand that the PC (U.S.A.) owned the church property, a failure to grasp the fact that a transfer of the real property without consideration amounted to a gift, an exclusive reliance on the Presbytery's previously approved dismissal policy as understood by members of the PET, a failure to understand how to apply the trust clause other than in the context of specific process steps in the policy, and a belief that the policy precluded even having a discussion about having the church property remain in the hands of the denomination or asking for any payment for the property upon its transfer.*

This Specification of Error is sustained.

*See the rationale below Specification of Error No. 7.*

*Specification of Error No. 6: (Appellants' Specification of Error No. 14) The SPJC erred in constitutional interpretation, in that it upheld the Presbytery's action as being within its discretion as trustee of the church property, based on Presbytery's contention that the transfer of the property without consideration would serve "the Great Ends of the Church" and further the "total ministry and witness for Christ," thus making any further recognition of the property trust unnecessary or inappropriate.*

This Specification of Error is sustained.

*See the rationale below Specification of Error No. 7.*

*Specification of Error No. 7: (Appellants' Specification of Error No. 15) The SPJC erred in constitutional interpretation, in that its decision would indicate that a presbytery has unfettered discretion with respect to church property being used by a congregation seeking dismissal to another Reformed denomination, while the Book of Order places the fiduciary and related responsibilities of a trustee of the property on the presbytery.*

This Specification of Error is sustained.

Presbytery voted to approve the transfer of the valuable Danville property unless a complaint or stay was filed within 90 days. A complaint was so filed. Following the ruling by SPJC, a new implementation date for the agreement was set. In the interim, an appeal was filed to this Commission and accepted with a preliminary order being entered May 18, 2012. Nevertheless, on May 21, 2012, Presbytery executed a quitclaim deed to Danville before this Commission was able to conduct the hearing on this appeal.

Presbytery, having transferred title while this case was pending, argued that the transfer of title renders the case moot because the quitclaim deed had been signed and could not be revoked.

5

Notwithstanding the transfer of title, in cases where circumstances prevent a remedy, this Commission may exercise its declaratory authority to provide guidance to lower councils and prevent future violations. *Daniel J. McKittrick v. The Session of the West End Presbyterian Church* (Remedial Case 215-5, 2003).

The *Book of Order* provides in G-8.0201 (now G-4.0203) that:

All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a congregation or of a higher council or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

Under the Trust Clause, a presbytery's discretionary authority to determine property rights, while broad, must be guided by the presbytery acting as a fiduciary for the benefit of the PC(U.S.A.), the beneficiary of the Trust Clause. A congregation's financial and all other assets are also understood to be covered by the Trust Clause. *Chesterbrook Taiwanese PC v. National Capital Presbytery*, Remedial Case 217-12, 2006.

Under the fiduciary obligations inherent in the Trust Clause, a presbytery must take into consideration the PC(U.S.A.)'s use and benefit of the property in every decision concerning its disposition. To comply with the Trust Clause, the presbytery must consider the interest of PC(U.S.A.) as a beneficiary of the property. Payments for per capita or mission obligations are not satisfactory substitutes for valuations of the property held in trust. (G-4.0203)

The Trust Clause reflects our understanding of the church as a communion of saints across time, with responsibilities both to those who came before and those who will follow. When a congregation seeks to leave the PC(U.S.A.), it is breaking what is often a significant historic relationship; it is also departing from a fellowship in which its officers have participated, by whose polity they have pledged to be governed, and with which many members may feel bonds of affection.

Based on an examination of the record, this Commission finds that the GDP developed by Presbytery, its implementation, and SPJC in its trial decision, failed to duly consider the economic interests of the PC(U.S.A.). Such consideration is essential. SPJC's exclusion of documents which were the most convincing evidence of the position of PC(U.S.A.) in regard to the Trust Clause and of the financial position of Danville, strongly supports the allegation of erroneous interpretation. Failure to consider the property value and the PC(U.S.A.)'s beneficial interest in the property was a fatal omission of the trustee's duty to the PC(U.S.A.).

The justification given by Presbytery for dismissal of the Danville church with property, which included only "Great Ends of the Church" and avoidance of litigation, was erroneously upheld by SPJC. While certainly valid, such considerations alone are not sufficient to satisfy the due diligence requirement imposed by the Trust Clause. SPJC erred in finding that due consideration had been given to the interest of the PC(U.S.A.) as the trust beneficiary under the *Constitution*. Due diligence, of necessity, will include not only the spiritual needs of the

6

congregation and its circumstances, but an examination of the congregation's financial position and the value of the property at stake. It is undisputed that Presbytery failed to make such an examination. SPJC erred in failing to require that financial due diligence be undertaken by Presbytery.

*Specification of Error No. 8:* *(Appellants' Specification of Error No. 2) The proceedings of the SPJC were irregular, in that one of its commissioners made a comment, before a witness could answer a question, to the effect that the attorney-client privilege would preclude answering the question, and cast doubt on the witnesses' ability to waive the privilege.*

This Specification of Error is not sustained.

There was no error in having the question of attorney-client privilege raised by a commissioner. If the moderator was incorrect in finding that the witness could not waive the privilege, such ruling was harmless because ultimately the witness was allowed to testify concerning the information objected to.

*Specification of Error No. 9:* *(Appellants' Specification of Error No. 3) The proceedings of the SPJC were irregular, in that in questioning a witness one of its commissioners made reference to, and quoted, a provision of the Book of Order that was not in effect at the time of the disputed action (G-4.0201), thus providing misleading support for the Presbytery's position.*

This Specification of Error is not sustained.

References to provisions of the *Book of Order* are not evidence. They may be incorrect or untimely but they have no impact without a determination or decision being based on the provisions that are considered.

*Specification of Error No. 10:* *(Appellants' Specification of Error No. 4) The proceedings of the SPJC were irregular, in that one of its commissioners belatedly revealed, near the conclusion of the trial in which he had materially participated as described at 2. and 3., above and at other times during the proceedings, that the "Danville church" (the church that was to have been dismissed by the Presbytery under the disputed terms), was his home church. In addition, there is nothing from the record that would indicate other than the same commissioner's full participation in the SPJC deliberations that followed the trial, despite the appearance of a significant conflict of interest.*

This Specification of Error is not sustained.

Having reviewed the record, it is clear the commissioner was not referring to Danville as his home church. Support for this conclusion can be found in that there was no objection or question of conflict of interest raised by anyone after his statement.

*Specification of Error No. 11:* *(Appellants' Specification of Error No. 5) The SPJC erred in declining to receive as proper evidence the Amicus Curiae Brief of Clifton Kirkpatrick et al. in support of the position of the Episcopal Church before the Supreme Court of California in the*

*Episcopal Church Cases. This brief sets forth the official legal position of the Presbyterian Church (U.S.A.) with respect to church property as provided in the property trust clause in the Book of Order.*

<u>This Specification of Error is sustained.</u>

Failure to receive the *Amicus Curiae* Brief into the record was an abuse of discretion in that it was a clear statement of the legal position of the PC(U.S.A.) as it related to the Trust Clause. Recognition of the legal position of the PC(U.S.A.) as the beneficiary under the Trust Clause is integral to any presbytery analysis concerning disposition of church property.

*<u>Specification of Error No. 12:</u> (Appellants' Specification of Error No. 6) The SPJC erred in declining to receive as proper evidence the Annual Statistical Report for the Community Presbyterian Church of Danville (CPCD), which was sent by its Clerk of Session to the Stated Clerk of the Presbytery of San Francisco. Appellants believe this report provides useful information concerning the number of members and financial strength of CPCD, matters which the Presbytery failed to consider but should have considered in negotiating the terms of its dismissal.*

<u>This Specification of Error is sustained.</u>

The failure to receive the report on Danville was an abuse of discretion because it provided relevant information which should have been considered as part of the dismissal.

*<u>Specification of Error No.13:</u> (Appellants' Specification of Error No. 7) The SPJC erred in receiving as proper evidence a copy of an E-mail communication from a member of the Presbytery Engagement Team (PET), the ad hoc committee that was charged with negotiating the terms of dismissal with representatives of CPCD, to the other members of the PET, describing her telephone conversation with a third party, despite her testimony that there was no follow-up discussion of its contents on the part of the PET and hence no indication that the PET based its actions on that conversation or E-mail message.*

<u>This Specification of Error is not sustained.</u>

There was no abuse of discretion by SPJC in receiving such evidence.

*<u>Specification of Error No. 14:</u> (Appellants' Specification of Error No. 8) The SPJC erred in receiving as proper evidence a copy of an E-mail communication from a member of the PET to the other members of the PET in which she related her understanding of the reasons for the CPCD Sessions' desire to leave the PC(U.S.A.). At no time was any evidence testimony produced to suggest that the Presbytery's terms of dismissal were influenced in any way by the matters discussed in that communication.*

<u>This Specification of Error is not sustained.</u>

There was no abuse of discretion by SPJC receiving such evidence.

8

*Specification of Error No. 15: (Appellants' Specification of Error No. 9) For the reasons stated at 10 (Appellants' 4) and 14 (Appellants' 8), above, there was a manifestation of prejudice in the conduct of the case.*

This Specification of Error is not sustained.

This Commission did not sustain either Specifications of Error No. 10 or No. 14 (Appellants' No. 4 and No. 8). Therefore, there was no manifestation of prejudice as a result of the conduct alleged in those Specifications of Error.

## Decision

When the lower council's actions cannot be undone, this Commission may exercise its declaratory authority to provide guidance to lower councils and to prevent future violations.

When a congregation seeks dismissal under G-11.0103i (now G-3.0301a), it is the responsibility of the presbytery to fulfill its fiduciary duty under the Trust Clause. This fiduciary duty requires that the presbytery exercise due diligence regarding the value of the property of the congregation seeking dismissal. Due diligence, of necessity, includes not only an evaluation of the spiritual needs of the congregation and its circumstances but also financial analysis of the value of the property at stake. Payments for per capita or mission obligations are not satisfactory substitutes for the separate evaluation of the value of the property held in trust.

## Order

IT IS THEREFORE ORDERED that the Decision of the Synod of the Pacific Permanent Judicial Commission is affirmed in part and reversed in part as set forth above.

IT IS FURTHER ORDERED that the Stated Clerk of the Synod of the Pacific report this Decision to the Synod of the Pacific at its first meeting after receipt, that the Synod of the Pacific enter the full Decision upon its minutes, and that an excerpt from those minutes showing entry of the Decision be sent to the Stated Clerk of the General Assembly.

IT IS FURTHER ORDERED that the Stated Clerk of the Presbytery of San Francisco report this Decision to the Presbytery of San Francisco at its first meeting after receipt, that the Presbytery of San Francisco enter the full Decision upon its minutes, and that an excerpt from those minutes showing entry of the Decision be sent to the Stated Clerk of the General Assembly.

## Absences and Non-Appearances

Commissioner Mary Charlotte McCall was not present and did not participate in this decision. Commissioner Patrick Notley did not participate in this decision.

### Concurring Opinion of H. Clifford Looney and Terry Epling

We concur in the majority decision.

Transfers of property remain within the discretion of Presbytery but the Presbytery must be mindful of the interest of the PC(U.S.A.) in maintaining the presence of the denomination to meet the needs of that affected Community including that portion of the church membership that wishes to remain within the PCUSA.

We also join in the majority's conclusion that the language of the Gracious Dismissal Policy adopted by the Presbytery of San Francisco did not require adequate consideration of property retention issues. The needs of future congregations, the involved debt, the probability that a substantial number of dissenting members may be enabled to continue a PCUSA congregation would compel retention of a property or equity facilitating those or similar interests are all matters to be considered to be involved in the Presbytery trustee's decision. The Gracious Dismissal Policy did not require the PET to deal with those aspects of the dismissal decision.

However erroneous the omissions of the GDP, and the construction given by its PET, it may well have been within the discretion of the Presbytery to dismiss the Danville church with its property.

Many factors other than the attempt to be "gracious" with the Danville congregation may have been considered. Those include:

This Danville congregation acquired these assets and had been paying on them and had been successful in meeting the need of a Presbyterian witness for the Christian faith in this community for many years;

The church had tried development of other PC (USA) churches in the area without success;

Only 4% of the congregation voted against the dismissal decision;

The PET felt, apparently with substantial basis, that the needs of the community for Presbyterian witness to the faith would be met by this church as it was constituted, and that no plan for an additional church was presently feasible, so that there was no need to use any of the equities of the property interests of the church for that purpose; and that no resources of the denomination had been used in the form of loans, nor was there any remaining indebtedness which was not being assumed by the Danville church.

In short, there may have been no apparent reason to require retention by the PC (USA) of any property interest. With the evidence in that stature, the burden of proof that the Complainant would had to have met to show an abuse of discretion by the Presbytery would have been heavy.

10

The testimony of Lois Quick (record p. 262 & 286) indicates that the properties were encumbered by about three million dollars in debt that the Danville congregation agreed to pay in accepting the property. Rev. Kathy Runyeon indicates at page 174 of the record that the Presbytery had no competing plans for the property.

The facts here presented to the PET are not ones that suggest that there would be substantial benefit from retaining the property. What the Presbytery did in securing additional mission and per capita payments may or may not have been sufficient to "balance the books" in this particular scenario, but it was within their discretion once they exercised due diligence and considered all the factors inherently required by the fiduciary duty of a trustee.

## Certificate

We certify that the foregoing is a true and correct copy of the decision of the Permanent Judicial Commission of the General Assembly of the Presbyterian Church (U.S.A.) in Remedial Case 221-04, Wilbert Tom, David Hawbecker, and Thomas Conrad, Appellants (Complainants), v. Presbytery of San Francisco, Appellee (Respondent), made and announced at Louisville, KY this 28th day of October 2012.

Dated this 28th day of October, 2012.

_____

Bradley C. Copeland Moderator
Permanent Judicial Commission of the General Assembly

_____

Jay Lewis, Clerk
Permanent Judicial Commission of the General Assembly

I certify that I did transmit a certified copy of the foregoing to the following persons by Federal Express Next Day Air, directing C. Laurie Griffith to deposit it in the mail at Louisville, KY, this 28th day of October, 2012.

JoAn Blackstone, Counsel for Appellant (Complainant)
Linda Lee, Committee of Counsel for Appellee (Respondent)
Stated Clerk, Synod of the Pacific
Stated Clerk, Presbytery of San Francisco
General Assembly Permanent Judicial Commission

11

I further certify that I did transmit a certified copy of the foregoing to the Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.) by delivering it in person to Joyce Lieberman, on October 28, 2012.

_____
Jay Lewis, Clerk
Permanent Judicial Commission of the General Assembly

I certify that I received a certified copy of the foregoing, that it is a full and correct copy of the decision of the Permanent Judicial Commission of the General Assembly of the Presbyterian Church (U.S.A.), sitting during an interval between meetings of the General Assembly, in Louisville, KY on October 28, 2012 , Remedial Case 221-04 Wilbert Tom, David Hawbecker, and Thomas Conrad, Appellants (Complainants), v. Presbytery of San Francisco, Appellee (Respondent),, and that it is the final judgment of the General Assembly of the Presbyterian Church (U.S.A.) in the case.

Dated at Louisville, KY on October 28, 2012.

_____
Joyce Lieberman, Assistant Stated Clerk

12

# Exhibit B

## WHAT IS THE TRUST CLAUSE?

G-4.0203 of the *Book of Order* states:

> All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)"[1]

Presbyterian congregations emerge from the collective gifts of God's people and often include direct gifts from individuals, other congregations, presbyteries, synods, and the General Assembly. These gifts are not regarded as given for a single generation, but are held in trust for this generation and for future generations to come. Indeed, "the Trust Clause reflects our understanding of the church as a communion of saints across time, with responsibilities both to those who came before and those who will follow. When a congregation seeks to leave the Presbyterian Church (U.S.A.), it is breaking what is often a significant historic relationship; it is also departing from a fellowship in which its officers have participated, by whose polity they have pledged to be governed, and with which many members may feel bonds of affection."[2] Accordingly, the idea of holding property in trust has long been a part of the Presbyterian theology as well as a practice recognized by the U.S. Supreme Court (*Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872).[3]

## HOW DOES CHURCH UNITY RELATE TO THE TRUST CLAUSE?

*"There is one Church, for there is one Spirit, one hope, 'one Lord, one faith, one baptism, one God and Father of all, who is above all and through all and in all' (Eph. 4:5-6) (F-1.0302(a))*

Our polity reflects this theology of unity and oneness and the *Book of Order* reminds us that "unity is God's gift to the Church in Jesus Christ" and "in Christ the Church is one, it strives to be one."[4] Along these lines, the 217th General Assembly (2006) called upon "every member of the Presbyterian Church (U.S.A.) to witness to the church's visible oneness, to avoid division into separate denominations that obscure our community in Christ, and to live in harmony with other members of this denomination, so that we may with one voice together glorify God in Jesus Christ, by the power of the Holy Spirit; and all sessions, congregations, presbyteries, and synods to renew and strengthen their covenanted partnership with one another and with the General Assembly."[5]

Further, G-3.0101 reminds us, "the mutual interconnection of the church through its councils is a sign of the unity of the church. Congregations of the Presbyterian Church (U.S.A.), while possessing all the gifts necessary to be the church, are nonetheless not sufficient in themselves to be the church. Rather, they are called to share with others both within and beyond the congregation the task of bearing witness to the Lordship of Jesus Christ in the world. This call to bear witness is the work of all believers. The particular responsibility of the councils of the

church is to nurture, guide, and govern those who witness as part of the Presbyterian Church (U.S.A.) to the end that such witness strengthens the whole church and gives glory to God."[6] Furthermore, "the congregation is the basic form of the church, but it is not of itself a sufficient form of the church. Thus congregations are bound together in communion with one another, united in relationships of accountability and responsibility, contributing their strengths to the benefit of the whole, and are called, collectively, the church."[7] Accordingly, the church is not a voluntary association of those who share the same opinions and experiences, but is an organic body reflecting unity in diversity and called into existence by God that celebrates and transmits through the ages the name and knowledge of Jesus Christ.[8] The constitutional provisions under which congregations hold property for the benefit of the Presbyterian Church (U.S.A.) arise out of and reflect our theological conviction that this denomination constitutes one indivisible body, which itself is part of the body of Christ, and which encompasses not only the visible Church today but also the one, holy, catholic, and apostolic Church of our heirs and forbearers (F-1.0302).

## HOW DOES MISSION RELATE TO THE TRUST CLAUSE AND CHURCH PROPERTY?

The *Book of Order* in G-4.0201 affirms, "the property of the Presbyterian Church (U.S.A), of its councils and entities, and of its congregations, is a tool for the accomplishment of the mission of Jesus Christ in the world."[9] Each local congregation "is the church engaged in the mission of God in its particular context" with a particular history.[10] For its members, the congregation is the site of baptisms, confirmations, marriages, and celebrations of the resurrection to join the communion of saints. Such significant personal experiences make the local congregation an indelible part of the lives of their members. These shared experiences are what most of us picture when we think of our home congregation.

Yet, we also affirm that the "congregation is the basic form of the church, but it is not of itself a sufficient form of the church" and our polity recognizes that purpose of the trust clause is not only to support the witness and mission of a particular congregations, but also to support the mission and witness of the whole Presbyterian Church (U.S.A.). Indeed, it is "the particular responsibility of the councils of the church is to nurture, guide, and govern those who witness as part of the Presbyterian Church (U.S.A.) to the end that such witness strengthens the whole church and gives glory to God."[11] Along these lines, as a council of the church, the presbytery is responsible for developing "the strategy for the mission of the church in its district"[12] and has the responsibility and power to organize, receive merge, dismiss and dissolve congregations in consultation with their members.[13] Further, the presbytery has the responsibility to assist congregations in developing mission and participating in the mission of the whole church.[14] Accordingly, it is important for the presbytery to prayerfully discern and consider the mission of the church in its district and of the whole church as it decides whether to dismiss or dissolve a congregation.

## WHO HAS THE AUTHORITY TO DISMISS A CONGREGATION?

Presbyteries are responsible for upholding the trust clause and congregations may only be dismissed upon the approval of their presbytery. In accordance with G-4.0207, "the relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery."[15] As noted above, the presbytery is responsible for the mission and government of the church throughout its geographical district and has the power

2

organize, receive merge, dismiss and dissolve congregations in consultation with their members.[16]

## CAN A CONGREGATION VOTE TO SEEK DISMISSAL? DOES A CONGREGATION HAVE A UNILATERAL RIGHT TO DEPART FROM THE PC(USA)?

No. There is not a unilateral right of a Presbyterian Church (U.S.A.) congregation to depart from the denomination or its presbytery of membership. Withdrawal from the Presbyterian Church (U.S.A.) is not a matter that can be considered at a congregational meeting.[17] No authority is given to a congregation or to session to vote to leave the denomination.[18] While a presbytery may consult with a congregation about dismissal in the form of listening sessions, hearings, or other consultations, these consultations are merely for the benefit of informing the presbytery as it considers a request for dismissal.[19] Along these lines, our church has long recognized that "by giving to presbytery rather than to session or congregation the power to dismiss a church, the constitution of this denomination guarantees a formal meeting of presbytery as the forum in which loyalist minorities of whatever size might press their claims that they were sufficient in numbers and dedication to continue a church in its connectional relationship within this denomination."[20] Further, in seeking to negotiate with a congregation seeking dismissal, presbyteries have an obligation to see that secular litigation is used as a last resort.[21]

Here, it is also important to note that freedom of conscience is limited for teaching elders, ruling elders and deacons under G-2.0105 and does not encompass the calling of congregational meetings to seek dismissal, moving churches to seek dismissal from the denomination or obstructing constitutional governance of the church.[22] There may not be any secret acts by the pastors and sessions diminishing a church's connection to the Presbyterian Church (U.S.A.). Further, congregations that fail to abide by the principles of Gracious Separation "have breached important responsibilities and duties."[23]

## DOES A CONGREGATION HAVE TO BE DISMISSED TO ANOTHER REFORMED BODY?

Yes. Dismissal to another reformed body is a requirement through authoritative interpretations of PC(USA) constitutional provisions.[24] Through authoritative interpretation the General Assembly held:

> Presbyteries may dismiss congregations to other ecclesiastical bodies of this denomination, and to denominations whose organization is conformed to the doctrines and order of the Presbyterian Church (U.S.A.). No congregation may be dismissed to independent status, or to the status of a nondenominational congregation.[25]

The requirement of dismissal to another reformed body goes back to historical reformed understandings of the importance and need to continue the reformed family as well as our reformed theology. Further, dismissal to "another Reformed body" was also the language used during reunion and is found in the *Book of Order* under the "Articles of Agreement."[26] Accordingly, if the presbytery discerns it should dismiss the congregation to another reformed body, then the Presbytery should dismiss "pending reception into another reformed denomination" so that the congregation does not end up in independent status if another reformed denomination refused to admit the congregation into the denomination.

## WHO DETERMINES WHETHER THE RECEIVING BODY IS ANOTHER REFORMED BODY?

3

"It is the responsibility of the dismissing presbytery to determine whether the receiving body meets these standards, and this responsibility cannot be delegated to any other entity within the presbytery (such as an administrative commission). Thus the General Assembly may not determine in advance whether a particular denomination or its constituent bodies qualify under these standards."[27] In exploring this matter, presbyteries should consider such questions as whether the receiving body is:

"1) doctrinally consistent with the essentials of Reformed theology as understood by the presbytery;
2) governed by a polity that is consistent in form and structure with that of the Presbyterian Church (U.S.A); and
3) of sufficient permanence to offer reasonable assurance that the congregation is not being dismissed to de facto independence."[28]

Further, "failure on the part of the presbytery thoroughly to explore and adequately to document its satisfaction in these matters may thus violate, however unintentionally, the spirit of the polity of the Presbyterian Church (U.S.A.)"[29]

## MAY A PRESBYTERY DELEGATE ITS FINAL DECISION TO DISMISS A CONGREGATION TO AN ADMINISTRATIVE COMMISSION?
While a presbytery could delegate dismissal of a congregation to an Administrative Commission, such a decision is of such missional importance to a presbytery that the entire presbytery would likely wish to discern such a matter together.[30]

## CAN A PRESBYTERY DISMISS ITSELF OR ALL OF ITS CONGREGATIONS?
No. A presbytery cannot release itself, or all of its congregations, for only the General Assembly and the synod working together itself can organize, divide, unite, or combine presbyteries or portions of a presbytery.[31]

## WHAT ARE GRACIOUS DISMISSAL POLICIES?
At the direction of the 219th General Assembly (2008), the Stated Clerk of the Presbyterian Church (U.S.A.) sent a resolution to the presbyteries, synods and sessions, "indicating the will of the assembly that presbyteries and synods develop and make available to lower governing bodies and local congregations a process that exercises the responsibility and power 'to divide, dismiss, or dissolve churches in consultation with their members' with consistency, pastoral responsibility, accountability, gracious witness, openness, and transparency."[32] Accordingly, Gracious Dismissal Policies may be used by councils to offer clarity and guide their process when discerning whether and how a particular congregation could be dismissed from the PC(USA).

## HOW DO GRACIOUS DISMISSAL POLICIES RELATE TO THE TRUST CLAUSE (G-4.0203)?
In the recent General Assembly Permanent Judicial Commission (GAPJC) case, Tom v. Pby of San Francisco, the GAPJC authoritatively interpreted how the Trust Clause found in the Book of Order at G-4.0203 interacts with Gracious Dismissal Policies.[33] The GAPJC held that while a presbytery has broad discretionary authority under the Book of Order to determine property rights [within the context of determining the mission of Jesus Christ in the world (G-4.0201) and in its district (G-3.0303a) to dismiss a particular congregation within its geographic region (G-

4

3.0301a)], the presbytery must fulfill its fiduciary duty under the Trust Clause (G-4.0203) to consider the interest of the Presbyterian Church (U.S.A.) as a beneficiary of the property.

### WHAT MUST BE IN A GRACIOUS DISMISSAL POLICY?
A presbytery has broad discretionary authority to determine the mission of Jesus Christ in its district and may take into account many issues such as the spiritual needs of the congregation and community as well as the Marks, Notes and Great Ends of the Church.[34] The presbytery must also consider a congregation's financial position and valuation of property and take into consideration the Presbyterian Church (U.S.A.)'s use and benefit of the property in every decision concerning disposition of property. Accordingly, the Gracious Dismissal Policy should include this duty among the procedures listed within the Policy.

### MUST A GRACIOUS DISMISSAL POLICY OR IMPLEMENTATION OF A GRACIOUS DISMISSAL POLICY INCLUDE CONSULTATION WITH ANY OF THE GENERAL ASSEMBLY ENTITIES?
No, a presbytery has discretionary authority to determine the mission of Jesus Christ in its district when deciding whether to organize, merge, dismiss or dissolve a congregation.[35] This discretionary authority includes the presbytery's consideration of a congregation's financial position and valuation of the property.

### MAY A GRACIOUS DISMISSAL POLICY (OR ANY BYLAW OR POLICY OF THE PRESBYTERY) DELINEATE THE CIRCUMSTANCES IN WHICH A PRESBYTERY WILL DISSOLVE, DISMISS OR MERGE A CONGREGATION?
No. Since the presbytery must determine its mission when discerning whether to dissolve, dismiss or merge a congregation, dismissal of a congregation requires that the presbytery make the decision about dismissal in each separate case after careful consideration of all the circumstances.[36] A presbytery may not discern ahead of time the circumstances in which a presbytery will dismiss a congregation. "Dismissal of a congregation now requires, as it always has with the single exception of Article 13, that the presbytery make the decision about dismissal in each separate case after careful consideration of all the circumstances." [37]

### MAY A GRACIOUS DISMISSAL POLICY DESCRIBE HOW AND WHEN PROPERTY WILL BE USED AND/OR DISTRIBUTED AMONG CONGREGATIONAL ENTITIES?
No. A presbytery is required to determine its mission, including the use and distribution of real and personal property, after careful consideration of all the circumstances on a case by case basis. [38]

### HOW MUST A GRACIOUS DISMISSAL POLICY BE IMPLEMENTED?
Even if the presbytery's Gracious Dismissal Policy does not include the fiduciary duty under the Trust Clause, the presbytery should ultimately exercise this fiduciary duty before making its decision about dismissal. In Tom v. Pby of San Francisco, the GAPJC stated that this would include exercising due diligence regarding the value of the property of the congregation seeking dismissal which would include doing a financial analysis of the value of the property.[39] The presbytery must be informed of this financial analysis before it votes on a dismissal. Providing this information gives the presbytery and congregation the information needed to make an informed decision regarding dismissal of the congregation.

5

## WHAT TYPES OF GRACIOUS DISMISSAL POLICIES WOULD NOT BE CONSTITUTIONAL?

Any Gracious Dismissal Policy that precludes a presbytery from taking into account the Trust Clause fiduciary duty before deciding whether to dismiss a congregation on a case-by-case basis would be unconstitutional. Possible examples of policies that would preclude this analysis on a case-by-case basis are:

1. Policies that only require a percentage vote from the congregation for the presbytery's approval of terms of dismissal including only taking into account the spiritual needs or desires of current membership and not the breaking of the historic relationship of the members who came before.

2. Policies that only require the consideration of per capita and/or mission financial obligations are not sufficient to meet the fiduciary duty under the Trust Clause to consider the interest of the Presbyterian Church (U.S.A.) as a beneficiary of property.

3. Policies that require the payment by the congregation of a set percentage of assets prior to approval for dismissal. This would serve to preclude a case-by-case analysis.

## WHAT IS THE PRESBYTERY'S ROLE REGARDING RECORDS OF A CONGREGATION SEEKING DISMISSAL?

Presbyteries have a constitutional responsibility to safeguard the historic records of congregations that choose to leave the denomination. According to the *Book of Order*, G-3.0107, ownership of the records of dismissed or dissolved congregations passes to the presbytery, and clerks are charged with the safekeeping of records that must be maintained in perpetuity.[40] Depositing records with the Presbyterian Historical Society, the official archives of the Presbyterian Church (U.S.A.), is a recommended means of preservation. The Presbyterian Historical Society (PHS) offers stated clerks and administrative commissions several options that may help ease the conflict over records while ensuring that vital materials are preserved by the denomination. The desire of departing congregations to have continued access to records may be a point of contention. By choosing to microfilm the original records and digitize the microfilm, presbyteries, congregations and PHS will all have access to the materials.[41] In sum, PHS provides presbyteries with the capacity to: 1) Place original materials on deposit; 2) Place materials on deposit and microfilm them; 3) Deposit, microfilm and digitize records; or 4) microfilm, digitize and return the original records to the congregation.[42]

## IS A PRESBYTERY'S DECISION TO DISMISS A CONGREGATION SUBJECT TO REVIEW?

Yes, a presbytery's decision to dismiss a congregation is subject to review and if a presbytery fails to carry out its constitutional responsibilities, the synod may be required to intervene by undertaking review of the presbytery's processes and decisions.[43] If the synod finds that the presbytery has not been faithful to its mission, the synod may direct the presbytery to appropriate action.[44] If a presbytery is unable or unwilling to carry out these constitutional responsibilities, the synod may assume jurisdiction over the presbytery's powers to divide, dismiss or dissolve congregations, identify true church, and hold property in trust for the use and benefit of the Presbyterian Church (U.S.A.).[45]

## WHAT ROLE DOES THE TRUST CLAUSE PLAY WITH REGARD TO CONGREGATIONAL LOANS?

6

The Trust Clause provides important support and safeguards for the low-cost loan programs for Presbyterian Church (U.S.A.) congregations provided by the Presbyterian Investment and Loan Program, Inc. (PILP) and the General Assembly Mission Council (GAMC). The PILP makes low-cost loans to Presbyterian Church (U.S.A.) congregations for new buildings and renovations and without the trust clause, presbyteries would be unlikely to guarantee loans and without guarantees PILP's ability to assist congregations would be significantly impaired.[46] Most church building projects cannot be financed by congregations from their current receipts and many congregations depend on loans from PILP, the GAMC's Church Loan Program, or commercial lenders to complete these projects. Generally, these loans are secured by first lien mortgages on the property of the borrowing congregation. The property of the congregation provides the collateral for these loans and is a potential source of repayment should the borrowing congregation not be able to repay the loan. In addition to being secured, these loans are guaranteed by the presbytery of jurisdiction of the borrowing congregation. This means the presbytery is responsible to pay back the loan should the borrowing congregation fail to pay. The presbyteries have confidence in guaranteeing these secured loans due in part to the fact that church property is held in trust under G-4.0203. Further, G-4.0204 states:

> Whenever property of, or held for, a congregation of the Presbyterian Church (U.S.A) ceases to be used by that congregation as a congregation of the Presbyterian Church (U.S.A.) in accordance with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery.

Under G-4.0204, when a congregation ceases to exist or leaves the denomination, the congregation's property (which includes, but is not limited to, its real property, building, and other assets such as investments) is subject to the control of the presbytery of jurisdiction. The presbytery continues to be responsible for mission of the Presbyterian Church (U.S.A.) in the area of the departing congregation, and the presbytery can use the property to implement that mission. If the departing congregation has a secured loan with PILP, guaranteed by the presbytery, the presbytery would have the ability to retain the property or the presbytery could use the property to raise funds to satisfy the presbytery's responsibility under the guaranty. As noted above, a presbytery may discern and give some or all of this property to a departing congregation, but this choice will not result in a release of the obligation to repay the secured loan and/or in the release of the guaranty.

If a congregation has a secured loan with PILP and/or the GAMC and chooses to leave the denomination or is dissolved by a presbytery, the terms of the loan provide that the loan is accelerated and becomes immediately due and payable. The guarantee of the presbytery is not satisfied until the loan is paid in full. Our connectional system and the fact that property owned and used by congregations is held in trust for the Presbyterian Church (U.S.A.) allows the denomination to assist local congregations by providing low interest mortgages through national entities such as PILP and the Church Loan Program. The assurances and protections given under the trust clause help enable these programs to make loans secured by mortgages of the underlying property which are more financially beneficial for the congregations than traditional loan sources.

In the current economy and in the aftermath of the banking crisis, it has become increasingly difficult for small and mid-size congregations to obtain financing for capital projects from banks.

7

It is often new, young, or struggling congregations that need the resources of the denomination the most and the PILP is able to meet these needs of these and other Presbyterian Church (U.S.A.) congregations. Without the current trust clause of the *Book of Order*, it is important to recognize that presbyteries would be unlikely to guarantee loans and without guarantees PILP's ability to assist congregations would be significantly impaired.

Updated February 2014

---

[1] G-4.0203

[2] PJC (2012, 221-03 Tom et. al. vs. Pby of San Francisco)

[3] This necessity for adoption of G-4.0203 arose from court decisions that changed the permissible role of courts in determining disputes as to church property. Until a few years before the adoption of G-4.0203, courts determining property disputes sought to determine from the doctrinal documents of a denomination whether the property of local congregations was held in trust for the larger church (this was referred to as the "implied trust" analysis). However, in 1979, the United States Supreme Court found that this type of inquiry into the doctrine of a denomination was an improper intrusion into the First Amendment right to freedom of religion. Accordingly, the courts were required to determine property disputes without seeking to interpret a denomination's doctrine (the so-called neutral principles of law analysis). For Presbyterians, this change in the legal framework the civil courts applied suggested specific reference in property matters in a denomination's constitutional documents was prudent. Section G-4.0203 provides that explicit understanding of the long held Presbyterian understanding. As such, it was not a change in our Presbyterian polity, but rather an attempt to protect the denomination's polity against changes in the permissible framework of legal analysis applied by the civil courts.

[4] In John 17:20-21, Jesus prayerfully desires unity in the Church saying: [20]"My prayer is not for them alone. I pray also for those who will believe in me through their message, [21] that all of them may be one, Father, just as you are in me and I am in you. May they also be in us so that the world may believe that you have sent me. Paul picks up on this theme in Galatians and Ephesians: Galatians 3:28 says "There is neither Jew nor Gentile, neither slave nor free, nor is there male and female, for you are all one in Christ Jesus." Ephesians 4:3, "Make every effort to keep the unity of the Spirit through the bond of peace." Along these same lines, F-1.0301 reminds us that our "church is called to be a community of love, where sin is forgiven, reconciliation is accomplished, and the dividing walls of hostility are torn down."

[5] GA (2006), Report of the Task Force on Peace, Unity, and Purity, 06-01, Rec. 1, a-b.

[6] G-3.0101

[7] G-1.0101

[8] *See* F-1.02 "Jesus Christ is the Head of the Church;" *see also* F-1.0403

[9] G-4.0201

[10] G-1.0101

[11] G-3.0101

[12] G-3.0301; G-3.0303(a)

[13] G-3.0301(a)

[14] G-3.0301(c)

[15] G-4.0207

[16] *See* G-3.0301; G-3.0303(a)

[17] GA (218th, Item 4-20); *see also* PJC (*Sundquist v. Heartland*, Remedial Case 219-03, 2008)

[18] *See* G-1.0503 and G-3.02

[19] *Sundquist v. Heartland*, Remedial Case 219-03

[20] *See* PCUS 1976, 92, *Strong v. Synod of Mid-South*.

[21] *Sundquist v. Heartland*, Remedial Case 219-03

[22] *Sundquist v. Heartland*, Remedial Case 219-03

[23] *Sundquist v. Heartland*, Remedial Case 219-03

[24] GA (2008, 14, 15 Item 07-13). For more information on authoritative interpretations *see* G-3.0501c and G-6.02

[25] GA (2008, 14, 15 Item 07-13). Along these lines, The General Assembly Permanent Judicial Commission has found that "[a]n 'independent' or 'congregational' Presbyterian church is an anomaly which runs counter to the notion

that we are a 'family' of churches and dismissal must therefore be made to another church within the family group ... . ... The ... presbytery had no constitutional right to dismiss ...the churches to independent status. ... The policy of not allowing members and ministers to be cut loose with no ties indicates the historic Presbyterian policy of ecclesiastical connectionalism. This policy likewise forbids ... dismissal to independency" (PCUS 1973, pp. 119-121, *Anderson v. Synod of Florida*).

[26] *See* the *Book of Order* Appendix B, Article 13 (page B. 13). The "Articles of Agreement" are cited here for historical purposes and do not carry constitutional authority.

[27] GA (2008; 14, 15 Item 07-13).

[28] GA (2008, 14, 15 Item 07-13).

[29] GA (2008, 14, 15 Item 07-13).

[30] *Sundquist v. Heartland,* Remedial Case 219-03; *see also* (PCUS 1976, 92, *Strong v. Synod of Mid-South*)

[31] G-3.0502(e)

[32] GA (2008, 49, 51, 284, Item 04-28) The 218th General Assembly (2008) of the Presbyterian Church (U.S.A.)

1. Directs the Stated Clerk to send this resolution to the presbyteries, synods, and sessions, indicating the will of the assembly that presbyteries and synods develop and make available to lower governing bodies and local congregations a process that exercises the responsibility and power "to divide, dismiss, or dissolve churches in consultation with their members" (Book of Order, G-11.0103i) with consistency, pastoral responsibility, accountability, gracious witness, openness, and transparency.

2. Believing that trying to exercise this responsibility and power through litigation is deadly to the cause of Christ, impacting the local church, other parts of the Body of Christ and ecumenical relationships, and our witness to Christ in the world around us, [the General Assembly] urges [congregations considering leaving the denomination,] presbyteries[,] and synods to implement a process using the following principles:

• Consistency: The local authority delegated to presbyteries is guided and shaped by our shared faith, service, and witness to Jesus Christ.

• Pastoral Responsibility: The requirement in G-11.0103i to consult with the members of a church seeking dismissal highlights the presbytery's pastoral responsibility, which must not be submerged beneath other responsibilities.

• Accountability: For a governing body, accountability rightly dictates fiduciary and connectional concerns, raising general issues of property (G-8.0000) and specific issues of schism within a congregation (G-8.0600). But, full accountability also requires preeminent concern with "caring for the flock."

• Gracious Witness: It is our belief that Scripture and the Holy Spirit require a gracious witness from us rather than a harsh legalism.

• Openness and Transparency: Early, open communication and transparency about principles and process of dismissal necessarily serve truth, order, and goodness, and work against seeking civil litigation as a solution.

[33] PJC (2014, 221-03, Tom et al v. Pby of San Francisco)

[34] *See* F-1.0302; F-1.0303; F-1.0304.

[35] However, in considering each congregation on a case-by-case basis, it is important to recognize that one of the entities of the General Assembly or a synod may have created with the congregation and the presbytery a direct financial interest in the property or assets and thus must be consulted by the presbytery. For example, The Presbyterian Church (U.S.A.) Investment and Loan Program (PILP) regularly extends loans to congregations which are secured by the property and/or guarantee of payment from a presbytery. A presbytery that is considering the dismissal or dissolution of a congregation with a secured or unsecured loan from PILP must, as a part of the presbytery's fiduciary interest under the Trust clause, consult with the Presbytery Investment and Loan Program.

[36] GA (Minutes, 1991, Req. 91-24, Part I, p 396).

[37] GA (Minutes, 1991, Req. 91-24, Part I, p 396).

[38] GA (Minutes, 1991, Req. 91-24, Part I, p 396).

[39] PJC (2014, 221-03, Tom et al v. Pby of San Francisco)

[40] G-3.0107 states, "each council shall keep a full and accurate record of its proceedings. Minutes and all other official records of councils are the property in perpetuity of said councils or their legal successors. When a council ceases to exist, its records shall become the property of the next higher council within whose bounds the lower council was prior to its cessation. The clerk of each council shall make recommendation to that body for the permanent safekeeping of the body's records with the Presbyterian Historical Society or in a temperature and humidity controlled environment of a seminary of the Presbyterian Church (U.S.A.)."

9

[41] The PHS microfilming program creates archival-quality film at a reduced cost for PC(USA) entities, and if requested, PHS will arrange for the production of a digital edition of the microfilm in PDF or JPEG format at cost. Presbyteries may opt to pay for microfilming (and digitization) or ask the departing congregations to cover the costs. After the records are microfilmed, stated clerks may decide to place the original records on deposit at PHS or return them to the departing congregation as part of a gracious dismissal agreement.

[42] For more information about these processes, please contact: Presbyterian Historical Society, 425 Lombard Street, Philadelphia, PA 19147. Phone (215)-627-1852. Email: refdesk@history.pcusa.org or via the web at: www.history.pcusa.org

[43] G-3.0108(a)&(b); *see also* F-3.0206

[44] G-3.0108(a)(b)&(c)

[45] *See* G-3.0401(c); G-3.0301(a); G-3.0303(b); G-4.0203 & G-4.0207.

[46] The funds for PILP loans are generated through the sale of Term Notes, which are debt securities to PC(USA) members and congregations and the sale of Denominational Account receipts (DARs) accounts to mid councils and PC(USA) agencies. The interest paid on these Term Notes and DARs and any redemptions are funded by the interest and principal repayment of the loans to congregations. The PILP relies on the congregation's repayment of principal and interest to be able to pay interest to investors and to repay principal to investors at maturity. The PILP administers the Church Loan Program for the GAMC. The Church Loan Program is a mission program under the responsibility of the GAMC and the principal corporation of the General Assembly, Presbyterian Church (U.S.A.), A Corporation, where endowment funds are also used to make low-cost loans to congregations.

Updated February 2014

# Exhibit C

# PERMANENT JUDICIAL COMMISSION
## OF THE GENERAL ASSEMBLY
## PRESBYTERIAN CHURCH (U.S.A.)

| | |
|---|---|
| Presbytery of New York City<br>        Appellant (Respondent) )<br>        )<br>vs. )<br>        )<br>Ruling Elder Mildred McGee, Teaching )<br>Elder Flora Wilson Bridges, Ruling Elder )<br>Douglas Howard, Teaching Elder Lonnie )<br>Bryant, Ruling Elder Daniel Amiot Priso, )<br>Teaching Elder Phillip Newell, Ruling Elder )<br>Emmanuel Gouad Njayick, Teaching Elder )<br>George Todd, Ruling Elder Estella Taylor, )<br>and Ruling Elder Norita Chisolm )<br>        Appellees )<br>(Complainants) | **DECISION AND ORDER**<br><br>Remedial Case 221-08 |

## Arrival Statement

This filing before the Permanent Judicial Commission of the General Assembly (GAPJC or this Commission) is an appeal of a Decision of the Permanent Judicial Commission of the Synod of the Northeast (SPJC) rendered on September 11, 2013. The Notice of Appeal was received by the Stated Clerk of the General Assembly on September 23, 2013.

## Parties

Appellant/Respondent is The Presbytery of New York City (PNYC). Appellees/Complainants are Ruling Elder Mildred McGee, Teaching Elder Flora Wilson Bridges, Ruling Elder Douglas Howard, Teaching Elder Lonnie Bryant, Ruling Elder Daniel Amiot Priso, Teaching Elder Phillip Newell, Ruling Elder Emmanuel Gouad Njayick, Teaching Elder George Todd, Ruling Elder Estella Taylor, and Ruling Elder Norita Chisolm.

## Jurisdictional Statement

This Commission finds that it has jurisdiction, that Appellants have standing to file the Appeal, that the Appeal was properly and timely filed, and that the Appeal states one or more of the grounds for appeal under D-8.0105.

1

## Appearances

Appellant/Respondent was represented by John Griem and Reade Ryan. Appellees/ Complainants were represented by Tee Gee Wilson and Lisa Borge.

## History

On February 13, 2013, the Stated Clerk of the Synod of the Northeast received a Remedial Complaint from Ruling Elder Mildred McGee, *et alia*, alleging that the action of the PNYC in adopting and implementing its Gracious Dismissal Policy (GDP) was irregular in regard to constitutional requirements of The Presbyterian Church U.S.A. (PC(U.S.A.)).

The development of the GDP by the PNYC began early in 2012, informed by Resolution 04-28, GA Minutes (2008, Part II, pp. 284-285) of the 218th General Assembly (2008) (GA) urging presbyteries to formulate a gracious and pastoral response to churches requesting dismissal from the PC(U.S.A.). This GA resolution, although not an authoritative interpretation, was used as the basis for the development of the GDP. Just after that Assembly, in October 2008, the PNYC through its Committee on Mission and Finance, which also served as the Board of Trustees (BoT), obtained a realtor's opinion of value of the properties held by all its congregations. Almost four years later, in July 2012, the BoT created a draft GDP that was distributed to the PNYC for its meeting on July 28, 2012. There was no discussion of the draft at that meeting. A later draft was given a first reading and discussion at the December 6, 2012, meeting of the PNYC. After two open hearings on December 13 and 20, 2012, the present GDP was approved by the PNYC on January 29, 2013, by a vote of 56 in favor and 49 against.

The SPJC summarized the GDP in the following way:

> ...[T]he PNYC GDP allows sessions to request initiation of the dismissal process following a 2/3 vote. Upon receipt of the notice, the stated clerk then calls one or more meetings between the Special Resolution Committee of the presbytery and the session (or its representatives), as well as the BOT (or its representatives) during the 120-day period following receipt of the notice. If the filing notice is not withdrawn at the end of the period, a congregational meeting is called (50% quorum) and dismissal is approved if confirmed by a 3/4 congregational vote. Financial arrangements include payment of any arrears in per capita, five years of per capita payments on a declining scale, and compensation for church property of 10% of the assessed value that exceeds $1,000,000, with a cap on the compensation of $2,000,000.

In addition, the policy allows for a downward adjustment or waiver in the case of hardship.

With the remedial complaint, Complainant also requested a Stay of Enforcement. The Executive Committee (EC) of the SPJC answered the Preliminary Questions in the affirmative and the Stay of Enforcement was subsequently granted by the SPJC.

Respondent requested an extension of the deadline for filing its response and the SPJC granted this extension. Respondent submitted a motion to the SPJC on April 29, 2013, to refer the case to the GAPJC, to which Complainants responded on May 14, 2013. The SPJC denied the motion on May 23, 2013. Respondent filed a second motion on July 2, 2013, asking the

2

SPJC to reconsider its decision to deny the earlier motion to refer the case to the GAPJC, to which Complainants again responded on July 16, 2013. The SPJC EC denied this motion on July 27, 2013.

Complainant filed for relief on February 13, 2013, and this remedial case was decided by the SPJC on September 11, 2013. In its decision, the SPJC sustained five of the seven specifications of error by Complainant and ordered that the GDP of the PNYC shall be set aside and shall have no force or effect.

## Specifications of Error

*Specification of Error No. 1:* *The SPJC erred in constitutional interpretation by holding that the Presbytery GDP conferred a unilateral right on a congregation to depart from the Presbyterian Church (U.S.A.), in violation of G-4.0207 and Sundquist v. Heartland Presbytery, GA PJC 219-03.*

This specification of error is not sustained.

While it may be understandable for a presbytery to develop a policy dealing with congregations considering dismissal with the intention of avoiding costly litigation, the GDP at the center of this case breaches the bounds of the Constitution of the PC(U.S.A.). The PNYC GDP exhibits substantial constitutional flaws in at least three ways concerning this specification of error. First, the GDP establishes a dismissal process that, as the SPJC notes, is "self-executing," whereby fulfillment of a series of steps and conditions automatically enacts dismissal upon their completion. A final vote by the PNYC is purposefully denied in the GDP in order to avoid divisive and argumentative response to a dismissal request, as admitted by the PNYC in the record and during arguments. Even though the process contains provisions for consultation with the PNYC and congregational input, it is in fact a predetermined and formulaic mechanism that replaces a final specific review and vote by the PNYC. The Constitution at G-3.0301a reserves as a direct act of the presbytery the authority to dismiss a church, a polity provision explicitly reasserted by G-4.0207.

As the SPJC noted, the PNYC does not need an independent policy in order to accomplish a just and effective dismissal:

> The Respondent has asserted that an order by this Commission to set aside this GDP would leave the presbytery in limbo and render it unable to reach any agreements on dismissal agreements, leaving only the option of costly litigation. This is a seriously overreaching assessment. We are sensitive to the difficult situation in which the PNYC finds itself and appreciate its sincere desire to deal with that as well as it can....[A dismissal agreement] can be achieved, either through Administrative Commissions appointed in each case that presents itself and is empowered to do so, or, indeed, by a Special Resolutions Committee, preparing the proposal for presbytery action. Considering that the presbytery mustered a majority vote, however slim, for the GDP under consideration in this case, and with the case-by-case requirement satisfied in these cases, it ought to be possible for the PNYC to reach agreement on approval for such dismissal arrangements.

3

The second constitutional error in the GDP is its provision that the vote by a congregation effectuates the dismissal process. This vote terminates the process and has the authority to effect dismissal without any constitutional authority so to act. The final certification by the PNYC is merely perfunctory. Further, such a congregational vote is not authorized within the permitted functions of a congregation in G-1.0503 and is specifically prohibited in *Sundquist et al. vs. Heartland Presbytery*: "Withdrawal from the Presbyterian Church (U.S.A.) is not a matter that can be considered at a congregational meeting" and the consultations of presbytery with members of the congregation "are not meetings at which business of the congregation may be conducted." *Sundquist 219-03, 2008.* [GA Minutes, (2010, Part II, pp. 362-367).] It should also be noted that the General Assembly in 1991 declared: "Nowhere is written that the congregation is permitted to make the decision that the presbytery commits itself in advance to confirm." GA Minutes (1991, Req. 91-24, Part I, p.411). In spite of this stream of clear constitutional interpretation, the GDP portrays a self-implementing dismissal rooted in a congregational decision in violation of the exclusive right and responsibility of a presbytery to dismiss a congregation.

The third constitutional error of the GDP is that a predetermined, formulaic mechanism runs counter to constitutional provisions for mutual dialogue and particular discernment. This Commission has previously rejected such approaches in matters related to ordination and membership *Larson 221-04, 2012.* The presbytery's right and responsibility for specific review and the necessity of individualized consideration on sensitive matters in the life of the church remain a core concept of PC(U.S.A.) polity.

*Specification of Error No. 2: The SPJC erred in constitutional interpretation by holding that the GDP does not give effect to the Trust Clause (G-4.0203) as required by Tom v. Presbytery of San Francisco, GA PJC 221-03 and G-4.0204.*

This specification of error is not sustained.

The Book of Order provides in G-4.0203 that "[a]ll property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), ...is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." The Trust Clause was interpreted by this Commission in *Tom, et al., v. Presbytery of San Francisco,* as it related to that presbytery's gracious dismissal policy, in the context of a number of factors including both spiritual and pecuniary aspects of the fiduciary responsibility. In *Tom,* this Commission said:

> When a congregation seeks dismissal under G-11.0103i (now G-3.0301a), it is the responsibility of the Presbytery to fulfill its fiduciary duty under the Trust Clause. This fiduciary duty requires that the Presbytery exercise due diligence regarding the value of the property of the congregation seeking dismissal. Due diligence, of necessity, includes not only an evaluation of the spiritual needs of the congregation and its circumstances but also financial analysis of the value of the property at stake. Payment for per capita for missions obligations are not satisfactory substitutes for the separate evaluation of the value of the property held in trust. *Tom, et al., v. The Presbytery of San Francisco,* Remedial Case 221-03, 2012.

4

This Commission is again called upon in this case to clarify the parameters of the Trust Clause. The Trust Clause creates an express trust in favor of the PC(U.S.A.) as a whole and not for the presbytery, the congregation, or any other body. Therefore, the presbytery, acting in the role of trustee, must exercise due diligence such that its determination is both reasonable and evident in the record. While presbytery is entitled to deference in making the fiduciary decisions under the Trust Clause, such deference is limited by the fiduciary obligations owed to the whole church.

Under the facts of this case, the PNYC argues that the requirement of due diligence under the Trust Clause has been met by adopting a formula for determining the value of the property at the time of enacting the GDP by the PNYC. However, the fiduciary nature of the Trust Clause requires an individual determination of the facts and circumstances related to dismissal of any church rather than a set formula, which may not be appropriate to the particular circumstances of a congregation. As stated by the SPJC, there must be an "individual assessment and valuation of the church's unique situation, finances, history, spiritual needs and financial needs" when considering dismissal.

In addition, the exercise of the fiduciary duty must be carried out during the course of discernment of a particular church's request for dismissal. A formulaic predetermination fails to account for the individualized requirement demanded by proper application of the fiduciary duty incumbent upon a presbytery. The SPJC correctly determined that the PNYC, acting as a fiduciary, may not abdicate this role (G-4.0207 and G-3.0303b). The record shows that the PNYC sought to avoid conflict and litigation. However, concern about conflict and litigation cannot justify abandonment of constitutional mandates.

Thus, the presbytery, in exercising its authority to perform due diligence under the fiduciary duties required by the Trust Clause, is required to make an appropriately timed, individual, unique determination of the circumstances applicable to any church requesting dismissal. In accountability to the PC(U.S.A.) as the beneficiary under the Trust Clause, such determination must be reasonable and based on documented facts. The GDP enacted by the PNYC fails to meet these requirements and, therefore, is unconstitutional.

*Specification of Error No. 3: The SPJC erred in constitutional interpretation by holding that the GDP did not provide specific guidance regarding discernment of theological differences as a basis for dismissal, in violation of F-1.0302a and F-1.0301.*

This specification of error is not sustained.

The PNYC adopted the GDP "to provide for reconciliation and resolution within the Presbytery of New York City" and to permit their congregations to be dismissed to join another Reformed denomination for theological reasons. The policy did not seek reconciliation and resolution as the initial step in the process (G-4.0207). The policy accepts notice from a congregation of perceived theological differences as sufficient for dismissal without concern for mutual discernment and dialogue (Sundquist). It is the nature and weight of theological difference that is critical in a justification for dismissal. The mere presence of theological differences does not preclude coexistence within the PC(U.S.A.). As stated in F-3.0105 "there are truths and forms with respect to which men of good characters and principles may differ. And in all these we think it the duty of private Christians and societies to exercise mutual forbearance toward each other." The GDP contains no procedures to encourage early discussion

5

with the PNYC about a congregation's perceived differences. As indicated in F-3.0204 "Presbyters are not simply to reflect the will of the people, but rather to seek together to find and represent the will of Christ." Without dialogue there cannot be a mutual understanding of the will of the people. Without joint discernment councils can misunderstand the will of Christ. The SPJC rightly concluded it was important that the PNYC "ensure that dismissal is the only viable remedy for the relevant theological differences."

*Specification of Error No. 4: The SPJC erred in constitutional interpretation by holding that the GDP did not provide an opportunity for the minority of a church in schism to retain the property of a congregation, in violation of G-4.0207.*

This specification of error is not sustained.

The PNYC GDP ignores the constitutional requirement under G-4.0207 to "determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the Presbyterian Church (U.S.A.)." The GDP process is initiated when the PNYC receives a written notice from the session. At that point, the PNYC automatically surrenders its constitutional obligation to determine whether a loyal faction exists and is entitled to the property. Under the GDP provisions, there is no attempt to identify the true church within the PC(U.S.A.). A fully implemented GDP effectively guarantees the property for those seeking dismissal.

It is clear what a presbytery must do when confronted with a property issue. Under G-4.0207, a presbytery is obligated to serve the interests and guard the rights of the "true church within the Presbyterian Church (U.S.A.)," regardless of who is in the majority of any session or congregational vote. The presbytery shall determine if one of the factions is entitled to the property because it is the "true church within the Presbyterian Church (U.S.A.)," majority notwithstanding. Any negotiation and decision about the disposition of the property must consider this interest of the true church. The GDP failed to comply with G-4.0207.

*Specification of Error No. 5: The SPJC erred in constitutional interpretation by holding that the GDP allowed a dismissed congregation to retain its records, in violation of G-3.0107.*

This specification of error is not sustained.

According to G-3.0107, when a congregation is dismissed to another denomination its session ceases to exist as a council of the PC(U.S.A.). The successor to a former church council is the presbytery and upon dismissal of the congregation the minutes and registers of the session become the property and responsibility of the presbytery. The presbytery may make provision for the departing congregation to retain copies of the records for historical purposes.

## Decision

For the reasons set forth above, this Commission finds that The Permanent Judicial Commission of the Synod of the Northeast did not err and affirms its decision.

6

## Order

IT IS THEREFORE ORDERED that the Decision of the Synod of the Northeast Permanent Judicial Commission is hereby sustained in its entirety and that the Gracious Dismissal Policy of The Presbytery of New York City be set aside and shall have no force or effect.

IT IS FURTHER ORDERED that the Stated Clerk of the Synod of the Northeast report this Decision to the Synod of the Northeast at the first meeting after receipt, that the Synod of the Northeast enter the full Decision upon its minutes and an excerpt from those minutes showing entry of the Decision be sent to the Stated Clerk of the General Assembly.

IT IS FURTHER ORDERED that the Stated Clerk of the Presbytery of New York City report this Decision to the Presbytery of New York City at the first meeting after receipt, that the Presbytery of New York City enter the full Decision upon its minutes and an excerpt from those minutes showing entry of the Decision be sent to the Stated Clerk of the General Assembly.

## Absences and Non-Appearances

Commissioner Mary Charlotte McCall did not participate in the hearing or deliberations.

## Certificate

We certify that the foregoing is a true and correct copy of the Decision of the Permanent Judicial Commission of the General Assembly of the Presbyterian Church (U.S.A.) in Remedial Case 221-08, The Presbytery of New York City, Appellant (Respondent), v. Ruling Elder Mildred McGee, Teaching Elder Flora Wilson Bridges, Ruling Elder Douglas Howard, Teaching Elder Lonnie Bryant, Ruling Elder Daniel Amiot Priso, Teaching Elder Phillip Newell, Ruling Elder Emmanuel Gouad Njayick, Teaching Elder George Todd, Ruling Elder Estella Taylor, and Ruling Elder Norita Chisolm, Appellees (Complainants), made and announced at San Antonio, TX this 4th day of May, 2014.

Dated this 4th day of May, 2014.

Bradley C. Copeland, Moderator
Permanent Judicial Commission of the General Assembly

Jay Lewis, Clerk
Permanent Judicial Commission of the General Assembly

I certify that I did transmit a certified copy of the foregoing to the following persons by Federal Express Next Day Air, directing C. Laurie Griffith to deposit it in the mail at San Antonio, TX this 5th day of May, 2014.

7

John M. Griem, Jr., Committee of Counsel for Appellant (Respondent)
Trina Moore, Counsel for Appellees (Complainants)
Stated Clerk, Synod of the Northeast
Stated Clerk, Presbytery of New York City
General Assembly Permanent Judicial Commission


I further certify that I did transmit a certified copy of the foregoing to the Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.) by delivering it in person to C. Laurie Griffith, on May 4, 2014.


---

Jay Lewis, Clerk
Permanent Judicial Commission of the General Assembly


I certify that I received a certified copy of the foregoing, that it is a full and correct copy of the decision of the Permanent Judicial Commission of the General Assembly of the Presbyterian Church (U.S.A.), sitting during an interval between meetings of the General Assembly, in San Antonio, TX on May 4, 2014, in Remedial Case 221-08, The Presbytery of New York City, Appellant (Respondent) v. Ruling Elder Mildred McGee, Teaching Elder Flora Wilson Bridges, Ruling Elder Douglas Howard, Teaching Elder Lonnie Bryant, Ruling Elder Daniel Amiot Priso, Teaching Elder Phillip Newell, Ruling Elder Emmanuel Gouad Njayick, Teaching Elder George Todd, Ruling Elder Estella Taylor, and Ruling Elder Norita Chisolm, Appellees (Complainants) and that it is the final judgment of the General Assembly of the Presbyterian Church (U.S.A.) in the case.

Dated at San Antonio, TX on May 4, 2014.


---

C. Laurie Griffith
Manager of Judicial Process and Social Witness

8

# Exhibit D

# Gracious Reconciliation and Dismissal Procedure

## PROLOGUE

The vision of the Presbytery of New Covenant is to *Grow congregations that passionately engage their community to make disciples.* Our mission is to -

- *Confess Jesus Christ as Lord*
- *Connect one another in ministry*
- *Challenge one another for mission.*

The Presbytery of New Covenant seeks to facilitate worship, mission, and other shared ministries by engaging all churches in our bounds to be united in carrying out our vision and mission. We believe The Mission of God as expressed in the Great Ends of the Church is greater than the PC (U.S.A.).

Recognizing that polity changes have caused some congregations to reconsider their connection with the PC (U.S.A.), the Presbytery has adopted a Procedure for Gracious Reconciliation and Dismissal. Nonetheless, a fundamental understanding from our Presbyterian heritage is one of connection rather than division. We believe that we discern the will of God more clearly in any particular time and place when we are in communion with each other than when we are separated. However, the Presbytery acknowledges that the particular forms of communion may shift over time, always reforming to better serve the mission of our Lord, Christ Jesus.

## Presbytery of New Covenant

## Gracious Reconciliation and Dismissal Procedure

The Presbytery of New Covenant is committed to pursuing reconciliation with pastors, Sessions, and congregations who are considering dismissal from the denomination. Whether that reconciliation takes the form of dismissal, mutually accepted re-commitment to the Presbytery-congregational relationship, or something in-between, it is the will of this Presbytery to create a gracious context and process in which the will of God is sought for the life, ministry, and calling of the particular congregation. All congregations of this Presbytery are invited to commit to this broad understanding of reconciliation with a graciousness befitting those who claim Jesus as Lord.

The Presbytery and congregations will be continually guided by these three principles:

1. The Mission of God as expressed in the Great Ends of the Church extends beyond the mission of the PC (U.S.A.). Therefore, we affirm that a congregation seeking dismissal to another Reformed Body does not diminish the unity of the one Church of Jesus Christ (F-1.0302 and F-1.0304).

2. The exercise of "mutual forbearance" is of utmost importance in our process. Therefore, all will treat each other with respect regardless of theological and ecclesiological differences.

3. We will pray and work for fairness to all parties in our decisions.

It is the Presbytery's belief that in adopting this Procedure congregations who faithfully follow it as a way of discerning if God would have them affiliate with another Reformed denomination are not engaged in
07/18/2015

schism and that therefore the Presbytery's understanding is that G-4.0207 (Property of a Church in Schism) does not apply to congregations faithfully following this process.

If a Session chooses not to follow this Gracious Reconciliation and Dismissal Procedure, undertakes actions attempting to revoke adherence to G-4.0203 of the Book of Order, or files suit in civil court against the Presbytery of New Covenant or higher councils of the Presbyterian Church (U.S.A.), then the "Alternative Process for a Church Seeking Dismissal from the Presbyterian Church (U.S.A.)" will apply.

In all matters relating to this subject, discerning answers to the following three questions will be deemed paramount:

1. Is God leading this particular congregation to restore fellowship with the Presbyterian Church (U.S.A.), or to seek dismissal from the Presbyterian Church (U.S.A.)?

2. If God is leading this congregation toward restoration of fellowship with the Presbyterian Church (USA), how can that be accomplished in a way that honors Jesus Christ and strengthens both the congregation and the Presbytery?

3. If God is leading this congregation to seek dismissal from the Presbyterian Church (U.S.A.), how can that be accomplished in a way that honors Jesus Christ and strengthens both the congregation and the Presbytery?

The Presbytery asks that any Session seeking or considering dismissal from the denomination to covenant with the Presbytery to enter into this defined process of mutual discernment through the formation of a Discernment Team from the Presbytery and the local congregation (see "Discernment Procedure" below). As described below, this process shall take no less than six months and ordinarily will take no more than two years from the date of the congregational vote to enter the Discernment Procedure. The Discernment Team will report and make recommendations to both the church and the Presbytery.

# DISCERNMENT PROCEDURE

Because reconciliation is the desired outcome of any disagreement between the congregation and the Presbytery, informal public conversations between the congregation and the Presbytery are expected prior to entering the Discernment Procedure to facilitate mutual understanding and reconciliation. Such meetings might take the form of town hall presentations, Sunday School classes, meetings of Presbytery representatives with the Session and/or congregation, or other appropriate venues.

After such conversations, a Session wishing to initiate a formal process shall put the matter to a vote. If at a duly noticed meeting with appropriate quorum, the Session votes by two-thirds majority to initiate the discernment process, the Clerk of Session shall contact the Presbytery office and inform the Stated Clerk of the Presbytery of this desire. The Session shall then vote on whether to arrange for an assembly of the congregation moderated by the pastor or his/her designee for the purpose of advising the Session regarding participation in the discernment process. Notice for this assembly must be given on two Sundays prior to the assembly and at least 10% of the membership must be in attendance. The most recent edition of Robert's Rules of Order will apply for the purpose of this assembly. An advisory vote shall be taken on the

motion to enter into the Discernment Procedure. If approved, any subsequent advisory vote regarding dismissal from the PC (U.S.A.) to another Reformed Body shall require attendance of at least 30% of the membership. After receiving advice from the congregation, the Session may vote to enter the procedure. If approved by the Session, the Stated Clerk of the Presbytery, the Moderator of General Council, the Moderator of Session and the Clerk of Session will sign a Covenant Agreement (see page 12), and representatives for the Discernment Team may be selected.

The Discernment Team shall consist of four representatives from the church and four representatives from the Presbytery. The Session of the congregation shall select the representatives from the church, two of whom shall be from the Session, and two at large active members of the congregation. The General Council shall select two Ruling Elders and two Teaching Elders from the Presbytery. The Stated Clerk of the Presbytery shall select a facilitator in consultation with the Discernment Team members. The facilitator shall not be one of the eight members of the Discernment Team and shall have voice but not vote during the discernment process. The Discernment Team shall covenant to meet together a minimum of five times.

In order to fulfill the constitutional responsibility of the Presbytery under the Book of Order, the Presbytery of New Covenant understands that church property is held in trust for the PC(U.S.A.) G-4.0203, and recognizes that the use of the property is for the benefit of PC(U.S.A.). Accordingly, the General Presbyter will arrange for a financial evaluation to provide an "individual assessment and valuation of the church's unique situation, finances, history, spiritual needs and financial needs." *(Reference Tom, et al., v. The Presbytery of San Francisco, Remedial Case 221-03, 2012).* Consideration shall include all current financial information, value of the property and future viability of the ministry. The General Presbyter shall appoint representatives recommended by Administrative Division Steering Committee and approved by General Council to form a Financial Analysis Consultation Team (FACT) to carry out a financial analysis. This process will include discussion with the Session and must conclude before the Discernment Team reports to the Session in order that the results may be included in the report of the Discernment Team.

The Session shall provide as soon as possible the following items to the General Presbyter:

- The Operating Budget as of the date of the assembly of the congregation on which the congregation voted to enter the Procedure and previous two year's operating budgets.
- The appraised value of the property, including land.
- The insured value of the property, including all assets.
- Existing liens on the property.
- Outstanding loans of the congregation.
- Current financial statements – audited income statements and balance sheet of the congregation, including all assets of any subsidiary or controlled entity.
- Insofar as practical, a history of property acquisition and values.
- The membership email and mail address list.

## The Discernment Process

After meeting at least twice, the Discernment Team will create or approve a process of prayer and discernment to listen and speak to the concerns, sensitivities and questions of congregation members. Throughout all the steps of this procedure, the Discernment Team is responsible for assuring equal opportunity for all viewpoints to be brought before the congregation and for all congregation members to have opportunity to voice their opinions and concerns. The Discernment Team will seek to assure that resource materials provided to the congregation fairly and accurately represent all viewpoints.

*First Meeting*

The first meeting of the Discernment Team shall be convened by the Stated Clerk of the Presbytery (or the Clerk's designated representative) to review this Procedure. The Discernment Team will engage in extended time of prayer and introductions and share their faith stories, their understanding of the spiritual and theological issues at stake between the congregation and the Presbyterian Church (U.S.A.), and pray for God's guidance for reconciliation. Following the first meeting, the Discernment Team will meet at least four more times. The expected content of the meetings is outlined below.

*Second Meeting*

The facilitator of the Discernment Team will guide a prayerful dialogue on foundational theological issues. The purpose of this discussion is to identify the extent of common theological and ecclesiastical ground between the congregation and the denomination as a basis for reconciliation. This meeting will be primarily for dialogue.

*Third Meeting*

The Discernment Team, in consultation with the Session, will create or approve a process of prayer and discernment to listen and speak to the concerns, sensitivities and questions of congregation members.

*Fourth Meeting*

The Discernment Team will meet to review the progress of the process of prayer and discernment being implemented by the Session. The Discernment Team will address the concerns, sensitivities and questions of congregation members.

*Additional Meetings*

The content of additional meetings will be determined mutually by members of the Discernment Team.

*Report of the Discernment Team*

Upon completion of the prayer and discernment process, the Discernment Team will prepare a report with recommendations to be presented to the Session and subsequently to the congregation in one or more "town hall" meetings.

If the Session determines the congregation is still called by God to remain in covenant relationship with the Presbyterian Church (U.S.A.), both parties will work together to heal any broken relationships (see "Guidelines for Restoration of Fellowship and Recommitment to Presbytery-Congregational Relationship" below).

If the Session concludes that the congregation may be called by God to be dismissed from the PCUSA to another Reformed body, the Session shall follow the "Procedure for Seeking Dismissal."

# GUIDELINES FOR RESTORATION OF FELLOWSHIP AND RECOMMITMENT TO PRESBYTERY-CONGREGATIONAL RELATIONSHIP

The result of a congregational advisory vote on the question of dismissal shall be reported to both the congregation and to the Presbytery. Following that vote, unless the session votes to seek dismissal, it shall complete this Procedure by entering into a season of reconciliation and prayer in concert with the Presbytery. The Presbytery will not agree to reinitiate the Gracious Reconciliation and Dismissal Procedure with the session for a period of at least three years following the advisory vote. A Reconciliation Team will be named, ordinarily including the members of the Discernment Team. This team shall create and conduct a process for continuation/transformation of fellowship and reaffirmation of the Presbytery-congregational relationship. In addition, it is appropriate for the Reconciliation Team to consult with the Session regarding reconciliation within the congregation. Among the tasks of the Reconciliation Team are:

1. Consulting with the Session as it prepares and adopts a covenant of reaffirmation articulating the relationship between the congregation, Presbytery and the PC (U.S.A.).

2. Consulting with the Session in fostering reconciliation and healing between congregational leaders and members, between congregational factions that may have surfaced or been created, and between the whole congregation and the Presbytery.

3. Conducting a public service of worship and reaffirmation to shared fellowship and ministry, with substantive participation from the Presbytery and the congregation.

4. Sharing of story and testimony from members of the Reconciliation Team and congregation at the congregational and Presbytery level.

5. Blessing and commissioning of any congregants who leave the local congregation (to the extent possible), in the hope of maintaining the unity of the Spirit in the bonds of peace. *(Ephesians 4:3)*

# PROCEDURE FOR SEEKING DISMISSAL

Upon completion of the discernment process, the Session may vote on whether to arrange for an assembly of the congregation for the purpose of advising the Session regarding dismissal from the PC(U.S.A.) to another Reformed body. This assembly shall be moderated by the pastor or his/her designee. At least 30% of the membership must be in attendance. The most recent edition of Robert's Rules of Order will apply for the purpose of this assembly. An advisory vote shall be taken on the motion to request dismissal from the PC(U.S.A.) to a particular Reformed Body.

07/18/2015

The Discernment Team will work with the Session to ensure the proper and fair implementation of the procedure outlined below:

1. The Session shall set a date for the advisory vote of the congregation. Advance notice of the date for the advisory vote shall be by written letter to each member on the active roll of the congregation who is eligible to vote, as well as by three Sunday worship announcements. The letter shall be mailed at least thirty (30) days in advance of the date of the advisory vote and shall include:

    a. a proposed motion from the Session requesting dismissal by the Presbytery to a particular Reformed body.

    b. a written statement from the Discernment Team majority and minority (if applicable).

    c. a written statement from the Financial Analysis Consultation Team (see item #7 below).

Public announcements of the advisory vote shall be made at all worship services between the date of the first notice and the actual date of the vote. Representatives of the Presbytery (which may include members of the Discernment Team, General Council, Stated Clerk of the Presbytery, General Presbyter, and Associate General Presbyters) shall also be invited to the meeting, with the right to address the body gathered.

2. Meetings After a Call for a Congregation Advisory Vote: The Discernment Team shall meet with the Session to ensure proper, fair and balanced communications during the period between the call for a congregational vote and the vote. Whenever possible, members of the Discernment Team should attend any town hall meetings or other congregational gatherings that take place during the period leading up to the congregational vote. The Discernment Team shall report to the Presbytery regarding the fairness of communications during this period.

3. Members eligible to cast an advisory vote shall be those listed on the roll of Active members of the church (G-1.0402) as of the date of the letter setting the date of the advisory vote. Members must be present to vote. The quorum for the advisory vote shall be the designated quorum stated in the congregational bylaws or that which was adopted at the assembly of the congregation specified above (lines 79-80), whichever is higher.

4. All members present, as well as the representatives of Presbytery, shall have the right to speak.

5. When the discussion is concluded, the advisory vote shall be taken by written ballot. In order for the proposal to pass, at least two-thirds of ballots cast must approve the proposed motion from Session.

6. After the advisory vote is taken, the Session may submit a request for dismissal to the Presbytery, which must include the results of the advisory vote of the congregation.

7. Prior to a desired dismissal, the Session shall propose a legally binding contract on behalf of the congregation regarding financial settlement. This contract shall be negotiated with Session representatives by a Negotiation Team appointed by the General Council and in consultation with the Financial Analysis Consultation Team. The Negotiation Team will recommend a contract to the Session which takes into consideration the report of the FACT, and which establishes a fair financial settlement of the congregation's responsibilities under the provisions of G-4.0203. This contract shall include payments reflected in this provision as well as those specified in item 8 below. The agreed upon settlement may be payable as a lump sum or paid in quarterly payments

over five (5) years. The first (or lump sum) payment shall be due upon the signing of all legal documents, which shall occur as soon as practical if the Presbytery votes to approve dismissal.

8. The method, interest, timing, and securing of all the above financial settlements shall be negotiated.

9. The contract shall include at least the congregation's contribution to the Presbytery the greater of: the per member share of the current Presbytery budget[1] or the average of the congregation's past three years' Presbytery contributions. These contributions shall be calculated on a declining scale over a five year period according to the following schedule:

>Year one – 100%
>Year two – 80%
>Year three – 60%
>Year four – 40%
>Year five – 20%
>Year six and beyond – 0%

10. The Presbytery, at its next stated meeting, shall vote on the proposed dismissal of the congregation, predicated on the contract noted above. Such dismissal, if approved, shall be pending execution of the contract.

11. A congregation that is approved for dismissal may take its name with it.

12. If any members express a desire to start a PC (U.S.A.) congregation, the Presbytery's committee responsible for evangelism and church growth shall determine if the leadership, mission, and resources exist to organize a new worshiping community. It shall be the responsibility of the Presbytery of New Covenant to support, encourage and provide resources for the establishment of a new church by a loyal minority.

13. A congregation being dismissed will be required to transfer the memberships of all those on the roll who request transfer to another congregation. The Session minutes and church register become the property of the Presbytery of New Covenant and will be delivered prior to all legal documents being signed.

14. When the Presbytery has approved the request for dismissal, all legal documents have been signed and payment(s) made, the Stated Clerk of the Presbytery of New Covenant shall issue a letter of dismissal to the Reformed Body which is prepared to receive the congregation.

15. In the event that any congregation's request for dismissal is approved under the terms of this Procedure, the Presbytery shall hold, in conjunction with the congregation, a final worship service of commissioning, to celebrate our common life in Jesus Christ and to pray for the effectiveness and well-being of both the congregation and the Presbytery. Those departing the Presbyterian Church (U.S.A.) will be commissioned by the Presbytery to further their work for the kingdom as they go forward in ministry. The service will be jointly planned by representatives of the Presbytery of New Covenant appointed by the Moderator and the Session, and all congregations of the Presbytery of New Covenant shall be invited.

---

[1] For example, in 2015 the per member share of the Presbytery budget is $40.77.

16. A congregation being dismissed shall be required to remove the Presbytery of New Covenant from any outstanding loan guarantees and to pay off any loans outstanding to any entity of the Presbyterian Church (U.S.A.).

17. A congregation being dismissed will be required to work with the Presbyterian Board of Pensions to determine the effective date of the dismissal.

18. There are some practical considerations to be addressed, should a congregation be approved for dismissal. These are listed for information, and are not all-inclusive or binding for the purposes of this Procedure:

   a) The status of Teaching Elders, Commissioned Ruling Elders and members in the ordination process
   b) The status of any insurance policies held by the congregation .
   c) The corporate status of the congregation shall be revised to reflect its dismissal.
   d) The Presbytery agrees to execute all documents necessary to effectuate the transfer of all assets or property pursuant to this procedure.
   e) Upon dismissal to another Reformed body, the congregation so dismissed shall be considered dissolved as a congregation of the Presbyterian Church (U.S.A.).

# Approval and Amendment of this Procedure

This Procedure shall be effective after a preliminary reading/discussion of the Procedure at a Presbytery meeting and ratification by a majority of those voting at a subsequent Presbytery meeting. Amendments to the Procedure are in order at the Presbytery meeting where the vote takes place.

Subsequent to the adoption of this Procedure, it may only be amended or removed by the same procedure stated above: after a preliminary reading/discussion of the Procedure at a Presbytery meeting and ratification by a majority of those voting at a subsequent Presbytery meeting.

The Procedure in effect on the date of the covenant agreement between the Session and the Presbytery shall remain in effect throughout the process for that particular congregation even if the Procedure is amended or removed by the Presbytery during the process.

# THE PRESBYTERY OF NEW COVENANT
# ALTERNATIVE PROCEDURE
# FOR A CHURCH CONSIDERING OR SEEKING DISMISSAL
# FROM THE PRESBYTERIAN CHURCH (U.S.A.)

The Presbytery of New Covenant has established a Gracious Reconciliation and Dismissal Procedure for member churches considering dismissal from the denomination and strongly encourages pastors, Sessions and congregations to engage in the process outlined in that Procedure.

Recognizing that there may be churches that either choose to seek dismissal from the PC (U.S.A.) without covenanting to abide by the Gracious Reconciliation and Dismissal Procedure or that may choose to abandon that process before completing it while continuing to seek dismissal from the denomination, the Presbytery establishes this Alternative Procedure for Churches Seeking Dismissal from the PC (U.S.A.).

The intent of this Alternative Procedure is to provide guidelines for a gracious, decent, and orderly interaction between the Presbytery and churches seeking dismissal outside of the process defined in the Gracious Reconciliation and Dismissal Procedure.

## ALTERNATIVE PROCESS

When the Presbytery is notified that a church has taken steps to request dismissal from the PC (U.S.A.) without complying with the Gracious Reconciliation and Dismissal Procedure or that a church that was proceeding under the Gracious Reconciliation and Dismissal Procedure fails to complete it but is requesting dismissal, then the Presbytery will respond by following these guidelines.

## A. ADMINISTRATIVE COMMISSION

1. Pursuant to G-3.0109b(5), the Moderator of Presbytery shall nominate and the Presbytery shall elect, an Administrative Commission ("AC"). The primary task of the AC is to "attempt to inquire into and settle the difficulties" of the church in question. The authority of the AC will be specifically defined for the situation. Powers of the AC may include authorization for the AC to assume jurisdiction in whole or in part over the affairs of the church with the power to act in place of the Session.

2. The Stated Clerk of the Presbytery will conduct a training session for members of the AC to apprise them of the powers that are delegated to the AC, and the facts and circumstances that prompted the formation of the AC.

3. Powers granted to the AC by the Presbytery may include the authority for the AC:

    a.   to determine whether a schism exists within the congregation (*see* Book of Order, G-4.0207).

    b.   If schism exists, to determine if one of the factions of the church represents *the true church within the PC (U.S.A.)* (*see* Book of Order, G-4.0207).

    c.   to make recommendations to the Presbytery to dissolve pastoral relationships or to place pastors on administrative leave. When requisite authority is given by the Presbytery, the AC may dissolve pastoral relationships (*see* Book of Order, G-3.0109b).

07/18/2015

d.   to request records of the Session (*see* Book of Order, G-3.0108b), *"If a higher governing body learns at any time of any irregularity or delinquency by a lower governing body, it may require the governing body to produce any records and take appropriate action."*

e.   to examine and copy whatever records of the church that may be relevant (*e.g.*, how money is held, title to property, title policies, surveys, insurance documents, financial statements and records, budgets, tax returns, bank and account statements, mortgages or other loan documents, corporate articles, bylaws, and charters – especially changes in any of these).

f.   to assume original jurisdiction (in whole or in part) in any case in which it determines that the Session is unable or unwilling to manage wisely the affairs of its church (*see* Book of Order, G-3.02 and G-3.0201).

g.   to freeze the assets of the church and approve expenditures.

h.   to secure the building, grounds and other property of the church for the use and benefit of the PC (U.S.A.).

i.   to determine if and when an assembly of the congregation is appropriate for the purpose of voting to seek dismissal from the PC (U.S.A.).

*j.*   to call that assembly of the congregation, and provide the Moderator and Clerk for that assembly and to report results of the congregational vote to the Presbytery;

k.   to authorize oversight of the church, its ministry and its property by a group within the congregation that has been identified as *"the true church within the PC (U.S.A.)"* (G-4.0207).

l.   to propose to the Presbytery any recommendation for the disposition of the property held by or for the church, and the assumption of the liabilities of the church, if there is no group within the congregation that has been identified as *the true church within the PC (U.S.A.)*, or if such group cannot or does not assume responsibility for the church, or its property or liabilities.

m.   to consider the conformity with the PC (U.S.A.) (in matters of doctrines and order) of the proposed receiving body or denomination to which a congregation has, or may, request dismissal, and to propose to the Presbytery any recommendation regarding same for the Presbytery's consideration and action.

n.   to fulfill any other responsibilities as assigned by the Presbytery, or as may be necessary or appropriate in connection therewith or in connection with those set forth above.

### B. ASSEMBLY OF THE CONGREGATION

1. The AC shall keep the Presbytery informed of significant actions taken and shall make recommendations directly to the Presbytery for all actions that require the Presbytery's approval.

2. One of the powers of the AC is to determine when or if an assembly of the congregation is appropriate for the purpose of advising the Presbytery whether the congregation wishes to seek dismissal from the PC (U.S.A.) to another Reformed denomination. Prior to any such advisory vote, the leadership of the church shall furnish to the AC written verification that they will receive the church upon dismissal from the PC (U.S.A.). The Presbytery or AC may request any other written information about that

07/18/2015

denomination, such as doctrine, governance and permanence. The call for an assembly of the congregation shall be in accordance with the notice and quorum requirements of that congregation.

3. A request for dismissal shall be by two-thirds advisory vote of the active membership of the congregation as recorded in the Annual Statistical Report for the immediately preceding year. By such vote the congregation must adopt a resolution requesting that the Presbytery dismiss the church to a specified Reformed denomination that is in correspondence with the General Assembly of the PC (U.S.A.) and is a member of ecumenical bodies in which the PC (U.S.A.) is also a member. The resolution shall specify whether dismissal is sought with all or part the church's property or without the church's property. If dismissal is sought with part of the property then the resolution shall specify the property to be retained.

## C. DISPOSITION OF CHURCH PROPERTY

1. Disposition of the property of the church shall be resolved in accordance with the provisions of G-4.0207 (Property of Congregation in Schism) and G-4.0208 (Exceptions) of the Book of Order.

2. A minority of the church congregation may choose to elect new church leadership and assume responsibility of the property subject to the jurisdiction of the AC or sell the property to the majority with the approval of the Presbytery (if required).

If the minority does not or cannot assume responsibility for the property within a reasonable period of time (as determined by the AC), then the AC may recommend that the Presbytery dismiss or dissolve the congregation, or dispose of the property, or take other appropriate action.

3. The AC may consider the following options for the disposition of the church property if there is no faction of the congregation that can or does assume responsibility for the church property as a continuing congregation of the PC (U.S.A.):

    a. Sell, transfer, lease or otherwise dispose of the property to a third party.

    b. Retain the property for a new church development, or hold, use and apply the property for another mission of the Presbytery.

    c. Sell, lease or transfer the property to the membership of the dismissed congregation upon terms acceptable to the Presbytery on condition that the church is dismissed to another Reformed denomination.

# Covenant Agreement

In order to: promote the ongoing faithfulness of our members in the work of the Mission of God through Jesus Christ; exercise "mutual forbearance"; treat others with respect regardless of theological and ecclesiological differences; and work for fairness to all parties in our decisions, therefore, the General Council of the Presbytery of New Covenant and the congregation of the

_____Church of

_____, Texas, covenant to follow the Gracious Reconciliation and Dismissal Procedure and abide by all its terms.

_____
Date

_____          _____
Pastor/Moderator of Session          Moderator, General Council, Presbytery of New Covenant

_____          _____
Clerk of Session          Stated Clerk, Presbytery of New Covenant

# Exhibit E

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MISSION PRESBYTERY, | § | BEXAR COUNTY, TEXAS |
| | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| ED BONDURANT, PAULA BONDURANT, BOB WISE, ANNA WISE, MIRIAM OGLESBEE ELLISON, AND DON DRUMMOND | § | |
| | § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## DEFENDANT'S VERIFIED ORIGINAL COUNTERCLAIM, INTERVENORS' VERIFIED ORIGINAL PETITION IN INTERVENTION, AND DEFENDANT'S AND INTERVENORS' APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

TO THE HONORABLE JUDGE OF SAID COURT:

Counter-Plaintiff Mission Presbytery ("Mission") files its Verified Original Counterclaim, and Intervenors Ed Bondurant, Paula Bondurant, Bob Wise, Anna Wise, Miriam Oglesbee Ellison, and Don Drummond ("Intervenors") file this Verified Original Petition in Intervention under Texas Rules of Civil Procedure 60 and 61 and state as follows:

## I.
## PARTIES

1. Counter-Plaintiff Mission is a non-profit corporation organized under the laws of the State of Texas.

2.     Counter-Defendant, First Presbyterian Church of San Antonio ("FPC") is a non-profit corporation organized under the laws of the state of Texas and located in San Antonio, Texas. FPC has previously appeared in this lawsuit.

3.     Intervenors Ed Bondurant, Paula Bondurant, Bob Wise, Anna Wise, Miriam Oglesbee Ellison, and Don Drummond are residents of San Antonio, Texas, and members of and/or contributors to FPC.

## II.
## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction of this action because the amount in controversy exceeds the minimal jurisdiction limits of this Court, and the subject matter is authorized by Chapter 37 of the Texas Civil Practice & Remedies Code.

5.     Venue is proper in Bexar County under Section 15.002 of the Civil Practice and Remedies Code because the FPC's principal place of business is located in Bexar County and all or a substantial part of the occurrence giving rise to this litigation occurred in Bexar County.

## III.
## STATEMENT OF FACTS

6.     Counter-Defendant FPC initiated this lawsuit against Mission on May 12, 2015 by filing Plaintiff's Verified Original Petition for Declaratory Judgment and Application for Temporary Restraining Order and Temporary and Permanent Injunction (hereinafter "FPC's Original Petition").

7.     Counter-Defendant FPC is a local congregation of the Presbyterian Church (U.S.A.) ("PC(USA)"). **Exh. B** (*W. Poe Affidavit*) ¶ 2. FPC formally joined PC(USA), the national denomination, in 1983. *FPC's Original Petition* ¶ 10. However, for the 100 years prior

2

to 1983, FPC was a member of Presbyterian Church in the United States ("PCUS"), a legal predecessor to the national denomination. *Id.* ¶¶ 8-9.

8. All members of the national denomination agree to be subject to PC(USA) rules and regulations. **Exh. B ¶ 2.** PC(USA)'s rules and regulations are based on the PC(USA) Constitution, which is divided into two parts: (1) the Book of Confessions and (2) the Book of Order. *Id.* For any given church to be subject to the PC(USA) Constitution, the individual church must be a member of the national denomination. *Id.* That is, all member churches of PC(USA) are subject to the Constitution, and no non-member churches are subject to the Constitution. *Id.*

9. FPC holds title to approximately eighteen parcels of real property, identified in Exhibit 1 to FPC's Original Petition (collectively referred to hereinafter as "FPC's Real Estate"). *FPC's Original Petition* ¶ 80. Further, FPC also owns personal property associated with the management and operation of the church, including but not limited to furniture, electronic equipment, vehicles, maintenance supplies, fixtures, telephone equipment, and appliances (collectively hereinafter referred to as "FPC's Other Property"). By its Original Petition, FPC has indicated a clear intent to leave PC(USA) imminently without sufficient regard to PC(USA)'s interest in FPC's Real Estate and Other Property. **Exh. B ¶ 6;** *also see, e.g., FPC's Original Petition* ¶¶ 36 (claiming FPC holds its property unencumbered by any trust for the use and benefit of PC(USA)), 81 (seeking to quiet title to FPC's Real Estate), 85 (request for permanent injunction from PC(USA) interfering with FPC property).

10. Mission is a district administrative unit of PC(USA). **Exh. B ¶ 2.** Mission is responsible for ensuring that local congregations adhere to the PC(USA) Constitution. *FPC Original Petition* ¶ 11. Mission is also charged with representing the interests of its member

3

congregations and individual church members, which includes the members of FPC as a PC(USA) church. **Exh. B ¶ 3.**

11.    Intervenors are all members and/or regular attendees of FPC who have contributed financially to the church over the past several years. *See* **Exh. C** (*E. Bondurant Affidavit*); **Exh. D** (*P. Bondurant Affidavit*); **Exh. E** (*B. Wise Affidavit*); **Exh. F** (*A. Wise Affidavit*); **Exh. G** (*M. Ellison Affidavit*); **Exh. H** (*D. Drummond Affidavit*).

12.    FPC's Articles of Incorporation dated November 18, 1988 state that FPC is a non-profit corporation and include the following language under the section entitled "PURPOSES":

> The purposes for which the corporation is formed is in the support of public worship and the worship of the Almighty God; **instruction and education according to the Holy Bible,** *the Book of Confessions and the Book of Order of the Presbyterian Church (U.S.A.),* or any successor; service to others; and such other religious, benevolent, charitable, and educational activities as may be appropriate. Incidental thereto, **such corporation shall have authority to do any and all things necessary or proper to the operation of a church,** *as may be permitted by the Constitution of the Presbyterian Church (U.S.A.),* or any successors, and permitted under the laws of the United States and the State of Texas.

**Exh. A** (*FPC Articles of Incorporation*) at 1 (emphasis added). Under the section entitled "CONDUCT OF BUSINESS," FPC's articles of incorporation state:

> All business of the corporation shall be conducted and transacted commensurate with the laws of the United States and the State of Texas *and according to the rules and regulations of the Presbyterian Church (U.S.A),* or its successor, as prescribed by the General Assembly, by the Synod, and by the Presbytery to which the corporation belongs, *according to the principles and doctrines of such demonination [sic] as enunciated in its Book of Confessions and Book of Order.*

*Id.* at 4 (emphasis added).

13.    In early 2015, FPC amended their articles of incorporation to remove a substantial portion of the language above. *FPC's Original Petition* ¶¶ 30-31. However, at all times between 1988 and the amendment, FPC's corporate purpose was expressly stated to be that as

4

listed in the above paragraph. **Exh. A at 1.** Further, at all prior times, as admitted in FPC's Petition, FPC was a member church of either PC(USA) or denominations that were legal predecessors of PC(USA) (i.e. PCUS that reunited and merged into PC(USA) in 1983), and held itself out to the public as such. *FPC's Original Petition* ¶¶ 8-9.

14.    While FPC has been a member congregation of PC(USA), PC(USA) and Mission have provided substantial financial benefits to FPC. These financial benefits include, but are not limited to:

(a)    FPC using PC(USA)'s name, affiliation, and registered mark to recruit members, donors and staff, including, for example: FPC's newsletters and website have regularly used the PC(USA) seal, and all of FPC's pastors since 1983 have been hired through Mission via the Presbyterian system overseen by Mission's Committee on Ministry, including the time, effort, and periodic reimbursement of various members of that committee; and

(b)    FPC and its pastors participating in the Board of Pensions (the retirement and medical plan of the PC(USA), overseen and administered by PC(USA) personnel who are paid by the PC(USA)) and using those benefits to attract employees.

**Exh. B ¶ 4** (collectively hereinafter referred to as "Mission's Donations to FPC"). All of Mission's Donations to FPC were made for the purpose of PC(USA). *Id.* ¶ 5.

15.    While FPC has been a member congregation of PC(USA), Intervenors have each contributed to FPC as follows:

(a)    Intervenor Ed Bondurant (with his spouse, Paula Bondurant) donated approximately $94,247.48 to FPC. **Exh. C ¶ 2.**

(b)    Intervenor Paula Bondurant (with her spouse, Ed Bondurant) donated approximately $94,247.48 to FPC. **Exh. D ¶ 2.**

(c)    Intervenor Bob Wise (with his spouse Anna Wise) donated approximately $20,200.00 to FPC. **Exh. E ¶ 3.**

(d)    Intervenor Anna Wise (with her spouse Bob Wise) donated approximately $20,200.00 to FPC. **Exh. F ¶ 3.**

5

(e)     Intervenor Miriam Oglesbee Ellison donated approximately $29,000.00 to FPC. **Exh. G ¶ 3.**

(f)     Intervenor Don Drummond donated approximately $137,000.00 to FPC. **Exh. H ¶ 3.**

(collectively hereinafter referred to as "Intervenors' Donations to FPC"). All of Intervenors' Donations to FPC were made for the purpose of benefitting PC(USA). **Exh. C ¶ 2; Exh. D ¶ 2; Exh. E ¶ 3; Exh. F ¶ 3; Exh. G ¶ 3; Exh. H ¶ 3.**

16.     Upon information and belief, FPC also solicited and received donations from a substantial portion of its congregation members while FPC has been a member of PC(USA). Further, upon information and belief, most, if not all, of the donations did not specify any limitation on the purpose of their charitable donation other than the fact that was it intended to be donated to FPC. At all times relevant to the donations referenced in this paragraph, FPC was a member of PC(USA) and/or FPC's corporate purpose was for "instruction and education according to the Holy Bible, the Book of Confessions and the Book of Order of the Presbyterian Church (U.S.A.)," and that incidental to such purpose, FPC only had authority to act as permitted by law and "by the Constitution of the Presbyterian Church (U.S.A.)." **Exh. A at 1.**

17.     Upon information and belief, the donations identified in Paragraphs 14 through 16 above have become intermingled and a part of FPC's Real Estate and Other Property. This has happened because the donations have been made over such a long period of time and, upon information and belief, constitute a substantial majority of FPC's annual income (i.e. every donation made between at least 1983 and present). Funds collected by FPC have, upon information and belief, been used by FPC to acquire, operate, maintain, and improve FPC's Real Estate and Other Property. Indeed, this intermingling of donated funds is exactly why FPC seeks a suit to quiet title with this Court. *FPC's Original Petition* ¶¶ 80-81. Thus, a significant

6

amount of donations have been used to either (1) improve, (2) develop, or (3) maintain FPC's Real Estate and/or purchase and maintain FPC's Other Property.

## IV.
## CAUSES OF ACTION

### A. *DECLARATORY JUDGMENT*

18. Paragraphs 1 through 17 are incorporated herein by reference.

19. Mission's and Intervenors' Donations to FPC are subject to a constructive charitable trust that restricts use of such funds for any purpose other than for PC(USA).

20. A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment. *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.). Constructive trusts are a very broad means of redressing wrong in keeping with the basic principles of equity and justice. *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). "[T]here is no unyielding formula to which a court of equity is bound in decreeing a constructive trust, since the equity of the transaction will shape the measure of relief granted." *Id.*

21. To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. *Id.*

22. Under Texas law, "property transferred unconditionally to a non-profit corporation, whose purpose is established or determined to be a public charity or educational facility, is nevertheless **subject to implicit charitable or educational limitations *defined by the donee's organizational purpose.***" *Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App.—Houston [1st Dist.] 1986), writ refused n.r.e. (Jan. 21, 1987) (emphasis added). **Where a donor does not expressly limit a donation *at the time of transfer*, the transferred property is deemed a gift to the charitable purposes and objects of the corporation.** *Id.* "Because a charitable

7

corporation is organized for the benefit of the public, and not for private profit or its own benefit, the public has a beneficial interest in all the property of a public benefit, non-profit corporation." *Id.* "*Such a corporation has legal title to the property but may use it only in furtherance of its charitable purposes.*" *Id.* (emphasis added).

23.     FPC expressly stated in its Articles of Incorporation that its non-profit corporate purpose was "instruction and education according to the Holy Bible, the Book of Confessions and the Book of Order of the Presbyterian Church (U.S.A.)," and that incidental to such purpose, FPC only had authority to act as permitted by law and "by the Constitution of the Presbyterian Church (U.S.A.)." **Exh. A** at 1. Further, even when FPC's Articles of Incorporation did not expressly state the above purpose, FPC was nonetheless subject to the PC(USA) Book of Order because FPC was a member congregation of PC(USA). *See FPC's Original Petition* ¶ 10. All member congregations of PC(USA) are subject to the Book of Order and a congregation is not permitted to be a member of PC(USA) unless the congregation agrees to be governed by the PC(USA) Constitution. **Exh. B** ¶ 2. Therefore, under the *Blocker* standard, every donation that FPC received while it was a member of PC(USA) is subject to a constructive charitable trust for the purpose of PC(USA) unless the donation at issue expressly stated that it was for another purpose or denomination *at the time the donation was made.* Thus, Mission's and Intervenors' Donations to FPC are subject to a constructive charitable trust that limits the use of said funds to use for the purpose of PC(USA).

24.     Further, all other donations made to FPC while FPC was a member of PC(USA) are subject to the same constructive charitable trust limitation. This limitation automatically applies to all other donations unless a specific donation, *at the time it was made,* expressly stated that it was for a denomination or purpose other than PC(USA). Absent evidence that a given

8

donation expressly stated that it was for a denomination or purpose other than PC(USA), the use of the donation must be subject to a constructive charitable trust for the purpose of PC(USA). *See Blocker*, 718 S.W.2d at 415.

25. As indicated by filing this lawsuit, FPC has expressed an intention to alter the already-established charitable purpose of the donated funds. Specifically, FPC intends to use the donated funds at issue for a denomination other than PC(USA). **Exh. B ¶ 6**. To allow FPC to retrospectively alter the purpose of the donations discussed above would constitute unjust enrichment in favor of whatever denomination FPC is attempting to join. The funds that FPC collected while a PC(USA) member congregation are all irrevocably subject to a limitation for that particular charitable purpose.

26. Because FPC's expressly stated corporate purpose is to further the instruction and education according to the Book of Order of the PC(USA), subject to the Constitution of the PC(USA), Mission and Intervenors request that this Court issue a declaratory judgment that a constructive charitable trust limits the use of Mission's and Intervenors' Donations to FPC to uses for the purpose of PC(USA), and not for the purpose of any other denomination.

27. Further, for the reasons stated above, Mission and Intervenors request that this Court issue a declaratory judgment that the same constructive charitable trust limits the use of all other donations to FPC made while FPC was a member of PC(USA) to uses for the purpose of PC(USA), and not for the purpose of any other denomination.

28. Finally, Mission and Intervenors request that this Court issue a declaratory judgment that all FPC Real Estate and Other Property are also subject to a constructive charitable trust for the purpose of PC(USA), and not for the purpose of any other denomination, because

9

such a substantial amount of donations taken in by FPC has been invested and intermingled with FPC's Real Estate and Other Property.

## B. TEMPORARY INJUNCTION

29. Paragraphs 1 through 28 are incorporated herein by reference.

30. Mission and Intervenors request that this Court issue a temporary injunction that prohibits FPC from using any funds received via the donations identified in Paragraphs 14 through 16 for a purpose of a denomination that is not PC(USA).

31. Under Texas law, a party is entitled to a temporary injunction to preserve the status quo of the subject matter of this suit pending a judicial resolution of the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.* "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Id.*

32. First, Mission and Intervenors have a cause of action against FPC for the equitable creation of a constructive charitable trust for the benefit of PC(USA). Mission and Intervenors have shown that they each, along with other unnamed congregation supporters, made Donations to FPC over the past several decades. *See* **Exh. B ¶ 4; Exh. C ¶ 2; Exh. D ¶ 2; Exh. E ¶ 3; Exh. F ¶ 3; Exh. G ¶ 3; Exh. H ¶ 3.** Further, most, if not all, of the donations were *not* made under an express limitation that they were for the purpose of any denomination other than PC(USA). *Id.* As a default rule, because those donations were to a charitable organization (FPC,

10

a non-profit religious corporation), the donated funds are subject to a constructive charitable trust that limits their use to FPC's stated corporate purpose (for the purpose of PC(USA)). *See Blocker*, 718 S.W.2d at 415. To allow FPC to retrospectively alter the purpose of Mission's, Intervenors', and other congregation members' donations (the "identifiable res" element) would constitute unjust enrichment.

33. The same constructive charitable trust must also be applied to FPC's Real Estate and Other Property because such a substantial amount of FPC's revenue (i.e. all donations FPC received for decades) are subject to the trust. That revenue has been reinvested in FPC's Real Estate and Other Property over the past several decades, and to allow FPC to use that funding for any denomination other than PC(USA) would constitute unjust enrichment.

34. By the filing of this lawsuit, FPC has affirmatively demonstrated that it has an imminent intention to begin using all of its funds and property in a manner that is not for the benefit of PC(USA). *See, e.g., FPC's Original Petition* ¶¶ 36, 81, and 85. FPC's intentions are also demonstrated by the fact that it scrubbed its Articles of Incorporation earlier this year in an attempt to mask its corporate purpose for the past three decades. *See Id.* ¶¶ 30-31. Further, statements made by and on behalf of FPC officers to representatives of Mission have stated a clear intent on the part of FPC leadership to leave the denomination – taking property with them – as soon as practicable. **Exh. B** ¶ 6. Absent this Court's intervention, FPC will attempt to use funds subject to a constructive charitable trust for a purpose other than that originally determined at the time of donation. Mission and Intervenors are thus forced to seek injunctive relief with this Court to protect their interests in the funds subject to the constructive charitable trust discussed above.

11

35. Mission and Intervenors are also entitled to a temporary injunction because they have no adequate remedy on appeal if FPC does spend or abscond with funds and/or property subject to the constructive charitable trust. Absent investigation in this lawsuit, Mission and Intervenors have no ability to determine the total scope of all donations that may be subject to the constructive charitable trust. Further, it may be close to impossible to trace the end use of donations dating back several decades, so any sale of FPC's Real Estate could result in an unidentifiable amount of limited-use funds being subject to an unauthorized purpose. Finally, Mission and Intervenors should not be forced to calculate an exact amount of the identifiable res at issue because it is not their burden to do so. *See Blocker*, 718 S.W.2d at 415 (as a default rule, donations are subject to the nonprofit's corporate purpose). Allowing FPC to use its funds, Real Estate, and Other Property for a denomination other than PC(USA) would force Mission and Intervenors to sue for damages that Mission and Intervenors have no burden to prove. Thus Mission and Intervenors have no adequate remedy on appeal if FPC violates the constructive charitable trust.

36. Because (i) FPC has shown an imminent intent to use funds collected for the purpose of PC(USA) for denomination other than PC(USA) and (ii) Mission and Intervenors may have no ability to seek an accurate amount of damages as a result of the breached constructive charitable trust, Mission and Intervenors request that this Court grant a temporary injunction restricting FPC's use of (i) donated funds, (ii) FPC's Real Estate, and (iii) FPC's Other Property for the purpose of PC(USA), and not for the purpose of any other denomination.

12

## C. *PERMANENT INJUNCTION*

37. Paragraphs 1 through 36 are incorporated herein by reference.

38. For the reasons stated above, Mission and Intervenors ask that this Court, after a trial on the merits, grant a permanent injunction that prohibits FPC from using any funds received via the donations identified in Paragraphs 14 through 16 for a purpose that is not for the benefit of PC(USA), including the purpose of a different denomination.

## V.
## ATTORNEY'S FEES

39. Mission and Intervenors are represented by an attorney in this matter, and are entitled to recover reasonable and necessary attorney fees under Texas Civil Practice & Remedies Code Section 37.009.

## VI.
## NOTICE TO THE TEXAS ATTORNEY GENERAL

40. Pursuant to Texas Property Code Section 123.003, Mission and Intervenors are providing a copy of this Counterclaim and Petition in Intervention to the Texas Attorney General because it is a proceeding involving a charitable trust.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Mission and Intervenors ask this Court grant the following relief their favor:

a. A declaration that Mission's and Intervenors' Donations to FPC are subject to a constructive charitable trust and that all such funds may only be used for the charitable purpose of PC(USA);

b. A declaration that all donations or gifts to FPC while FPC has been a member of PC(USA) are subject to a constructive charitable trust and that all such funds may only be used for the purpose of PC(USA);

c. A declaration that FPC's Real Estate and Other Property are encumbered by a constructive charitable trust for the purpose of PC(USA);

13

d.  A Temporary Injunction enjoining FPC from using any donation subject to the constructive charitable trust described above for any denomination other than PC(USA);

e.  A Permanent Injunction enjoining FPC from using any donation subject to the constructive charitable trust described above for any denomination other than PC(USA)

f.  A Temporary Injunction ordering that FPC is enjoined from using FPC's Real Estate and Other Property for any denomination other than PC(USA);

g.  A Permanent Injunction ordering that FPC is enjoined from using FPC's Real Estate and Other Property for any denomination other than PC(USA);

h.  Court costs;

i.  Attorney fees as are reasonable and necessary; and

j.  All other relief to which Mission and/or Intervenors are entitled.

Respectfully submitted,

**LLOYD GOSSELINK**
 **ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone:    (512) 322-5800
Facsimile:    (512) 472-0532

By:  _____

JOSÉ E. de la FUENTE
State Bar No. 00793605
jdelafuente@lglawfirm.com
TYLER T. O'HALLORAN
State Bar No. 24083590
tohalloran@lglawfirm.com

14

DAVIDSON TROILO REAM & GARZA
A Professional Corporation
7550 IH-10 West, Suite 800
San Antonio, Texas 78229-5815
Telephone:    (210) 349-6484
Facsimile:    (210) 349-0041

Keith Kendall
State Bar No. 11263250
kkendall@dtrglaw.com

**ATTORNEY FOR DEFENDANT
MISSION PRESBYTERY AND
INTERVENORS**

15

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the method indicated below on this 30th day of July, 2015:

David B. West
dwest@dykema.com
Larissa Sanchez Fields
lfields@dykema.com
DYKEMA COX SMITH
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
*Via E-Service & Email*

Kent C. Krause
kkrause@cdklawfirm.com
CRADDOCK DAVIS & KRAUSE, LLP
3100 Monticello Avenue, Suite 550
Dallas, Texas 75205
*Via E-Service & Email*

Office of the Attorney General Ken Paxton
Charitable Trusts Section
Financial and Tax Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
*Via CMRRR*

JOSÉ E. de la FUENTE

16

# EXHIBIT A

0 0 0 9 9 0 0 1 1 2 4

FILED
in the Office of the
Secretary of State of Texas

NOV 18 1988

Clerx I-B
Corporations Section

ARTICLES OF INCORPORATION

OF

FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO

We, the undersigned natural persons, who are of the age of eighteen (18) years or more, acting as Incorporators of a corporation under the Texas Non-Profit Corporation Act, do hereby adopt the following Articles of Incorporation for such corporation:

ARTICLE ONE

NAME

The name of the corporation is the First Presbyterian Church of San Antonio.

ARTICLE TWO

NON-PROFIT CORPORATION

The corporation is a non-profit corporation.

ARTICLE THREE

DURATION

The period of its duration is perpetual.

ARTICLE FOUR

PURPOSES

The purposes for which the corporation is formed is the support of public worship and the worship of Almighty God; instruction and education according to the Holy Bible, the Book of Confessions and the Book of Order of the Presbyterian Church (U.S.A.), or any successor; service to others; and such other religious, benevolent, charitable, and educational activities as may be appropriate. Incidental thereto, such corporation shall have authority to do any and all things necessary or proper to the operation of a church, as may be permitted by the Constitution of the Presbyterian Church (U.S.A.), or any successors, and permitted under the laws of the United States and of the State of Texas.

-1-

## ARTICLE FIVE

### INITIAL REGISTERED OFFICE AND AGENT

The street office of the initial registered office of the corporation is 404 North Alamo St., San Antonio, Texas 78205, and the name of its original registered agent at such address is Louis H. Zbinden, Jr.

### ARTICLE SIX

### MEMBERS OF THE CORPORATION

The members of the corporation shall be all of the active members (as that term is defined in the Book of Order) of the First Presbyterian Church of San Antonio at the time of incorporation and such other persons as may thereafter from time to time become and remain active members of such church.

### ARTICLE SEVEN

### GOVERNANCE

The corporation shall be governed by the Session. The Church is governed prior to incorporation by a session, elected by the congregation pursuant to provisions of the Book of Order of the Presbyterian Church (U.S.A.). The current Session consists of forty-five (45) elders, and they shall constitute the initial corporate Session. The number of elders may from time to time be fixed and elected by the congregation pursuant to the provisions of the aforesaid Book of Order. The Session shall also function as the Board of Trustees. The following is a listing of the names and addresses of the current Session:

James D. Baskin
260 Country Lane
San Antonio, TX 78209

Donald A. Beeler
145 Camellia Way
San Antonio, TX 78209

Robert Browning
175 Primrose
San Antonio, TX 78209

Ben Chilcutt
405 Elizabeth
San Antonio, TX 78209

Curtis N. Cox
238 E. Edgewood
San Antonio, TX 78209

Edward W. Crane
107 Briarcliff
San Antonio, TX 78213

Mrs. Walter C. Dunlap
24 Santa Clara Rd.
Seguin, TX 78155

Donald R. Drummond
301 East Kings Highway
San Antonio, TX 78212

Donald E. Everett
142 Laurel Heights Pl.
San Antonio, TX 78212

-2-

0 ; 0 9 9 0 0 1 4 2 6

Mrs. C.W. Ferguson
13795 Bluff Villa Ct.
San Antonio, TX 78216

Fred W. Gould
7207 Payaya Drive
San Antonio, TX 78223

Mrs. Peter Hains
7610 Vinewood Court
San Antonio, TX 78209

J. Joe Harris
321 Geneseo
San Antonio, TX 78209

Houston H. Harte
2207 Camelback
San Antonio, TX 78209

Thomas Hawkes
P.O. Drawer 121
San Antonio, TX 78291

James H. Hopper
107 Wickford Way
San Antonio, TX 78213

Ike S. Kampmann
131 E. Kings Highway
San Antonio, TX 78212

Mrs. Blair P. Labatt
212 W. Summitt
San Antonio, TX 78212

T Weir Labatt, III.
135 W. Elsmere Place
San Antonio, TX 78212

George J. Laughead
336 Tuxedo
San Antonio, TX 78209

Mrs. Robert H. LePere
2211 Camelback
San Antonio, TX 78209

Charles D. Lutz, III
147 Oakhurst
San Antonio, TX 78209

William J. Lyons
720 Castano
San Antonio, TX 78209

John W. McLeod
504 W. Magnolia
San Antonio, TX 78212

Marion W. McCurdy
601 Mandalay Drive East
San Antonio, TX 78212

Orvis E. Meador, Jr.
151 Cave Lane
San Antonio, TX 78209

Daniel C. Morales
6130 Ingram, #1703
San Antonio, tX 78238

Will A. Morriss
215 Royal Oaks
San Antonio, TX 78298

Mrs. Julia Norton
218 Stanford
San Antonio, TX 78212

Charles G. Orsinger
2206 Camelback
San Antonio, TX 78209

David Peeples
335 Rockhill
San Antonio, TX 78209

Jack W. Pool
334 Woodway Forest
San Antonio, TX 78209

William L. Ruhmann
127 W. Elmview
San Antonio, TX 78209

Mrs. Jean T. Rushing
302 Rilla Vista Dr.
San Antonio, TX 78216

Robert R. Scott
301 Kennedy
San Antonio, TX 78209

John R. Shaw
2611 Eisenhauer, #802
San Antonio, TX 78208

Mrs. Gary F. Simone
435 Wood Shadow
San Antonio, TX 78216

George H. Spencer, Jr.
202 W. Summitt
San Antonio, TX 78209

Louis H. Stumberg
R.R. 2, Box 303A
San Antonio, TX 78249

Ronald G. Tefteller
228 Luther Dr.
San Antonio, TX 78212

Joseph E. Warrick
3427 Hopecrest
San Antonio, TX 78230

J. Michael Wilkes
403 Lazy Bluff
San Antonio, TX 78216

Mrs. Kaye E. Wilkins
560 Grandview
San Antonio, TX 78209

Margaret Wyatt
135 W. French Pl.,#211
San Antonio, TX 78212

Elizabeth Zogheib
135 W. French Pl., #102
San Antonio, TX 78209

## ARTICLE EIGHT

### CONDUCT OF BUSINESS

All business of the corporation shall be conducted and transacted commensurate with the laws of the United States and the State of Texas and according to the rules and regulations of the Presbyterian Church (U.S.A.), or its successor, as prescribed by the General Assembly, by the Synod, and by the Presbytery to which the corporation belongs, according to the principles and doctrines of such demonination as enunciated in its Book of Confessions and Book of Order.

### ARTICLE EIGHT

### INCORPORATORS

The name and street address of each incorporator is :

Name                                            Address

Myrl M. Hart                                    321 Sunset Road
                                                San Antonio, TX 78209

Ike S. Kampmann, Jr.                            131 E. Kings Hwy.
                                                San Antonio, TX 78212

James D. Baskin                                 260 Country Lane
                                                San Antonio, TX 78209


IN WITNESS WHEREOF, we have hereunto set our hands this 16th day of November, 1988.

_____
Incorporator

_____
Incorporator

_____
Incorporator

-4-

0 7 0 9 9 0 0 1 4 2 6

STATE OF TEXAS     §
COUNTY OF BEXAR     §

I, Patricia Agisotelis, a notary public, do hereby certify that on the 16th day of November, 1988, personally appeared before me Myrl M. Hart, Ike S. Kampmann, Jr. and James D. Baskin, who, each being by me first duly sworn, severally declared that they are the persons who signed the foregoing document as incorporators, and that the statements therein contained are true.

IN WITNESS THEREOF, I have hereunto set my hand and seal on the day and year above written.

_Patricia L. Agisotelis_
Notary Public for the State of Texas
Printed Name: PATRICIA Agisoteus
My Commission Expires: 4/91

4/91

-5-

# EXHIBIT B

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § § | |
| v. | § § § | |
| ED BONDURANT, *et. al.*, | § § § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF WILLIAM C. POE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, came on this day the Reverend Dr. William Christopher Poe who, being personally known to me, was placed under oath and testified as follows:

1. "My name is William C. Poe. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am the Interim Stated Clerk of Mission Presbytery (hereinafter "Mission"), and the following facts are true and correct and within my personal knowledge as Interim Stated Clerk of Mission.

2. A presbytery, like Mission, is a corporate expression of the church within a certain district, composed of all the congregations and all the teaching elders (ministers) within that district. As a presbytery, Mission is a district administrative unit of the Presbyterian Church

(U.S.A.) (hereinafter "PC(USA)"). Mission is responsible for ensuring that local congregations like First Presbyterian Church of San Antonio (hereinafter "FPC") adhere to the PC(USA) Constitution. The PC(USA)'s Constitution is divided into two parts: (1) the Book of Confessions and (2) the Book of Order. By the terms of the PC(USA) Constitution, every PC(USA) congregation is subject to the terms of the PC(USA) Constitution. For any given congregation to be subject to the PC(USA) Constitution, the individual congregation must be a member of the national denomination. In other words, all member congregations of PC(USA) are subject to the PC(USA) Constitution, and no non-member congregations are subject to the Constitution.

3. Mission is also charged with representing the interests of its member congregations and individual church members of those congregations, which includes the members of FPC as a PC(USA) congregation.

4. From the date of FPC's organization as a congregation to present, including the period from 1983 (the date of reunion and merger between the PCUS and UPCUSA, creating PC(USA)) to present, Mission and PC(USA) have provided FPC with substantial financial support. This financial support includes, but is not limited to:

        a.      FPC using the PC(USA)'s name, affiliation, and registered mark to recruit members, donors and staff, including, for example: FPC's newsletters and website have regularly used the PC(USA) seal, and all of FPC's pastors since 1983 have been hired through Mission via the presbyterian system overseen by Mission's Committee on Ministry, including the time, effort, and periodic reimbursement of various members of that committee;

2

b. FPC and its pastors participating in the Board of Pensions (the retirement and medical plan of the PC(USA), overseen and administered by PC(USA) personnel who are paid by the PC(USA)) and using those benefits to attract employees.

5. Mission provided the above support to FPC so that FPC could use it for the specific purpose of benefiting the PC(USA), and the members of PC(USA), Mission Presbytery, and FPC as a PC(USA) congregation.

6. On June 9, 2015, Mission received a letter from FPC's counsel on behalf of FPC specifically asking to negotiate promptly (1) the relinquishment of any claim by Mission and the PC(USA) of any interest in FPC property and (2) the terms of FPC's dismissal from the PC(USA) denomination to another reformed body.

_____
William C. Poe

Sworn to and subscribed before me the undersigned authority on this the 31st day of July, 2015.

_____
Notary Public, State of Texas

CATHERINE ANN DANIELS
NOTARY PUBLIC
State of Texas
Comm. Exp. 12-18-2017

3

# EXHIBIT C

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § § | |
| v. | § § § | |
| ED BONDURANT, *et. al.*, | § § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

**AFFIDAVIT OF ED BONDURANT**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, came on this day Ed Bondurant, who, being personally known to me, was placed under oath and testified as follows:

1. "My name is Ed Bondurant. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

2. I have been a member of FPC since 1973. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA.

4863636.1

PCUS, which was then succeeded by the PCUSA pursuant to the merger.

Between 1973 and present, including the period from 1988 to present, I have donated (with my spouse Paula Bondurant) approximately $94,247.48 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."



_____
Ed Bondurant

Sworn to and subscribed before me the undersigned authority on this the 29th day of July, 2015.

_____
Notary Public, State of Texas

JENNIFER MCLAUGHLIN
My Commission Expires
March 2, 2017

# EXHIBIT D

## CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § | |
| v. | § § § | |
| ED BONDURANT, *et. al.,* | § § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF PAULA BONDURANT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, came on this day Paula Bondurant, who, being personally known to me, was placed under oath and testified as follows:

1. "My name is Paula Bondurant. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

I have been a member of FPC since 1976. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA. At all times prior to the merger, FPC always represented itself as a local congregation of the

4863656.1

PCUS, which was then succeeded by the PCUSA pursuant to the merger.

Between 1973 and present, including the period from 1988 to present, I have donated (with my spouse Ed Bondurant) approximately $94,247.48 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."

_Paula Bondurant_
Paula Bondurant

Sworn to and subscribed before me the undersigned authority on this the 29th day of July, 2015.

_Jennifer McLaughlin_
Notary Public, State of Texas



JENNIFER MCLAUGHLIN
My Commission Expires
March 2, 2017

# EXHIBIT E

CAUSE NO. 2015-CI-07858

| FIRST PRESBYTERIAN CHURCH OF<br>SAN ANTONIO | § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | |
| MISSION PRESBYTERY, | §<br>§ | BEXAR COUNTY, TEXAS |
| Defendant, | §<br>§ | |
| v. | §<br>§ | |
| ED BONDURANT, *et. al.,* | §<br>§<br>§ | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF BOB WISE

| STATE OF TEXAS | § | |
| COUNTY OF BEXAR | § | |

BEFORE ME, the undersigned authority, came on this day Bob Wise, who, being personally known to me, was placed under oath and testified as follows:

1. "My name is Bob Wise. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

2. I have been a member of FPC since 1997. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA. At

all times prior to the merger, FPC always represented itself as a local congregation of the PCUS, which was then succeeded by the PCUSA pursuant to the merger.

3.   Between 1997 and present, I have donated (with my spouse Anna Wise) approximately $20,200 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."



Bob Wise

Sworn to and subscribed before me the undersigned authority on this the 30th day of July, 2015.

Notary Public, State of Texas

BRADLEY K. BREMER
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-18-2015

4863777.1

# EXHIBIT F

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MISSION PRESBYTERY, | § | BEXAR COUNTY, TEXAS |
| | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| ED BONDURANT, *et. al.*, | § | |
| | § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF ANNA WISE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, came on this day Anna Wise, who, being personally known to me, was placed under oath and testified as follows:

1.     "My name is Anna Wise. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

2.     I have regularly attended FPC since 1991. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA. At

4863786.1

all times prior to the merger, FPC always represented itself as a local congregation of the PCUS, which was then succeeded by the PCUSA pursuant to the merger.

3. Between 1997 and present, I have donated (with my spouse Bob Wise) approximately $20,200 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."



Anna Wise

Sworn to and subscribed before me the undersigned authority on this the 7th day of July, 2015.

Notary Public, State of Texas

BRADLEY K. BREMER
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-18-2015

4863786.1

# EXHIBIT G

# CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § § | |
| v. | § § § | |
| ED BONDURANT, *et. al.,* | § § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF MIRIAM OGLESBEE ELLISON

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, came on this day Miriam Oglesbee Ellison, who, being personally known to me, was placed under oath and testified as follows:

1. "My name is Miriam Oglesbee Ellison. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

2. I have been a member of FPC since 1979. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA.

4863693.1

At all times prior to the merger, FPC always represented itself as a local congregation of the PCUS, which was then succeeded by the PCUSA pursuant to the merger.

3. Between 1979 and present, including the period from 1988 to present, I have donated approximately $29,000 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."

Miriam Oglesbee Ellison

Sworn to and subscribed before me the undersigned authority on this the 29th day of July, 2015.

Notary Public, State of Texas



MARY CATHERINE HOOKER
Notary Public, State of Texas
My Commission Expires
September 03, 2016

4863693.1

# EXHIBIT H

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § | |
| v. | § § | |
| ED BONDURANT, et. al., | § § | |
| Intervenors. | § § | 73RD JUDICIAL DISTRICT |

## AFFIDAVIT OF DON DRUMMOND

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, came on this day Don Drummond, who, being personally known to me, was placed under oath and testified as follows:

1.    "My name is Don Drummond. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am a member of the First Presbyterian Church of San Antonio (hereinafter "FPC"), and the following facts are true and correct and within my personal knowledge.

2.    I have been a member of FPC since 1967. Since the merger of the PCUS with the Presbyterian Church (U.S.A.) (hereinafter "PCUSA") in 1983, FPC has always represented itself as a local congregation of the PCUSA, and I have always understood that FPC is a PCUSA congregation and is subject to the Constitution, rules, and regulations promulgated by PCUSA.

4863755.1

At all times prior to the merger, FPC always represented itself as a local congregation of the PCUS, which was then succeeded by the PCUSA pursuant to the merger.

3.     Between 1967 and present, including the period from 1988 to present, I have donated approximately $137,000.00 to FPC. Each donation that I made to FPC was made to FPC as a congregation of the PCUSA so that FPC could use the funds in furtherance of its corporate purpose for the benefit of FPC as a PCUSA congregation. It was my understanding and intent that the donations would only be used for the purpose of benefitting PCUSA by virtue of FPC being a member church and that FPC would operate pursuant to the Constitution, rules, and regulations of the PCUSA. I did not have any intent at the time of my donations for any of my donations to be used for the benefit of any other denomination."

_____
Don Drummond

Sworn to and subscribed before me the undersigned authority on this the 30th day of July, 2015.

_____
Notary Public, State of Texas

MARY CATHERINE HOOKER
Notary Public, State of Texas
My Commission Expires
September 03, 2018

4863755.1

# Exhibit F



2015CI07858 -0073

CAUSE NO. 2015-CI-07858

| | |
|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO, | IN THE DISTRICT COURT |
| Plaintiff, | |
| v. | |
| MISSION PRESBYTERY, | BEXAR COUNTY, TEXAS |
| Defendant. | |
| v. | |
| ED BONDURANT, *et al.*, | 73RD JUDICIAL DISTRICT |
| Intervenors | |

### ORDER DENYING INTERVENORS' EMERGENCY MOTION FOR RECONSIDERATION OF INTERVENORS' APPLICATION FOR TEMPORARY INJUNCTION

Came on to be considered Intervenors' Emergency Motion for Reconsideration of Intervenors' Application for Temporary Injunction. After considering the Intervenors' Motion for Reconsideration, Plaintiff's Brief in Opposition, any further replies or responsive pleadings, the evidence presented, the record, and the arguments of counsel, if any, the Court finds that the Intervenors' Emergency Motion for Reconsideration on Intervenors' Application for Temporary Injunction should be DENIED.

IT IS THEREFORE ORDERED that Intervenors' Emergency Motion for Reconsideration on Intervenors' Application for Temporary Injunction is DENIED.

SIGNED on the 22 day of OCTOBER, 2015.

JUDGE PRESIDING

# Exhibit G

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH SAN ANTONIO | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | 73RD JUDICIAL DISTRICT |
| | § | |
| MISSION PRESBYTERY, | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

## Deposition Designations from the August 11, 2015
## Deposition of Reverend Raymond Martin Tear

Pg 4, Ln 23 – Pg 5, Ln 6

Pg 14, Ln 17 – Pg 16, Ln 25

Pg 17, Ln 9 – Pg 17, Ln 11

Pg 18, Ln 11 – Pg 20, Ln 3

Pg 21, Ln 11 – Pg 21, Ln 21

Pg 23, Ln 3 – Pg 23, Ln 7

Pg 23, Ln 22 – Pg 25, Ln 3

Pg 26, Ln 24 – Pg 27, Ln 2

Pg 28, Ln 16 – Pg 29, Ln 16

Pg 29, Ln 25 – Pg 30, Ln 22

Pg 31, Ln 15 – Pg 31, Ln 24

Pg 32, Ln 21 – Pg 33, Ln 3

Pg 34, Ln 10 – Pg 34, Ln 19

Pg 37, Ln 19 – Pg 40, Ln 2

Pg 42, Ln 10 – Pg 43, Ln 9

Pg 44, Ln 7 – Pg 44, Ln 24

Pg 45, Ln 10 – Pg 45, Ln 25



EXHIBIT
P548

1

Pg 46, Ln 17 – Pg 48, Ln 22

Pg 51, Ln 17 – Pg 52, Ln 4

Pg 53, Ln 19 – Pg 54, Ln 5

Pg 55, Ln 16 – Pg 56, Ln 23

Pg 102, Ln 20 – Pg 102, Ln 24

Pg 103, Ln 15 – Pg 104, Ln 16

Pg 105, Ln 25 – Pg 109, Ln 1

Pg 111, Ln 22 – Pg 112, Ln 6

6297999.1

## Reverend Raymond Martin Tear, (Pages 4:23 to 5:6)

### 4

Q. Okay. Would you tell us your name, please?

A. Raymond Martin Tear.

Q. And what is your occupation?

### 5

A. I'm currently pastor of First Presbyterian Church of Ingram, Texas.

Q. And are you ordained as a pastor?

A. Yes, I am.

Q. And in what -- what denomination?

A. The Presbyterian Church, USA.

---

## Reverend Raymond Martin Tear, (Pages 14:17 to 16:25)

### 14

Q. All right. Now, you're in a new church building now. When was that building constructed?

A. It was constructed 1990 -- started in, I believe, 1997. Was completed in 1998, and the congregation moved in, in '98.

Q. Now, when that building was constructed, was the church part of the PCUSA?

A. Yes.

Q. Okay. So when First Presbyterian Church of

### 15

Ingram was first formed, it was under the United Presbyterian Church.

A. Yes.

Q. That was in 1951?

A. Yes.

Q. Then the merger took place in 1983 of the north --

A. Yes.

Q. Let me finish my question -- of the northern and southern churches. Did First Presbyterian Church of Ingram vote to join the merged denomination?

A. That wasn't a -- a choice that was left up to congregations. The --

MR. de la FUENTE: Object to form.

THE WITNESS: Pardon me?

MR. de la FUENTE: Sometimes I'm going to object to form.

THE WITNESS: Okay.

3

MR. de la FUENTE: It's just for the record. You may answer the question.

THE WITNESS: Okay.

A. That was not an issue that was subject to a congregational vote. What it required was a vote of both general assemblies, votes in the Presbyteries, and then I believe it required another vote of the general

16

assemblies of the two denominations.

Q. (By Mr. West) So it was your understanding that the Presbyteries voted on whether or not to -- to merge the two denominations rather than the local churches; is that correct?

A. Correct.

MR. de la FUENTE: Object, form.

A. Correct.

Q. Okay. When the new church building was constructed in Ingram, how was it paid for?

A. The congregation had raised a major portion of the cost for building the building. They had acquired the land a few years earlier. Then -- and here again, I can't give you the exact name, but general assembly has a loan fund that local congregations can borrow from in order to help them with building or renovation or something like that, and this took place before I was there.

The church borrowed a substantial sum from the general assembly loan fund so that they would have enough to -- to do the site preparation that was necessary and to build the building and to complete 70 percent of it. It's a 10,000-square-foot building. There was 3,000 square feet that were left unfinished at the time.

---

**Reverend Raymond Martin Tear, (Page 17:9 to 17:11)**

17

Q. Okay. And you talked about the loan. What's the balance on that loan for the building?

A. Zero. There's no balance. It's been paid off.

---

4

6297999.1

**Reverend Raymond Martin Tear, (Pages 18:11 to 20:3)**

18

Q. Okay. Let me ask you about the organization of First Presbyterian Church of Ingram. Does it have a governing body?

A. Yes, we have a Session.

Q. And are there articles and bylaws or bylaws for the church?

A. Yes, there are.

Q. And who prepared those? Let me rephrase that. Were those prepared in conjunction with Presbytery?

A. Not to my knowledge.

Q. Have they ever been amended?

A. Yes, they have.

Q. When was the amendment of -- done?

A. There have been various small amendments at various times. The latest amendment to the church bylaws

19

would have been when the new form of government was approved, and one of the things that was recommended for congregations to do was if they wanted to retain Robert's Rules of Order as the parliamentary procedure that was to be followed, you needed to have a congregational meeting and amen -- amend the bylaws accordingly, and so we did that.

Q. Under the Articles of Incorporation of First Presbyterian Church of Ingram, who are the directors?

A. For the corporation, there are three trustees, and those are people who currently serve on the Session, as well.

Q. And what is the role of the trustees?

A. Role of the trustees is to deal with whatever matters would occur between the corporation and the State of Texas or other local governments.

Q. Okay. So is the church organized under the laws of the State of Texas?

A. Yes, it is.

Q. When the articles were amended, did First Presbyterian Church of Ingram get permission from Presbytery to amend those articles?

A. There was no -- no, we did not.

Q. Why?

A. Permission was not necessary.

20

Q. And how do you know that?

A. Book of Order doesn't say anything about

5

needing permission from Presbytery to amend the bylaws.

---

**Reverend Raymond Martin Tear, (Page 21:11 to 21:21)**

21

Q. Do you receive – tell me where the funds for the operation of the church come from.

A. The funds for operation of the church come primarily from the contributions of members. We have some other people who – we call them friends of the congregation – who don't necessarily attend, even, but are in sympathy with some of the ministries that we support. They contribute. We also have some small cash reserves, some of which are in CD's, and so there's a little bit of interest that comes, but these days, that's not very much.

---

**Reverend Raymond Martin Tear, (Page 23:3 to 23:7)**

23

Q. When the checks are made payable to the church, even if it's for a specified purpose, are the checks made out -- which entity are the checks made out to?

A. The checks are made out to First Presbyterian Church of Ingram.

---

**Reverend Raymond Martin Tear, (Pages 23:22 to 25:3)**

23

Q. Okay. Now, if the check was made payable to First Presbyterian Church of Ingram, is the church obligated to send any portion of that money to Mission Presbytery?

24

A. No.

Q. Is it obligated to send any portion of that money to the PCUSA?

A. No.

6

Q. Has the church -- currently does the -- does First Presbyterian Church of Ingram make any payments or distributions of funds to Mission Presbytery?

A. Only if they come -- only if they come in as designated funds would that be done at this point.

Q. Okay. In the past, has First Presbyterian Church of Ingram ever made distributions or payment of funds to Mission Presbytery?

A. Yes.

Q. And about what percentage of your budget would you say went to Presbytery?

A. Well, there would have been per capita and -- which is a suggested contribution based on so much money per member, but again, that's not a requirement. It's a suggestion. There have been payments made in the past, but it's been quite some time, and I -- I couldn't give you an amount.

Q. Did those payments stop during the time that you were the head pastor?

A. Yes.

Q. Was -- does Presbytery have the ability to come

25

in and compel First Presbyterian Church of Ingram to make the per capita payments you just described?

A. Not according to the Book of Order.

---

**Reverend Raymond Martin Tear, (Pages 26:24 to 27:2)**

26

Q. Okay. Let me back up and ask you, first, when did First Presbyterian Church of Ingram first express an

27

interest in leaving the denomination, the PCUSA?

A. That would have been about 2011.

---

**Reverend Raymond Martin Tear, (Pages 28:16 – 29:16)**

28

Q. Was there a process in 2011 for dismissal of churches from the denomination?

A. Yes. It was rather informal. It was just a

7

set of practices that the committee on ministry and Presbytery had -- had used, but it was not a formal policy.

Q. Was there anything in the Book of Order at that time that gave governance on how a particular church would leave the denomination?

A. Just that Presbytery could dismiss

29

congregations. There was no detailed step-by-step sort of plan for doing that.

Q. Okay. So you talked with your Session in 2011, and about what time of year was that? Do you remember?

A. This would have been after March of 2011.

Q. Okay. After the vote by Presbytery. Okay. What was the -- the next step in the discussions to -- about leaving the denomination?

A. Well, they asked me about the process, and as I was -- as I told them, I had already spoken with the chairman of the Committee on Ministry because I knew that I was going to be asked what is the process if we want to leave.

Q. And who was the chairman of --

A. The chairman of the Committee on Ministry at that time was the Reverend Richard Powell.

---

**Reverend Raymond Martin Tear, (Pages 29:25 to 30:22)**

29

Q. And why did you call him?

30

A. Because he was chairman of the Committee on Ministry, and it was the Committee on Ministry that handles -- or at that time was handling those matters pretty much on their own.

Q. Okay. So can you tell us briefly what the role of Committee on Ministry was at that time?

A. In the dismissal process?

Q. Right.

A. Yeah. They would meet with the -- with the congregation and the pastor, and there was an informal policy that congregation was to pay 10 percent of the value of their property and other assets, and that the Committee on Ministry would then -- this would be an

8

agreement between Presbytery and the congregation, that the Committee on Ministry would then recommend that the congregation be dismissed to some other reformed denom- -- reformed or Presbyterian denomination.

Q. Was any of this set down in writing at that time?

A. When I spoke with Reverend Powell, he -- he didn't say anything about a written policy. He said, "This is the practice that we're following."

---

### Reverend Raymond Martin Tear, (Pages 31:15 to 31:24)

31

Q. All right. What was the next discussion that took place after that, after you met with the Session?

A. Well, they wanted to be sure that the congregation would be on board with that, and so we did have a congregational meeting to -- to discuss that possibility because of -- it's a small congregation. The Session knows the congregation quite well, but we knew it wasn't a decision that the Session could make, nor could I. It has to be a congregational decision, so we wanted to see if they were on board with beginning that process.

---

### Reverend Raymond Martin Tear, (Pages 32:21 to 33:3)

32

Q. What happened after that congregational meeting?

A. In -- at the June meeting of Presbytery, Reverend Powell came to me and said, "Two of your elders have come to me to say -- to -- to tell me that they're

33

concerned about the direction of the church." That's almost a direct quote. "And so we are going to send in a Listening Team."

---

### Reverend Raymond Martin Tear, (Pages 34:10 to 34:19)

34

Q. Had you ever heard the term "Listening Team" before?

9

A. Not that I recall.

Q. Did he tell you what a Listening Team did?

A. Only in broad outlines, that they would be visiting with -- with the Session, with me, and with members of the congregation.

Q. Had you ever heard of another church receiving a visit from a Listening Team in this Presbytery?

A. Not that I recall.

---

**Reverend Raymond Martin Tear, (Pages 37:19 to 40:2)**

37

Q. Okay. At this time, had any further action been taken to try to -- by the church to lead the denomination?

A. Seems about that time a committee known as -- we call the Study Group had been formed to look at various denominations and reformed tradition -- reformed in Presbyterian -- that might be possible fits for First

38

Presbyterian Church of Ingram, and looking at things like their form of government, how administration works, finances, those sorts of things, mission emphases, that sort of thing.

Q. Okay. Now, after these first couple of meetings where the Listening Team came to the church --

A. Right.

Q. -- for a couple of different days, what happened after that?

A. The Listening Team prepared its report and told us that they had it done and that they wanted to meet with the Session. So we had a called Session meeting --

Q. Okay.

A. -- and I don't think all members of the Listening Team were present, but at least two of them were. Maybe -- maybe more.

Q. And, roughly, when was that called Session meeting?

A. I'm thinking this was probably about the end of August, maybe. I might not have the --

Q. I see.

A. -- analogy quite right.

Q. Okay.

A. But the end of August, maybe first part of

10

September following the meetings. It was in pretty short -- pretty short time after they met with members of the congregation and myself they prepared the report, and so we had the called Session meeting. Reverend Huser came in, and he says, "We have our report ready. We're not here to discuss it. We're not here to debate it. We're just here to put it in your hands." And so they did.

Q. And so they gave you a written report, and basically what did that report say?

A. The report said that I had spent too much time on certain aspects of pastoral ministry, namely, teaching and preaching, and some other community involvement, and not enough time on developing an evangelism program or a Christian education program and that what I had done, in their estimation, was to spend all my time on things that I enjoyed and to have ignored pretty much everything else.

Q. And after you received that report and the Session received that report, what was the next action taken on that report?

A. The Session informed the congregation of the nature and content of the report, and then the congregation was rather outraged at the content and so prepared a letter basically saying that what's said in the report is not true and that I hadn't been neglectful, so on, and -- and they -- they all signed it. That was sent to the Committee on Ministry, as I recall.

---

**Reverend Raymond Martin Tear, (Pages 42:10 to 43:9)**

Q. Okay. So after that meeting with Committee on Ministry, what happened after that?

A. The recommendation of the Committee on Ministry was that Presbytery should approve an Administrative Commission to --

Q. And what's an Administrative Commission?

A. Okay. An Administrative Commission is an appointed body of teaching and ruling elders that is tasked with a particular job. They have the authority of the whole governing body so that whatever the commission

6297999.1

does, it's as though the whole governing body does it. And their responsibilities, as well as their jurisdiction, is normally laid out in the -- in the motion that appoints the -- the Administrative Commission.

MR. de la FUENTE: Objection,

43

responsiveness.

Q. And who -- who -- who appointed the Administrative Commission?

A. The -- well, they're appointed by Presbytery, a -- a slate of people to serve on the Administrative Commission is presented, normally. In this case, I believe that the formation of the Commission was approved with the actual membership to be approved, and by the Committee on Ministry.

---

**Reverend Raymond Martin Tear, (Pages 44:7 to 44:24)**

44

Q. Okay. So did you ever see anything in writing about what the charge to the Administrative Commission from Presbytery was?

A. It was in the -- in the motion that was presented.

Q. Okay.

A. They had -- their charge was to look into the situation at First Presbyterian Church of Ingram, Texas, to take steps to resolve that, up to and including dissolution of the pastor relationship --

Q. And when --

A. -- between -- the pastor relationship between myself and the congregation.

Q. And when you say "dissolution of the pastor relationship," is that basically terminating the pastor from employment?

A. Correct, from employment with that congregation, yes.

---

**Reverend Raymond Martin Tear, (Page 45:10 to 45:25)**

45

Q. Okay. Let me break it down now --

12

A. Okay.

Q. -- into questions. Did the Administrative Commission come and meet with the Session?

A. They attended a Session meeting, is what they did. I wouldn't say they met with us. They attended -- I think -- well, my impression was they wanted to sit in on a Session meeting to see how we conducted our business.

Q. Okay.

MR. de la FUENTE: Object to responsiveness.

Q. Did they -- were they observing at the Session meeting, or did they run the Session meeting?

A. No, they did not run the Session meeting. They moderated the Session meeting.

---

**Reverend Raymond Martin Tear, (Pages 46:17 to 48:22)**

46

Q. Then the Session meeting took place in November.

A. Correct.

Q. What took place at that Session meeting?

A. A long time member of the church had made a substantial contribution and had become concerned with what had happened at general assembly and then especially with the action of Presbytery to appoint an Administrative Commission, that the money that had been

47

given would be -- was in danger of being used for purposes that, if Presbytery were to remove me and remove the Session and assume original jurisdiction, that the money would be used for purposes that this contributor -- member contributor -- would not agree with, and so asked if the Session would be willing to refund the contribution.

Q. And that request came from the donor?

A. It came from the donor, yes.

Q. Okay. And did this -- what did the Session do?

A. The Session took that as a very serious matter, and the -- the motion was made and seconded that the money be refunded to the donor. At that --

Q. And was that done?

A. No, it was not.

13

Q. Okay.

A. At that point, the chairman of the Administrative Commission spoke up and said, "Well, we're going to assume jurisdiction over your finances."

Q. Did that take place at the Session meeting?

A. We were informed at the Session meeting, and then later on we received a registered letter, Certified Mail, that they had assumed original jurisdiction, yes.

Q. And what does that term mean, "Original jurisdiction"?

48

A. "Original jurisdiction" means that the Administrative Commission takes over that particular function that would normally be in the hands of the Session.

Q. Okay. How did -- does an Administrative Commission take over the funds of a church? In this case, how did the Administrative Commission do that?

A. They didn't take over the checkbook or anything like that, but they laid out guidelines that we were to follow. We could pay our -- our monthly bills and normal mission stuff, but we were not supposed to make any other kinds of expenditures.

Q. Okay. Was the refund of the -- of the funds to the donor ever completed?

A. Never occurred.

Q. Okay. Had those funds been designated for any particular purpose?

A. No, they had not been designated.

Q. Okay. What happened after the Administrative Commission assumed original jurisdiction?

A. Well, we followed the rules that they laid out for us to follow. I mean, our treasury did.

---

**Reverend Raymond Martin Tear, (Pages 51:17 to 52:4)**

51

All right. Once the Administrative Commission met with Session members and then members of the church, what's the next action that the Administrative Commission took?

A. The next action that they took was for the chairman of the Administrative Commission to tell me

14

personally, still at the -- at the church --

Q. Okay.

A. -- that they found no fault with me or with the

52

Session.

Q. Did you ever get a report from the Administrative Commission?

A. Nothing in writing.

---

## Reverend Raymond Martin Tear, (Pages 53:19 to 54:5)

53

What did the Administrative Commission do after that?

A. Okay. I was told by a member of the Administrative Commission that the -- that a report had been prepared, submitted to the Committee on Ministry, but that it included the names of the two people who had been dismissed; therefore, the Administrative

54

Commission -- or the -- excuse me -- the Committee on Ministry had sent it back for those names to be edited out and to be resubmitted.

Q. Did you ever get a copy of that report?

A. Never did.

---

## Reverend Raymond Martin Tear, (Pages 55:16 to 56:23)

55

Q. About when did the Administrative Commission chair tell you that you had been -- that -- what were his exact words to you? What did he tell you when he called you?

A. No. He spoke with me face-to-face.

Q. Okay.

A. He said, "We find no fault with you, Ray Tear."

Q. What was your response?

A. Can we take a break -- well, no, we can't. This is a question, I realize. Sorry.

56

I was a bit -- I was a bit more composed at that moment, and I said, "Bob, thank you very much. Frankly, that's how I thought it would come out."

Q. Let me ask you about the Session. Had any

6297999.1

allegations been made about the activities of the Session, by either these complainants or anybody at Presbytery?

A. I don't know of any direct accusations because we were never told -- all we were told was these people were concerned about the direction of the church, which is rather ambiguous.

Q. Did you ever receive a copy of any charges against you?

A. Just the report from the Listening Team.

Q. Okay. And when you met with the head of the Administrative Commission, did he tell you at that time that he did not find any fault with the actions of the Session?

A. He told me that the Session and I were both in the clear on that.

Q. Okay.

A. Those are not his exact words, but that was the gist of the conversation.

---

**Reverend Raymond Martin Tear, (Pages 102:20 to 102:24)**

102

Q. Reverend Tear, who prepared these articles?

A. These were prepared by a couple of members of the -- of the -- excuse me. A couple members of the Session who also serve as members of the board of trustees.

---

**Reverend Raymond Martin Tear, (Pages 103:15 to 104:16)**

103

Q. Okay. Have you -- or rather, has the church looked at the Book of Order, if that's the right term, for the Evangelical Presbyterian Church?

A. Yes, we have.

Q. Does the Evangelical Presbyterian Church have any provision in its Book of Order which contains a trust clause?

A. It does not. Well -- well, let me qualify that, please. Any event that a congregation should dissolve or cease to function, then the -- the assets devolve to the Presbytery, but as long as the

104

congregation is a functioning congregation, it holds full

16

title to its property --

Q. Okay.

A. -- according -- that's according to the EPC Book of Order.

Q. If you will look at Exhibit Number 5 --

A. Yes.

Q. -- which is the third page back. It's actually numbered page 1, Article IV.

A. Yes.

Q. That begins with, "Upon any dissolution of this corporation." Do you see that?

A. Yes, I do.

Q. Has any effort been taken to dissolve the corporation?

A. No, none at all.

---

**Reverend Raymond Martin Tear, (Pages 105:25 to 109:1)**

105

Q. Did you have any discussions with -- I'll just

106

call it the "EPC," Evangelical Presbyterian Church --
about who would hold title to the property of the church
if the church does become associated with the EPC?

A. That was -- yes, that was one of the questions
that was asked of some people from the EPC that we
invited to come and tell us about the EPC.

Q. And what were you told?

A. We were told that the local congregation holds
its -- holds title to its property free and clear, you
know -- well, I'm sorry, free and clear and near --
whatever financial obligations they may have with other
financial institutions or something is another matter,
but, no, that the congregation is in charge of its
property, holds title to it.

Q. So it was your understanding, based on those
discussions, that First Presbyterian Church of Ingram
would hold title to its property free and clear of any
claim of the Evangelical Presbyterian Church; is that
correct?

A. Correct.

Q. Did you investigate -- oh, before I go there,
was it your understanding when these Articles of
Incorporation were passed by the congregation that the
church was in any way conveying ownership of First

17

Presbyterian Church of Ingram's property to the EPC?

107

A. No, that's not what they were doing. They were not seeking to convey property, no, not at all.

Q. Okay. So consequently, did you feel any need to instruct the PCUSA or Mission Presbytery on the effect of these articles?

A. No, we did not. What -- what we were doing as part of the preparation for being dismissed to the Evangelical Presbyterian Church.

Q. Now, as part of your investigation into what other options there were for First Presbyterian Church of Ingram --

A. Yes.

Q. -- to asso- -- affiliate or associate with another denomination --

A. Right.

Q. -- what other denominations did you look at?

A. The Christian Reform Church, the Reform Church in America, looked at the Evangelical Covenant Order, but it was -- that was done before it was actually formed as a denomination, and a couple other Presbyterian denominations, like the Associate Reformed Orthodox Presbyterian Church, a fair number.

Q. Now, I didn't get the full list of all of those. Let me ask you about the Christian Reform Church.

A. Yes.

108

Q. Do they have any provision where ownership of the local church property is held or where title to the local church property is held by that denomination?

A. I really can't answer that with -- without the report that the Study Group prepared that --

Q. Okay.

A. -- contains all that information.

Q. Does the Evangelical Covenant Order Presbyterians that you mentioned have any provisions, to your knowledge, that would require ownership of local church property by the denomination?

A. To the best of my knowledge, no.

Q. Are you aware of any other Presbyterian denominations that have a trust clause in which property is held by a local church for the benefit of the denomination?

A. I am not.

Q. Is that something you discussed or rather that

18

the church discussed in its deliberations about whether to join or affiliate with another denomination?

A. Absolutely. That's been one of the great fears of many people, is that in being dismissed from the PCUSA to the EPC, is that we -- we wanted to be sure -- or the congregation wanted to be sure they were not going some place where -- where they would have to face that kind

109

of -- of a situation.

---

**Reverend Raymond Martin Tear, (Pages 111:22 to 112:6)**

111

Q. Okay. What is the next step in the process of negotiations with Presbytery about being dismissed from the PCUSA to another denomination?

A. Well, the next step is the board of trustees of

112

Mission Presbytery are supposed to meet the end of August, so I understand, at which time they're going to discuss the -- the financial situation of First Presbyterian Church of Ingram and what that means for what the congregation would be able to contribute as a parting gift from the PCUSA.

6297999.1

# Exhibit H

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH | § | IN THE DISTRICT COURT |
| SAN ANTONIO | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 73RD JUDICIAL DISTRICT |
| | § | |
| MISSION PRESBYTERY, | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

## Deposition Designations from the June 16, 2015
## Deposition of Hector Reynoso

Pg 4, Ln 5 – Pg 4, Ln 8

Pg 5, Ln 11 – Pg 5, Ln 18

Pg 6, Ln 3 – Pg 6, Ln 21

Pg 8, Ln 2 – Pg 8, Ln 10

Pg 12, Ln 19 – Pg 13, Ln 6

Pg 14, Ln 3 – Pg 14, Ln 5

Pg 15, Ln 1 – Pg 15, Ln 12

Pg 16, Ln 1 – Pg 16, Ln 24

Pg 17, Ln 5 – Pg 17, Ln 16

Pg 18, Ln 7 – Pg 19, Ln 8

Pg 21, Ln 23 – Pg 22, Ln 3

Pg 23, Ln 9 – Ln 12 (ending with "were")

Pg 23, Ln 20 – Pg 24, Ln 14

Pg 25, Ln 4 – Pg 25, Ln 14

Pg 26, Ln 17 – Pg 27, Ln 16

Pg 28, Ln 18 – Pg 32, Ln 6

Pg 37, Ln 7 – Pg 38, Ln 13

1

6298378.1



Pg 38, Ln 20 – Pg 39, Ln 9

Pg 40, Ln 11 – Pg 41, Ln 13

Pg 43, Ln 9 – Pg 44, Ln 24

Pg 45, Ln 4 – Pg 46, Ln 3

Pg 46, Ln 13 - Pg 49, Ln 25

Pg 51, Ln 4 – Pg 51, Ln 24

Pg 60, Ln 10 – 66, Ln 2

Pg 66, Ln 14 – Pg 66, Ln 20

6298378.1

**Reynoso, Hector, (Page 4:5 to 4:8)**

Q. Can you state your name for the record, please?
A. My name is Hector Reynoso.
Q. Okay. And what is your occupation?
A. I am a pastor, a minister.

---

**Reynoso, Hector, (Page 5:11 to 5:18)**

Q. Okay. And tell us briefly your job history since you finished seminary.
A. When I finished seminary I was not yet finished with all the ordination process so I worked as sort of an intern at Emmanuel Presbyterian Church in Galveston.
Q. Okay.
A. After that, in the year 2002 I was called to be a pastor at El Principe de Paz in Mercedes, Texas.

---

**Reynoso, Hector, (Page 6:3 to 6:21)**

Q. And what denomination is that church a part of?
A. That church, when I was ordained, it was part of the Presbyterian Church USA.
Q. Okay. And when you were ordained, were you ordained into the Presbyterian Church USA?
A. Yes, I was.
Q. Okay. How long were you at El Principe de Paz?
A. I was there until -- I think it was February 2012.
Q. Okay. And how long were you there?
A. That's a total of nine years and 11 months.
Q. Okay. Can you tell us a little bit about the history of El Principe de Paz? When was it formed?
A. Well, El Principe de Paz was originally a mission of the Presbyterian Church of Mexico for several years before it was established at around the year 1912. In 1912, the Presbyterian Church of Mexico organized it as a congregation, as a church, as an official church.

3

**Reynoso, Hector, (Pages 8:2 to 8:10)**

8

Q. Is El Principe de Paz still affiliated in any way with the Mexican denomination, the Presbyterian Church in Mexico?

A. Well, your question is if El Principe de Paz is affiliated with the Presbyterian Church in Mexico?

Q. Right.

A. No, it's not, but El Principe de Paz is no longer open. But during the time I was there, it was not.

---

**Reynoso, Hector, (Pages 12:19 to 13:6)**

12

Q. What about the real property? Did the church El Principe de Paz pay for the property? Did it pay money to the presbytery to use the property, or how did that work?

A. The congregation paid for the property and the building. It took them several years, but they did it.

Q. When was that property paid off?

13

A. The congregation had several pictures with that particular day when they finished paying and they were burning the final notice. And I'm trying to think of what year was that. It was probably in the 1970s.

Q. Before you came?

A. Oh, yeah. Way before I came, yes.

---

**Reynoso, Hector, (Page 14:3 to 14:5)**

14

Q. And was that church built and paid for before the Presbyterian Church USA came into existence?

A. Yes.

---

**Reynoso, Hector, (Page 15:1 to 15:12)**

15

Q. Okay. Let me turn to discussion about presbytery again. Were you on any committees for

4

presbytery?

A. I served on the committee on ministry.

Q. And what is that?

A. Committee on ministry, its main function -- I don't know if it was the original intention, but its main function was supervision of churches through what they had -- they called triennial visits. We were all assigned a certain area and we had to make triennial visits and see how the church was doing and report back to the committee.

**Reynoso, Hector, (Page 16:1 to 16:24)**

16

Q. And what authority did the presbytery have to take actions in those local churches?

A. In order to take action -- well, the committee on ministry did not have the authority to take action unless it was granted to them by the presbytery as a whole. So the committee on ministry -- let's say, for example, if an administrative commission is formed. It needed to be approved by presbytery, not by the committee on ministry.

Q. Okay. What's an administrative commission?

A. An administrative commission is a group that is formed by presbytery in order to go to a church that may be experiencing some difficulties, or sometimes an administrative commission is also named to ordain a pastor. So that's also -- that's a different case.

But most of the time what people understand by administrative commission is when the presbytery grants certain authority, certain powers, to a group to go into the church, meet with the session, and based on their assessment they come and they make those recommendations to -- they make recommendations to the presbytery as to the actions that need to be taken. Then the presbytery votes whether to go that route or not.

**Reynoso, Hector, (Pages 17:5 to 17:16)**

17

Q. Give us an example of the types of actions that an administrative commission is authorized to take in a church.

A. An administrative commission may be granted the

5

power to go into a congregation, assess, and if they consider that it's necessary to remove the pastor or remove the session, the whole session, or close down the church. They are given those powers. But they need to be brought to presbytery for a vote.

Q. Can they take those actions without vote of the presbytery?

A. No.

---

**Reynoso, Hector, (Pages18:7 to 19:8)**

18

Q. Okay. While you were on the administrative commission -- I'm sorry -- on the committee on ministry, were there any circumstances where the presbytery sent in any kind of committee to take actions either against a pastor or remove session members or to close the church without using an administrative commission?

A. There was this instance where something -- something was just out of order. And I had a friend, a pastor in a church in Ingram, at the same time that I was on the committee on ministry. And he told me that a visiting team had been sent to his church. He did not call it an administrative commission. He called it something like a visiting team.

Being in the committee on ministry, I looked for the minutes and I looked at every single meeting to see whether anything was going to be reported. And I was there until the end of 2011 and I never saw anything reported about that administrative

19

commission -- it was not a commission. I'm sorry -- about the visiting team.

Q. And what is a visiting team?

A. Well, that's -- well, the first time that I actually saw the term "visiting team" was on the gracious dismissal policy of Mission Presbytery. But that was after all of this visiting had taken place. I did not know the term officially as a term used.

---

6298378.1

**Reynoso, Hector, (Pages 21:23 to 22:3)**

Q. Now, after the visiting team was formed, did they make -- come back and make recommendations to the committee on ministry?

A. Yes.

Q. And what were those recommendations?

A. To present charges against Pastor Ray Tear.

---

**Reynoso, Hector, (Page 23:9 to 23:12, ending with "were")**

Q. Were charges brought against the pastor by the presbytery?

A. That's around the time I left the denomination; but my understanding was that they were.

---

**Reynoso, Hector, (Pages 23:20 to 24:14)**

Q. You said that was -- that took place after you left the denomination. Yes, when did you leave the PCUSA?

A. At the beginning of February of 2012.

Q. And what led you to leave? I'm talking about personally first of all.

A. Well, there -- it can be divided in several reasons, into two or three. Theological reasons, first of all.

Q. Okay.

A. Secondly, due to several things that took place in the last few years, I had -- I had no confidence, no trust in the process nor in the leadership of presbytery. I had seen and experienced many things that led me to conclude that we needed to -- I needed to break away from the denomination.

Q. Okay. Now, what about the church, El Principe de Paz? Did the members of the church vote to -- have a vote to leave the denomination?

A. They did.

---

7

**Reynoso, Hector, (Page 25:4 to 25:14)**

25

Q. Can you tell me what this is?

A. Give me just a second, please.

Q. Sure.

A. This is a letter that we wrote.

Q. And you say "we." Who wrote it?

A. "We" meaning me, Pastor Tom Johnson, with the -- with the participation of our sessions.

Q. Okay. And what was the purpose of this letter?

A. To inform elders, COM members, and staff of Mission Presbytery, and the whole PCUSA that we had left the PCUSA.

---

**Reynoso, Hector, (Pages 26:17 to 27:16)**

26

Q. I asked you about El Principe de Paz. Were you helping at another church while you were employed?

A. Yes.

Q. What was the name of that church?

A. San Pablo Presbyterian Church.

Q. And where is that located? Where was that located?

A. In the city of Brownsville.

Q. And how big a church was that, how many

27

members?

A. It was a small congregation. I cannot remember the number of members.

Q. Did that congregation also vote to leave the denomination?

A. Yes.

Q. Okay. And then you mentioned Pastor Tom Johnson. Where was he? What church was he with?

A. He was a pastor at Getsemani Presbyterian Church in San Benito.

Q. And did that church also vote to leave the denomination?

A. Yes.

Q. Okay. So the three churches left, what, at the same time; is that correct?

A. Yes.

8

Q. Okay. Turn to No. 3, if you would, the dismissal policy. Tell us first of all, what's a dismissal policy and who prepared that?

A. After the year 2010, the general -- the general assembly of the PCUSA, in the year 2010, approved to send an amendment to the presbyteries which caused many congregations to start leaving, preparing to leave, or talk about leaving the denomination.

Q. And what was that proposal?

A. The proposal was called as Amendment 10-A. That's how it was known. It had two things that many of us just could not agree or subscribe to.

The first one was taking away certain key words like "obedience" and "conformity" to scripture, then putting in the word "guided" by scripture. So as far as theology and our beliefs, what we saw was that we always held the scriptures as our main authority, and now officially the Book of Order was going to change and they were not going to be our authority. They were going to be only guides.

Q. Okay. Let me interrupt you there because I want to break it down to just a question-answer format. You mentioned that decision was taken by the general assembly in 2010?

A. Yes.

Q. Were you present at that meeting?

A. I was present at that meeting as a commissioner and also as a vice moderator -- vice moderator candidate to the general assembly.

Q. And what is a vice moderator candidate to the general assembly?

A. Every year or every time that the general assembly meets, they elect a moderator for the assembly and a vice moderator. That year, there were several candidates for moderator, and sometime before, one of the candidates called me to see if I would like to be a vice moderator candidate.

Q. And when you say general assembly, this is the national body -- I mean, the national forum where -- for the entire Presbyterian Church USA?

A. Yes.

Q. Okay.

9

A. It's when all presbyteries send commissioners. So it's the largest meeting of the PCUSA.

Q. And where was that held?

A. That year, it was St. Paul, St. Paul, Minnesota.

Q. And did you speak at that meeting?

A. I did.

Q. Okay. And what did you speak about?

A. I spoke against this amendment, Amendment 10-A.

Q. Okay. Were you elected as vice moderator for the general assembly?

A. No.

Q. Okay.

A. No, I was not.

Q. Can you tell us what happened -- well, is there anything significant that happened at that general
31
assembly meeting that you attended that affected either your decisions or the decisions of the churches to change denominations?

A. Yes. A certain tone had already -- a certain tone of hostility had been developing in that denomination, but this particular general assembly multiplied it. I did not stop speaking about the things that I saw, heard, and witnessed. And a few things took place that -- well, soon after that, I was visited at the church by the moderator of the committee on ministry and by the consultant for church development.

Q. And who was that?

A. That's Ruben Armendariz.

Q. And which title was -- did he have?

A. I think he was consultant of church development.

Q. Okay.

A. They came to see me. Mr. Powell sent me an e-mail that they were going to come visit me. I asked him several times to please let me know why so that I -- or the reason why so that I could prepare. I got no reply until the day that they were coming, and he said that they were going to talk to me about the things I had been saying.
32
Well, they came to see me and they strongly suggested that I stop speaking or that I should resign from the committee on ministry.

10

Q. Did you resign?

A. No, I did not resign. I saw it as intimidation and as a violation of their position.

**Reynoso, Hector, (Pages 37:7 to 38:13)**

Q. Okay. What was your concern with this dismissal policy?

A. I had two or three concerns. The first one is that I had already seen it at work unofficially. A visiting team had been formed under these conditions to go to the Presbyterian church of Ingram, and I had seen how detrimental it had been to the congregation, how it had divided the congregation, how the pastor's reputation had been dragged through the floor. So I had seen it at work.

The second one was that it was closing all the doors for a congregation to freely -- freely assemble and talk about the issue. And to me that was a violation of the freedom of assembly. If you read this line here, "When the leadership of the presbytery becomes aware that there's a conversation in the session or congregation about leaving, visitation will be offered to the session of a listening team appointed by the moderator of presbytery," etc., etc. "Should

the congregation or its leadership refuse visits and discussion with a listening team and/or the resolution team, the counsel shall immediately recommend to the presbytery the formation of an administrative commission with the authority to act for the presbytery in matters delegated to that administrative commission."

Needless to say, many presbyteries right now in the PCUSA have similar lines. And what do the administrative commissions do? They come in, they remove the pastor, they remove the session. You get rid of the problem. They don't want to leave -- they cannot leave anymore. And that, I saw this here.

11

**Reynoso, Hector, (Pages 38:20 – 39:9)**

38

Q. Did El Principe de Paz go through -- when it voted to leave the denomination, did it go through this gracious dismissal process?

A. No.

Q. Did San Pablo Presbyterian Church go through this gracious dismissal process?

39

A. No.

Q. And did --

A. Getsemani.

Q. -- Getsemani Presbyterian Church go through this process?

A. No.

Q. Okay. And what was the reason the churches did not want to go through this process?

A. Because we were aware of all these things.

---

**Reynoso, Hector, (Pages 40:11 – 41:13)**

40

Q. Okay. Now, looking at the bottom of the second page of Exhibit 1, still under No. 3, the last three words, it says, "We believe that this policy is in direct violation of the United States Constitution, which grants us freedom of speech, freedom of assembly, and even freedom of religion, yet even more important and above all this, it is not being Christ like."

You talked a little bit about the freedom of speech. But what was the concern in this policy that affected -- that led you to make this statement about the freedom of speech?

MR. DE LA FUENTE: Object; form.

A. We -- as a church, we are freely -- out of our own free will, that liberty that we have here in this country, we freely associated with the Presbyterian

41

Church USA at that time. No one forced us. And that same freedom, we had to leave, and not -- it was not just a little tantrum. The denomination had deteriorated theologically to a point that it can no longer -- for us orthodox Christians, it can no longer be called Christian.

12

6298378.1

So we cannot -- we cannot sit at the table with people, for example, that believe in abortion. We just can't. We see it as murder. We cannot possibly sit together.

So as we have the freedom to be there, our Constitution also grants us the freedom not to be there because the beliefs of the denomination have changed.

---

**Reynoso, Hector, (Pages 43:9 – 44:24)**

43

Q. What's a resolution team?

A. As presented in the policy, the dismissal policy, the resolution team was going to be like an administrative commission but was going to have those powers to recommend whether a church can leave or not or the terms in which a church could leave.

Q. Do you know of any situations where the -- I forgot the name of the committee you just mentioned -- the visiting team took some sort of action to remove a pastor in Mission Presbytery?

MR. DE LA FUENTE: Object; form.

A. Well, except for the case in Ingram, in other cases it was, as I remember, an administrative commission that went in to either close a church or remove the session or -- I can remember the First Church of Edinburg. The First Presbyterian Church of Edinburg, an administrative commission went in there.

44

They were having problems with the pastor.

Q. I'm sorry. Who is "they"? Who was having problems with the pastor?

A. That's a good question. Some members of the session were having problems with the pastor, but it had grown -- the problems had grown and there's -- a lot of stuff went on there. I think there were lawsuits or whatever.

But at the end the presbytery -- or the administrative commission recommended to close the congregation. The members did not want for the church to close. They went to presbytery and they pretty much begged for presbytery not to close the church, but that was the recommendation of the administrative commission and presbytery voted and they closed the church and

13

sold it.

Q. And that was which church?

A. First Presbyterian Church of Edinburg.

Q. And when did that happen?

A. Oh, it could have been perhaps 2009, something like that.

Q. Okay. Was that while you were on the committee on ministry?

A. Yes.

---

**Reynoso, Hector, (Pages 45:4 to 46:3)**

45

Q. Okay, Reverend Reynoso, before the break we were talking about Exhibit 1. I want to go back to that exhibit and look at No. 4 where it says, "Historic decline of Hispanic ministries in Mission Presbytery." You've got the document in front of you, but what was the concern that you had and that your churches had about Hispanic ministries in Mission Presbytery?

A. I'm sorry. I'm kind of reading a little bit.

Q. Okay.

A. Hispanic ministries started way before the 1900s. They grew for a while. We had something called the Texas-Mexican Presbytery. That's probably the strongest part of the history of the ministry.

But since around 1950 that the Texas -- or the Tex-Mex presbytery was closed, Hispanic churches began to die off little by little. Little by little, one after another just closed, closed, closed. And there was a good number at the time of the -- at some point there were about 50 churches, established congregations, plus many, many preaching points, but now we were down to about 11 at the time we left, I think, and --

46

Q. Was that before -- was that 11 including your churches?

A. Including ours, yeah.

---

**Reynoso, Hector, (Pages 46:13 to 49:25)**

46

Q. Okay. Let me ask you about leaving. What was the manner in which your churches voted to leave the

14

denomination?

A. Are you talking about the actual meeting?

Q. No. You didn't go through the gracious dismissal process.

A. Okay.

Q. How -- is there a term for how y'all left the denomination or what process you used?

A. Oh, we called it -- or it's usually called disaffiliation.

Q. Okay.

A. Or renouncing jurisdiction.

47

Q. All right. When you disaffiliate, is that -- tell us -- tell us what it means to disaffiliate.

A. To disaffiliate is to -- when a congregation has a congregation meeting, duly called congregation meeting, and votes to disaffiliate from the denomination, in contrast to the dismissal policy that goes through a whole process guided by a presbytery.

Q. Look at the last paragraph on Exhibit 1. The third page, there's a line where it says, "We lovingly declare" -- and read that sentence for us.

A. "We lovingly declare that we are no longer under the jurisdiction of the PCUSA."

Q. And what does that mean?

A. Once we took our vote, we were no longer under the authority or leadership or supervision or guidance of the Presbyterian Church of the United States.

Q. Okay. Does that include the pastors?

A. That included the pastors, the sessions, the congregation.

Q. And then read the next two sentence -- next two sentences.

A. "Yet in no way do we seek to be disobedient to the Lord and to His word. We understand that the property clause in the Book of Order of the PCUSA makes us hold in trust our property, where we worship and

48

serve, for the PCUSA."

Q. And then read the next two sentences -- well, read the rest of that paragraph.

A. "No good argument can remove that clause. Therefore, we appeal to your sense of mercy and implore of you to dig deep within your hearts and allow us to keep our properties, our assets and bank accounts. We are not rich churches, we do not have a high income, we

15

6298378.1

do not have big bank accounts, and we are all located in low-income neighborhoods in two of the poorest counties of the United States. So we kindly implore, for the sake of the extension of God's kingdom, that you will let us go with the little that we have so that we may continue" --

Q. Let me finish it. "To let His light shine in our respective neighborhoods."

I'm going to read the next paragraph, which says, "Nevertheless, if you decide that it is important for you to keep our buildings and our finances, please note that we stand ready to hand everything over to you. Our convictions have led us to make a stand for Christ and the faith of the church, not the properties."

Did I read that correctly?

A. Yes.

49

Q. Did presbytery allow your church El Principe de Paz and San Pablo to retain any of its -- of the property that the congregation had used?

MR. DE LA FUENTE: Object -- object; form.

A. No.

MR. WEST: What's the objection?

MR. DE LA FUENTE: They were no longer those churches at that time.

MR. WEST: I said the congregations.

Q. You can answer.

A. We received a letter to get out of the building. The pastors received a letter to get out of the building. We had a day or two. I can't remember.

The congregation stood with us. They left with us. Then we started -- we received letters or e-mails, not -- asking to return everything, the bank accounts, and we did.

(Reynoso Exhibit No. 2 marked)

Q. Let me hand you what I've marked -- excuse me -- Exhibit 2. Is this the letter that you received from presbytery after you sent the letter marked as Exhibit 1?

A. Yes, this is the one.

Q. And what's the date on this letter?

A. February 13, 2012.

6298378.1

**Reynoso, Hector, (Pages 51:4 – 51:24)**

51

Q. Okay. So you received this letter from Mission Presbytery saying, "No later than Friday, February 16, 2012, remove your personal items and turn in all church keys to the COM regional chair, Anna Bohart."

Did you meet with Anna Bohart?

A. Yes, I did.

Q. Did you turn in your personal items to -- I mean, I'm sorry, did you remove your personal items?

A. Yes, I did.

Q. And what did those consist of?

A. Mainly books and my laptop.

Q. Okay. And was that a laptop you bought or was that --

A. Yeah.

Q. Okay. And then did you give her the keys to the church?

A. Yes.

Q. Okay. And did you do that on February 16th, or was it a little later?

A. No, it was on that date I -- we signed -- we signed for it.

---

**Reynoso, Hector, (Pages 60:10 to 66:2)**

60

Q. Okay. When you left PCUSA, you were under the Evangelical Presbyterian Church at that point; is that correct? You started a new congregation --

A. That's --

Q. -- I mean, a new church under the Evangelical Presbyterian Church; is that what you said earlier?

A. Yes.

Q. Okay. Where did the church meet then?

A. We -- when we left, we met at -- well, we're still meeting at the Lutheran church.

Q. Do you pay rent to use --

A. We pay.

Q. -- their building?

A. Yes.

Q. Okay. And how is your salary paid?

A. Through the church. The church pays me.

61

6298378.1

Q. Okay. The church members?

A. The church, you know, through their tithes and offerings, they pay my salary.

Q. And did the church set up new bank accounts?

A. Yes.

Q. And where were those bank accounts set up?

A. Well, at first they were in the same bank as -- the same bank as we had before.

Q. Okay. And where did the funds in those accounts for the new church come from?

A. They came from -- we started putting money into that new account after we had disaffiliated.

Q. Okay. Why did you move your account from -- well, first of all, what was the name of the new church under the Evangelical Presbyterian Church?

A. At first we continued calling ourselves El Principe de Paz EPC, I think.

Q. So it was the same name of the church but EPC because of the new denomination?

A. Yes. So it was -- the name of the other church was actually Iglesia Presbiteriana El Principe de Paz, so we just kept El Principe de Paz EPC.

Q. Okay. And is that how your bank account was set up?

A. Yes.

62

Q. Okay. Why did you move that account to another bank?

A. The bank made a mistake and sent our new statement to the post office of El Principe de Paz PCUSA even though we had gone to the bank and changed the address and everything. But for whatever computer glitch, whatever they -- whatever happened, they sent that to El Principe de Paz in the PCUSA.

And next thing we know, two members, as we understand, two members representing Mission Presbytery -- one of them was Anna Bohart and somebody else -- they went to the bank with the information of the new account that we had now in the EPC and they tried to take out the money.

And when they tried to take out the money, the bank asked them for the PIN number, I think, and they provided the wrong one. And the bank said, "This is wrong so we're freezing this account." And they left us without funds. That's -- the little we had, was there.

18

Q. About how much was there?

MR. DE LA FUENTE: Object to responsiveness.

A. It wasn't much. Maybe at the -- maybe somewhere around $2,000, but -- it may not be much to anybody else, but for us it's 100 percent of everything we had.

Q. Was that the bank account that was used to pay your rent at the Lutheran church?

A. Yes.

Q. Was that the bank account that was used to pay your salary?

A. Yes.

Q. How long was that bank account frozen?

A. I cannot remember. Maybe a week or more.

Q. Did the bank eventually lift that freeze or the hold on the account?

A. After we had the help of a lawyer, yes, they did.

Q. Okay.

(Reynoso Exhibit No. 5 marked)

Q. I'll hand you what's been marked as Exhibit 5. Can you tell me what this is?

A. Allow me just a second, please.

Q. Sure.

A. This is what is called an advisory opinion coming from the general assembly in order to implement the trust clause in the PCUSA.

Q. Okay. And do you know where -- how you received this? Did you receive this document?

A. I received it or I even -- or I researched it or somehow I found it.

Q. Okay. And do you know what this document does? What's an advisory opinion?

A. An advisory opinion is -- coming from the general assembly, is a very strong -- very strong suggestion to presbyteries on how to handle the trust clause, the property of the churches.

Q. Okay. Would you turn to the third page back where it says letter D? Let me -- okay, yeah, turn to that.

First of all, what is the trust clause that you refer to?

A. When the PCUSA was started in 1983, a trust

19

6298378.1

clause was inserted in the Book of Order saying that all congregations of the Presbyterian church hold their property in trust for the denomination.

Many congregations were allowed exceptions at the time, but not all took them. But since then, since 1983, it's been part of the PCUSA, which was started in 1983.

MR. DE LA FUENTE: Object to responsiveness.

Q. Look at the third page back, and it says letter D. Can you read that heading?

65

A. "Presbyteries are responsible for enforcing the trust clause." Do you want me to keep reading?

Q. No, it's kind of long. What's your understanding of what presbytery's role was in terms of enforcing the trust clause?

A. Well, this particular opinion, again, based on everything that we had experienced and was going on in the whole denomination, it was like the denomination saying, "We are not going to let you go. Anyone can be here but no one can go." You know, "Anyone can come in here" -- that's what they're proclaiming. "We're inclusive. Everybody come in here, but we just won't let you go."

And that -- to me, that's what this opinion does. It strengthens that position, that position in presbyteries, and it creates more hostility.

Q. How would it -- how does the presbytery enforce a trust clause? What actions can it take to enforce that provision?

A. Well --

MR. DE LA FUENTE: Object, form.

A. -- allow me to think about this for a moment. Through their dismissal policies

Q. Can they use the administrative commissions to

66

take action on the trust clause?

A. Definitely.

---

**Reynoso, Hector, (Pages 66:14 to 66:20)**

66

Q. Yeah, can a listening team be used to enforce a

6298378.1

trust clause?

MR. DE LA FUENTE: Object; form.

A. Based on the dismissal policy of Mission Presbytery, yes. That listening team will become the -- what do they call it -- the -- the following step, whatever the name of the team was.

21

# Exhibit I

CAUSE NO. 2015-CI-07858

| FIRST PRESBYTERIAN CHURCH | § | IN THE DISTRICT COURT |
| SAN ANTONIO | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 73RD JUDICIAL DISTRICT |
| | § | |
| MISSION PRESBYTERY, | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

**Deposition Designations from the June 16, 2015**
**<u>Deposition of Thomas Crandall Johnson</u>**

Pg 4, Ln 5 - Pg 4, Ln 10

Pg 5, Ln 25 - Pg 6, Ln 3

Pg 7, Ln 2 – Pg 8, Ln 12

Pg 10, Ln 13 – Pg 10, Ln 23

Pg 12, Ln 4 – Pg 13, Ln 24

Pg 15, Ln 12 – Pg 15, Ln 23

Pg 16, Ln 23 – Pg 17, Ln 13

Pg 18, Ln 15 – Pg 19, Ln 13

Pg 23, Ln 24 – Pg 24, Ln 5

Pg 25, Ln 23 – Pg 26, Ln 3

Pg 37, Ln 13 – Pg 37, Ln 22

Pg 41, Ln 12 to Pg 42, Ln 4

1



6298086.1

**Johnson, Thomas, (Pages 4:5 to 4:10)**

4

Q. Would you state your name for the record, please?

A. My name is Thomas Crandall Johnson.

Q. And how are you employed?

A. I'm employed as a pastor of San Benito Presbyterian Church, EPC, San Benito, Texas.

---

**Johnson, Thomas, (Pages 5:25 to 6:3)**

5

Q. Okay. Was it called San Benito Presbyterian

6

Church at that time?

A. No. At that time it was Iglesia Presbiteriana Getsemani.

---

**Johnson, Thomas, (Pages 7:2 to 8:12)**

7

Q. Okay. When did Iglesia Presbiteriana Getsemani become part of a different denomination?

A. There are three parts to this, and name changes that happened along the way. 1950s, it changed to Second Presbyterian Church. And then it was changed in about '67 to Iglesia Presbiteriana Getsemani. And then when I was there we changed it to Iglesia Presbiteriana Getsemani of San Benito. And so during the course of the time, it was not incorporated until I got there. It was incorporated. And we wrote the articles of incorporation and the other data. And so it moved from the Presbyterian Church of Mexico probably to -- then it was PCUS or UPUSA. I can't remember right now. I think it was in the southern branch and -- okay, it was the southern branch.

2

Q. Okay. And when did it become part of the PCUSA?

A. That happened in 1983.

Q. And so it was already part of PCUSA when you --

A. Yes.

-- became pastor there?

That's correct.

Q. Okay. Now, you left the denomination at some

8

point, correct?

A. Yes, that is correct.

Q. In what year did you leave?

A. We left the PCUSA in the year 2012 -- well, excuse me. I'm sorry. I left the PCUSA in the year 2012.

Q. Okay.

A. And if you're saying the "you," other parishioners, yes, that is correct.

Q. So did the parishioners leave Getsemani at the same time that you did?

A. Yes.

---

**Johnson, Thomas, (Pages 10:13 to 10:23)**

10

Q. Okay. Let me talk to you now about the membership of Iglesia Presbiteriana Getsemani. Were there discussions in advance of the vote to leave about leaving the denomination?

A. Yeah. When I wasn't -- yes. When I was not there, I was at First Presbyterian Church in La Feria. I was carrying on a congregational meeting there. They had celebrated a townhouse -- a town hall meeting, and several of the elders gathered the people during Sunday school class and they said they were -- they wanted to leave.

3

12

Q. What was your understanding of the process of having discussions within a church if it wanted to consider changing denominations?

A. Well, back when Brother John Davenport was a pastor at First Presbyterian Church in Edinburg, I was part of an administrative group called the Listening Team, an administrative commission where we had the power of being able to take original jurisdiction.

So we could go and listen. We were going to listen on a Saturday and then after that, a couple of days later, we were going to meet with the session. But we had the right to decide what was done with the property, what was done with the pastor, if he would stay or go, and we had the right to make use of any funds that they had. And we looked at all the funds that were available and we examined everything that they had right there in order to stand with whatever decision needed to be made.

Q. And that was called a Listening Team?

A. Yes, it's a Listening Team with the power of original jurisdiction, they call it. That's a legal term.

13

Q. Who else was on that Listening Team with you?

A. Reverend Justin Jones, Reverend Kathy Trevino, and two elders. I can't remember where they were from. I think they were from McAllen, the elders from McAllen, because they're the closer ones.

We were the first administrative action team, I think, of two or three of them that were there.

Q. Was there any kind of training by Mission Presbytery as to what a Listening Team could or could not do, what their functions were?

A. Maybe 20 minutes. So, yeah.

4

Q. Okay. And what were you told by Mission Presbytery?

A. That we could do anything that we wanted there, pretty much, but first -- the first day is to go listen to everybody. And so we went up and were there at the church and -- we went up on a Saturday, and whoever wanted to talk to us could come and talk to us.

Q. And which church --

A. And so we spoke --

Q. I'm sorry.

A. First Presbyterian Church in Edinburg.

Q. Okay. And what year was that?

A. I believe it was about 2006/2007.

Johnson, Thomas, (Page 15:12 to 15:23)

15

Q. Were property issues discussed by the Listening Team?

A. We had -- we wanted a list of all the properties, so, yes, all the properties were listed and we had knowledge of the properties; the manse, the church building, and an additional property that they had. And so all -- everything that they had, and the accounts. We went over a list of all the accounts that they had. They had one account for memorizing all the books of the Bible. They had several different accounts that they had there besides a general fund and CDs.

Johnson, Thomas, (Pages 16:23 to 17:13)

16

Q. Now, did the Listening Team have to get approval from anyone else to take these actions or did it take these actions on its own authority?

17

A. Its own authority, because we were granted --

5

we were granted original jurisdiction.

Q. And what does that mean?

A. That means that we could decide with respect to property, we could decide with respect to bank accounts, and we could decide if that session kept on as session, and also if that pastor stayed on. So original jurisdiction basically is that.

So, of course, we would report to presbytery, but we would have to make the decisions. In other words, these committees are getting together so that the whole presbytery doesn't have to come down and meet right there and the whole presbytery do that.

---

**Johnson, Thomas, (Pages 18:15 to 19:13)**

18

Q. Let me go back now to the church at which you were the pastor, Iglesia Presbiteriana Getsemani. At some point there were discussions -- you talked about this earlier -- about leaving the denomination that took place with your congregation. As a result of those discussions -- well, what happened after those discussions took place?

A. Prior to that and along the way there's been several conversations. For example, one conversation that took place was at El Principe de Paz in Mercedes, where we had a meeting just to talk about what it means

19

to be different than the Mission Presbytery that we currently had. And so we were talking about overlaying presbyteries. We were talking about different divisions of Mission Presbytery.

And as we were talking to different divisions of the presbytery superimposing, I just said, "Well, may as well listen and find out what's going on and what the ideas are."

So I went to El Principe de Paz and I heard the presentations there, and, lo and behold, I

6

got an e-mail that said, "You're not supposed to be meeting here because the denomination hasn't approved having this particular meeting."

**Johnson, Thomas, (Pages 23:24 to 24:5)**

Q. Now, at Getsemani, while you were pastor, did the church receive any funds from presbytery?

A. No, not as such.  In 1956 -- there's a placard on the wall there of the church, and I believe it's 1956, where the Synod of the Son acknowledges that from this point forward, Iglesia Presbiteriana Getsemani will receive no further funds from the presbytery.

**Johnson, Thomas, (Pages 25:23 to 26:3)**

Q. And did it have any provision in deeds, as far as you know, that that property was held for the benefit of the PCUSA?

A. No.  They didn't have anything in the bylaws, so there's no -- there's nothing written to the benefit of anybody.

**Johnson, Thomas, (Page 37:13 to 37:22)**

Q. While you were a member of Mission Presbytery, are you aware of any other churches where either an administrative commission or a listening committee came in and took action with regard to a pastor?

A. Apart from the one I did at the First

7

Presbyterian Church here in --

Q. Yes, right.

A. Yes, and also with Pastor -- he was in the military, he was a marine, and he was a teacher in Weslaco. I can't remember his name, but, yeah.

---

**Johnson, Thomas, (Pages 41:12 to 42:4)**

41

Q. Why did you and the members decide not to go thorugh the Gracious Dismissal process?

A. It was very complicated. We would get – if a Listening Team were to come – and I was on a Listening Team. If a Listening Team were to come, it would listen to the persons and give strength to some and others, no, and it would just be a thing of putting people into a quandary, a conundrum between the sword and the wall – or how do you say that – a rock and a hard place, I guess. I don't know how that saying is. But it would be very difficult, make it more difficult than it was.

And, this way, the people would not have a fight on their hands over the things that were there or

42

anything. It would be just they left, and it's easiest to mend the relationship so we can have – a cousin can talk to the cousin or a brother can talk to another brother. And so it was not desired to hurt anybody.

8

6298086.1

# Exhibit J

| FIRST PRESBYTERIAN CHURCH | § | IN THE DISTRICT COURT |
| SAN ANTONIO, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ___ JUDICIAL DISTRICT |
| | § | |
| MISSION PRESBYTERY, | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER

First Presbyterian Church of San Antonio's ("FPC") has filed a Verified Original Petition for Declaratory Judgment and Application for Temporary Restraining Order and Temporary and Permanent Injunction ("Petition"). After considering FPC's verified pleading and argument of counsel, the Court finds that FPC has established the probability of its right to the requested relief under the neutral principle factors set forth by the Texas Supreme Court in *Masterson v. Diocese of Nw. Texas*, 422 S.W.3d 594 (Tex. 2013); *Windwood Presbyterian Church, Inc. v. Presbyterian Church (USA.)*, 438 S.W.3d. 597 (Tex. App—Houston [1st Dist.] 2014). Based upon the property deeds of FPC, the terms of its corporate charter, the provisions of the denominational constitution, and the generally applicable provisions of Texas law, FPC has demonstrated the likelihood of its complete and exclusive ownership of any property held in its name.

The Court finds that it clearly appears that Mission Presbytery ("Presbytery") has the means at its disposal to cause immediate and irreparable injury, loss or damage to FPC in connection with FPC filing this action and that, if the Court does not issue the Temporary Restraining Order, FPC will be irreparably injured because Presbytery will proceed to form an Administrative Commission to seize control of FPC property or its operations or both. Such conduct by Presbytery would cause immediate damage to the funding of FPC's charities,

**TEMPORARY RESTRAINING ORDER**                                              **PAGE 1**

ministries, and scholarships and render FPC without an adequate remedy at law in that an award of damages would not adequately compensate FPC for the resulting harm to its ability to conduct its ministries.

The Court finds that the equities favor the issuance of this Temporary Restraining Order and that this Temporary Restraining Order is necessary to preserve the status quo between the parties pending a hearing on FPC's request for a temporary injunction.

The Court further finds that this Temporary Restraining Order is properly granted without notice to Presbytery because of Presbytery's incentive, ability and directions from the Presbyterian Church (U.S.A.) to immediately form such an Administrative Commission and endeavor to seize control of FPC's operations.

IT IS THEREFORE ORDERED that the requested Temporary Restraining Order be and is hereby issued against Mission Presbytery its officers, agents, employees, and counsel, and any persons or entities in active concert or participation with Presbytery, or acting by or through Presbytery or on its behalf or in its stead. This Temporary Restraining Order pertains to all Property held by or for First Presbyterian Church of San Antonio, both immovable (real) together with all buildings and improvements thereon, and movable (personal), whether corporeal or incorporeal, wherever located, whether held by, for the benefit of, or in the name of First Presbyterian Church of San Antonio (collectively "Property"), which real Property is more particularly described in Exhibit 1 to the Petition. Presbytery is restrained from filing any documents in the mortgage and conveyance records of Bexar County to assert ownership, use or control, or rights to determine ownership, use or control, to any real Property titled in the name of First Presbyterian Church of San Antonio or to assert a trust on behalf of Presbytery or other affiliated third party over real Property

titled in the name of First Presbyterian Church of San Antonio or otherwise held by or for First Presbyterian Church of San Antonio the effect of which would be to place a cloud on the title of said real Property, or otherwise interfere with or disturb Plaintiff's ownership, use, control, or disposition of Plaintiff's Property, or interfere with Plaintiff's right to determine the ownership, use, control, or disposition of Property held by or for First Presbyterian Church of San Antonio or held in the possession of, control of, or owned by, for the benefit of, or titled in the name of First Presbyterian Church of San Antonio.

IT IS FURTHER ORDERED that Mission Presbytery, and any persons or entities in active concert or participation with it, on its behalf or in its stead, whether acting directly or indirectly, are temporarily restrained from taking any action that could affect the property rights of First Presbyterian Church of San Antonio, including but not limited to:

(1) Filing any documents in the mortgage and conveyance records in Bexar County, or any County where FPC's property is located, the effect of which would be to place a cloud on the title of any property titled in the name of plaintiff;

(2) Otherwise taking any action to claim or assert ownership, use, or control of the Personal and Real Property, or a right to determine ownership, use or control of the Personal and Real Property, in the possession or control of, owned by, titled in the name of or held for the benefit of First Presbyterian Church of San Antonio;

(3) Asserting any rights to the property of First Presbyterian Church of San Antonio, including but not limited to seeking to change the locks of the church, initiating any disciplinary action against the ministers or members of the church, appointing an administrative commission with authority to assume "original jurisdiction" over FPC's local governance and control of local property possessed by or titled in the name of First Presbyterian Church of San Antonio or First Presbyterian Church of San Antonio Foundation, or otherwise interfering, by dissolution or otherwise, in any way with the property-related rights and responsibilities of the employees of FPC, the governing body of FPC (the session), its congregation, or the governing body of its local church corporation FPC (the board of trustees);

(4) Contacting any financial institution to assert a claim of interest in any account, fund, stock or other asset held in the name or for the benefit of First

Presbyterian Church of San Antonio or First Presbyterian Church of San Antonio Foundation; or

(5) Otherwise interfering with the normal duties and responsibilities of the officers, ministers, and employees of First Presbyterian Church of San Antonio or the First Presbyterian Church of San Antonio Foundation or any designees thereof in any way that pertains to the ownership, control, use or disposition of the Real and Personal Property held by, for or in the name of First Presbyterian of San Antonio.

IT IS FURTHER ORDERED that nothing in this Temporary Restraining Order shall preclude Presbytery from taking ecclesiastical action for non-pretextual ecclesiastical cause that is unrelated to this litigation or any property issue raised in, prompted by, related to, or affecting the ownership, control, use, or disposition of the Personal or Real Property held by, for or in the name of First Presbyterian Church of San Antonio

IT IS FURTHER ORDERED that the clerk is to issue notice to Defendant that the hearing on Plaintiff's application for a temporary injunction is set before the Presiding District Court of Bexar County, Texas for the 16ᵗʰ day of MAy, 2015 at 9:00 Am. The purpose of the hearing shall be to determine whether this temporary restraining order should be made a temporary injunction pending a final adjudication of rights by this Court.

IT IS FURTHER ORDERED that this Temporary Restraining Order shall not be effective unless and until Plaintiff executes and files with the clerk a bond in the amount of Five hunnred dollars ($ 500 ).

IT IS FURTHER ORDERED that this Temporary Restraining Order shall expire fourteen days from the date it is entered, or until further order of this Court.

SIGNED this 12 day of May, 2015, at 11:16 A.M.

_____
JUDGE PRESIDING

# Exhibit K


2015CI07858 -D073

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | |
| MISSION PRESBYTERY, | § § | BEXAR COUNTY, TEXAS |
| Defendant, | § § | |
| v. | § § | |
| ED BONDURANT, *et. al.,* | § § | |
| Intervenors. | § | 73RD JUDICIAL DISTRICT |

## ORDER DENYING PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION

CAME TO BE HEARD parties in the above-styled and numbered cause on this day, August 26, 2015, on Plaintiff's Application for Temporary Injunction against Mission Presbytery. After considering each of the parties' pleadings, the evidence presented, the parties' arguments and the applicable law, the Court denied Plaintiff's Application for Temporary Injunction. The temporary restraining order issued in this matter May 12, 2015, is dissolved and otherwise is of no force or effect.

IT IS HEREBY ORDERED by the Court that Plaintiff's Application for Temporary Injunction is DENIED.

SIGNED this ___12__ day of ~~September~~ OCTOBER, 2015.

_____
JUDGE PRESIDING



2015CI07858 -0073

CAUSE NO. 2015-CI-07858

| | | |
|---|---|---|
| FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MISSION PRESBYTERY, | § | BEXAR COUNTY, TEXAS |
| | § | |
| Defendant. | § | |
| | § | |
| v. | § | |
| | § | |
| ED BONDURANT, et al., | § | 73RD JUDICIAL DISTRICT |
| | § | |
| Intervenors | § | |

**ORDER DENYING DEFENDANT'S AND INTERVENORS'
APPLICATION FOR TEMPORARY INJUNCTION**

Came on to be considered Defendant Mission Presbytery and Intervenors' Application for Temporary Injunction. After considering the Defendant and Intervenors' Application, the responses in opposition, any further replies or responsive pleadings, the pleadings and discovery on file, the evidence presented, the record, and the arguments of counsel, if any, the Court finds that the Defendant Mission Presbytery and Intervenors' Application for Temporary Injunction should be DENIED.

IT IS THEREFORE ORDERED that Defendant Mission Presbytery's and Intervenors' Application for Temporary Injunction is DENIED.

SIGNED on the 12 day of OCTOBER, 2015.

_____
JUDGE PRESIDING

1 copy

# JUDGE'S NOTES



2015CI07858 -P00052

CAUSE NO.: 2015CI07858  COURT: 073  DATE/TIME: 08/26/2015 09:00AM
SETTING COURT: 109

STYLE: FIRST PRESBYTERIAN CHURCH OF SAN ANTONIO
VS. MISSION PRESBYTERIAN

DISCOVERY LEVEL: 3

ATTORNEY(S) FOR CASE:
DAVID WEST ✓ 210·226·8395
KENT KRAUSE ✓ 214·750.3551
JAMES ANTHONY

JOSE DE LA FUENTE ✓ 512.322.5800
KEITH KENDALL ✓ 210·349·0041
LLOYD LUNCEFORD

FILED
DONNA KAY McKINNEY
DISTRICT CLERK
BEXAR COUNTY
CF
15 AUG 26 AM 10:34
DEPUTY

TYPE OF MOTION OR APPLICATION:
NON-JURY RESET ON TEMPORARY RESTRAINING ORDER **PER RULE 11**

CONFERRING_____ ESTIMATE HEARING TIME_____
AGREED ORDER_____ ASSIGNED COURT_____
DROP_____ RECORD TAKEN_____
INTERPRETER_____ RESET DATE_____ TIME_____

DATE OF NOTES  8/26 - 27/2015

J GABRIEL

JUDGE INITIALS____

RECORD TAKEN
Letitia "Tish" Moncivais
131st District Court
210/335-2521

10/12/15 Injunctions denied / orders signed (2)

Finding of No Imminent Danger. Any changes
in that status, however, may be Reconsidered by this
Court.

PROPERTY OF BEXAR COUNTY DISTRICT CLERK'S OFFICE

(DK510A)

# Exhibit L

At an Open Stated Meeting on October 23, 2015, at Presbyterian Pan American School in Kingsville, Texas, Mission Presbytery approved the following action by an overwhelming majority:

On October 12, 2015, the Session of First Presbyterian Church of San Antonio, Texas, called a congregational meeting to follow the morning service of worship on Sunday, November 1, 2015, for the following purposes:
1. "That First Presbyterian Church, San Antonio, terminate our voluntary affiliation with the Presbyterian Church (U.S.A.);
2. That First Presbyterian Church, San Antonio, petition a Covenant Order of Evangelical Presbyterians for voluntary affiliation, and so affiliate, if approved;
3. That First Presbyterian Church, San Antonio, reaffirm and ratify its previous Elders and Deacons, both active and those on rotation; the officer nominating committee; and the terms of call of all ordained staff wishing to remain employed by First Presbyterian Church, San Antonio."

The stated purposes of this congregational meeting are contrary to the provisions of the Constitution of the Presbyterian Church (U.S.A.) [Book of Order, G-1.0503].

The Session of First Presbyterian Church, San Antonio, has indicated its unwillingness to utilize the Gracious Separation Process approved by Mission Presbytery, or any form or revision of that process.

On October 13, 2015, Judge John Gabriel of the 131st District Court of Bexar County, State of Texas, denied the petition of First Presbyterian Church, San Antonio, for a Permanent Injunction against the Presbytery, and set aside the Temporary Restraining Order that had been granted to First Presbyterian Church, San Antonio, on May 12, 2015, enjoining the Presbytery from taking any ecclesiastical action against the church that could be construed by the court to interfere with the church's holding title to its property.

Mission Presbytery has a deep pastoral concern for this congregation and its members and ministers, and for the relationships that bind us together in Christ.

**Therefore, be it resolved** that Mission Presbytery, acting in Stated Meeting on October 23, 2015, does hereby declare that as the congregation of First Presbyterian Church, San Antonio, is poised to conduct a vote in congregational meeting that is in violation of the provisions of the Constitution of the Presbyterian Church (U.S.A.), Mission Presbytery does hereby authorize the appointment, by vote of the Presbytery, of an Administrative Commission [G-3.0109b] to intervene on its behalf with First Presbyterian Church, San Antonio, and its Session, with the following purposes and authority:

1. To take all necessary steps, if it becomes evident that the church is in "schism," to discern the "true church" within the Presbyterian Church (U.S.A.) in this matter [G-4.0207];
2. To have access to all church records [G-3.0107], including but not limited to: membership rolls, minutes of Session and all boards and committees, minutes of congregational meetings, financial records, the church website, membership directories, newsletters, and materials distributed for sessional or congregational information;
3. To have access to relevant records having to do with corporate officers, corporate articles, bylaws, and/or charters, including changes to any of these during the last 10 years [G-3.0108];

4. To determine, on behalf of presbytery, whether proceedings have been faithful to the mission of the whole Church, and that lawful injunctions of higher councils have been obeyed [G-3.0108a]; and, if necessary, to direct that corrective action be taken if matters are determined to be out of compliance with the Constitution [G-3.0108c];
5. If it becomes necessary, to assume original jurisdiction over the Session [G-3.0303e], with full authority and power to (a) provide for worship, sacraments, and continuing pastoral care of all members of the congregation, in the spirit of the Gospel of Christ; (b) to receive and act on requests from members to be transferred or deleted from the rolls; (c) to have authority to call necessary congregational meetings, and to obtain current and accurate membership lists from the church for this purpose;
6. To have authority to dissolve pastoral relationships, both temporary and installed, fully observing the due process requirements of the Constitution (G-2.0901ff.];
7. To have authority to negotiate terms for the dismissal of the congregation if it becomes evident that a sufficient majority of the active membership desires to be dismissed to another Reformed denomination with which the Presbyterian Church (U.S.A.) is in communion.

**The Administrative Commission's authority is restricted in the following specific way:** The Administrative Commission shall not take any action to change the current right, title, or legal interest in any real or personal property that is presently held and/or used by the congregation. The Administrative Commission shall maintain the status quo with respect to such property.

**Later in the same Stated Meeting,** on October 24, 2015, the Presbytery elected the following persons to the Administrative Commission, with the provision of appointing an additional Ruling Elder to the Commission after obtaining that person's expression of willingness to serve:

Teaching Elder Faith Jonggeward (San Pedro, San Antonio)
Teaching Elder Al Krummenacher (Austin Presbyterian Theological Seminary)
Teaching Elder Fred Morgan (Honorably Retired)
Teaching Elder Rob Mueller (Divine Redeemer, San Antonio)
Ruling Elder Phil Barnes (Westlake Hills, Austin)
Ruling Elder Judy Ferguson (First, Kerrville)
Ruling Elder Susan Trull (St. Andrew, San Antonio)

# Exhibit M


2015CI07858 -0073

CAUSE NO. 2015-CI-07858

FIRST PRESBYTERIAN CHURCH OF §       IN THE DISTRICT COURT
SAN ANTONIO, §
     §
     Plaintiff, §
     §
v. §
     §
MISSION PRESBYTERY, §       BEXAR COUNTY, TEXAS
     §
     Defendant. §
     §
v. §
     §
ED BONDURANT, et al., §
     §       73RD JUDICIAL DISTRICT
     Intervenors §

## ORDER GRANTING TEMPORARY INJUNCTION

After considering First Presbyterian Church of San Antonio's ("FPC") Verified Original Petition for Declaratory Judgment and Application for Temporary Restraining Order and Temporary and Permanent Injunction, memorandum in support of temporary injunction, any further replies or responsive pleadings, discovery on file, the evidence presented, the temporary injunction hearing record and the arguments of counsel, the Court finds that FPC has established the probability of its right to the requested relief under the neutral principle factors set forth by the Texas Supreme Court in *Masterson v. Diocese of Nw. Texas*, 422 S.W.3d 594 (Tex. 2013); *Windwood Presbyterian Church, Inc. v. Presbyterian Church (USA.)*, 438 S.W.3d. 597 (Tex. App.—San Antonio [1st Dist.], 2014, no pet.). The Court further finds that: (i) FPC is a Texas not-for-profit corporation; (ii) Its primary purpose is not monetary but spiritual and philanthropic; and (iii) FPC supports numerous ministries, missionaries, and charitable endeavors of wide-ranging civic and community impact, including but not limited to: the SAMM shelter (started at FPC), Community Assistance Ministry (CAM), the Dental Clinic, and Mission Road. Based upon

the property deeds of FPC, the terms of its corporate charter, the provisions of the denominational constitution, and the generally applicable provisions of Texas law, FPC has demonstrated the likelihood of its complete and exclusive ownership of any property held in its name. The Court also finds that Mission Presbytery has the means at its disposal and has indeed threatened imminent harm and irreparable injury, loss or damage to FPC in connection with FPC filing this action and that, if the Court does not issue the Temporary Injunction, FPC will be irreparably injured, because Presbytery will proceed to form an Administrative Commission or listening team to seize control of FPC property or its corporate operations or both. Such conduct by Mission Presbytery would render FPC without an adequate remedy at law in that an award of damages would not adequately compensate FPC for the resulting harm to its ability to conduct its various ministries. The Court therefore finds that absent a temporary injunction, the rights of FPC and its ministry will be irreparably injured, as seizure of FPC's property or corporate operations by Mission Presbytery will adversely impact donations and volunteer support by Plaintiff's congregants and that no amount of subsequent monetary reimbursement would be an adequate remedy for the irreparable damage that would be done to the mission and ministries of FPC. The Court also finds that FPC seeks protection of the ownership, possession and enjoyment of immoveable and personal property and that existing policy and prior action of Mission Presbytery demonstrates that FPC will suffer irreparable injury if injunctive relief is not granted and, thus, a monetary award is an insufficient remedy at law. Thus, the Court finds that the equities favor the issuance of this Temporary Injunction and that this Temporary Injunction is necessary to preserve the status quo between the parties pending a judgment on the merits of the underlying claims.

IT IS THEREFORE ORDERED that this Temporary Injunction be and is hereby issued against the Mission Presbytery of the Presbyterian Church (USA), its officers, agents, employees,

and counsel, and any persons or entities in active concert or participation with the Mission Presbytery, or acting by or through the Presbytery or on its behalf or in its stead (hereinafter "Presbytery"). This Temporary Injunction pertains to all Property held by or for First Presbyterian Church of San Antonio and its civil corporation (FPC), both immovable (real) together with all buildings and improvements thereon, and movable (personal), whether corporeal or incorporeal, wherever located, whether held by, for or in the name of FPC (collectively "Property"), which real Property is more particularly described in the Appendix attached hereto. Presbytery is enjoined from filing any documents in the mortgage and conveyance records of Bexar County to assert ownership, use or control, or rights to determine ownership, use or control, to any real Property titled in the name of FPC or to assert a trust on behalf of the Presbytery or other affiliated third party over real Property titled in the name of FPC or otherwise held by or for FPC the effect of which would be to place a cloud on the title of said real Property, or otherwise interfere with or disturb FPC's ownership, use, control, or disposition of FPC's Property, or interfere with FPC's right to determine the ownership, use, control, or disposition of Property held by or for FPC or held in the possession of, control of, or owned by or titled in the name of FPC.

IT IS FURTHER ORDERED that the Mission Presbytery of the Presbyterian Church (USA), and any persons or entities in active concert or participation with it, on its behalf or in its stead, whether acting directly or indirectly, are temporarily enjoined from taking any action that could affect the property rights of FPC, including but not limited to:

(1) Filing any documents in the mortgage and conveyance records in Bexar County, or any County where FPC's property is located, the effect of which would be to place a cloud on the title of any property titled in the name of plaintiff;

(2) Otherwise taking any action to claim or assert ownership, use, or control of the Personal and Real Property, or a right to determine ownership, use or control of the Personal and Real Property, in the possession or control of, owned by, titled in the name of or held for the benefit of First Presbyterian Church of San Antonio;

SIGNED this __30th__ day of __OCTOBER__ 2015, at __4:31__ p. m.

_____
JUDGE PRESIDING

# Exhibit N

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2015-CI-07858
VOLUME 1 OF 1

FIRST PRESBYTERIAN CHURCH       *       IN THE DISTRICT COURT
OF SAN ANTONIO                   *
                                 *
V.                               *       131ST JUDICIAL DISTRICT
                                 *
MISSION PRESBYTERY              *       BEXAR COUNTY, TEXAS

TESTIMONY OF RUBEN ARMENDARIZ & WILLIAM POE
AND
CLOSING ARGUMENTS

On the 27th day of August, 2015, the following proceedings came on to be heard before the Court, in the above-numbered and styled cause, and the following proceedings were had before THE HONORABLE JOHN D. GABRIEL, Judge Presiding, held in the 131st District Court, San Antonio, Bexar County, Texas.

Proceedings reported by computerized stenotype machine.

LETITIA MONCIVAIS, CSR NO. 3416
BEXAR COUNTY COURTHOUSE
131ST DISTRICT COURT
100 DOLOROSA, 4TH FLOOR
SAN ANTONIO, TX 78205
210/335-2521

LETITIA MONCIVAIS, CSR, RPR
131ST DISTRICT COURT    210/335-2521

APPEARANCES

MR. DAVID WEST, SBOT #21196400
DYKEMA COX SMITH
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Phone No.: 210/554-5500

- and -

MR. KENT C. KRAUSE, SBOT #11714600
CRADDOCK, DAVIS & KRAUSE, LLP
3100 Monticello Ave., Ste 550
Dallas, TX 75205
Phone No.: 214/750-3550

- and -

MR. LLOYD J. LUNCEFORD, SBOT#8439
TAYLOR, PORTER, BROOKS & PHILLIPS, LLP
451 Florida Street, 8th Floor
Baton Rouge, LA 70821
Phone No.: 225/387-3221
      REPRESENTING THE PLAINTIFF;


MR. JOSE E. DE LA FUENTE, SBOT #00793605
MR. TYLER T. O'HALLORAN, SBOT #24083590
LLOYD GOSSELINK ROCHELLE & TOWNSEND
816 Congress Ave., Suite 1900
Austin, TX 78701
Phone No.: 512/322-5849

- and -

MR. KEITH KENDALL, SBOT# 11263250
DAVIDSON, TROILO, REAM & GARZA
7550 West IH-10, Suite 800
San Antonio, TX 78229
Phone No.: 210/349-6484
      REPRESENTING THE DEFENDANT.

INDEX

AUGUST 27, 2015                                          PAGE

PLAINTIFF'S WITNESS:
                        DIRECT        CROSS
    RUBEN ARMENDARIZ    4,34          30,38

DEFENDANT'S WITNESS:
                        DIRECT        CROSS
    WILLIAM POE         30,72         65,77


CLOSING ARGUMENTS
    BY MR. KRAUSE . . . . . . . . . . . . . .    80
    BY MR. LUNCEFORD . . . . . . . . . . . .     89
    BY MR. DE LA FUENTE . . . . . . . . . . .    93
REBUTTAL ARGUMENTS
    BY MR. KRAUSE . . . . . . . . . . . . . .    106
    BY MR. DE LA FUENTE . . . . . . . . . . .    107

* - * - *

RUBEN ARMENDARIZ,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. LUNCEFORD:

Q.    Mr. Armendariz, my name is Lloyd Lunceford.

For the record, would you please state your name?

A.    Ruben Pacillas Armendariz.

Q.    Would you spell your last name for the benefit of the court reporter?

A.    A-R-M-E-N-D-A-R-I-Z.

Q.    And forgive me, is it Mr. Armendariz or Reverend Armendariz?

A.    I'm a ruling elder. Mr. Armendariz.

Q.    By whom are you currently employed?

A.    By Mission Presbytery.

Q.    And what -- in what capacity?

A.    I am the Associate Presbytery, head of staff.

Q.    Is there any employee of Mission Presbytery who is your superior, or are you the top guy right now?

A.    I'm the top guy.

Q.    Would you briefly describe the scope of your job responsibilities?

A.    It's fairly wide. I am responsible for the operation of the Mission Presbytery and staff. I

A.   G-3.0205.   "In addition to those responsibilities described in G-3.0113, the session shall prepare and adopt a budget and determine the distribution of the congregation's benevolences."

Q.   Prior to the adoption of a church's budget by a session, the session submits those budgets to the presbytery for the presbytery's review and approval?

A.   No.

Q.   Okay.   There's no qualification on the authority of a session to adopt a budget and determine distribution of the congregation's benevolences in this provision, is there?

A.   I'm sorry.   Repeat that question.

Q.   The session is given full authority in this provision?

A.   Yes.

Q.   Okay.   How would you define the term benevolences?

A.   It's a broad term of gifts that a congregation may give.

Q.   Would it include designated gifts to certain missions?

A.   Yes.

Q.   To certain PC(USA) missions?

A.   Yes.

Q. Well, in the Book of Order, the trust is said to run in favor of the PC(USA). But isn't it a sign to the presbytery, the responsibility, the front line responsibility to implement that?

A. Yes, it is.

Q. Okay. Thank you.

Now, if you would read part B, which is additional authority of the presbytery.

A. "Assume original jurisdiction in any situation in which it determines that a session cannot exercise its authority."

Q. I'll ask you to stop there for just a moment. That uses a phrase "assume original jurisdiction." That's sort of a presbyterian vernacular or a parlance or vocabulary.

What does "assume original jurisdiction" mean?

A. Assume original jurisdiction is a power that is given to an administrative commission.

Q. So a presbytery can appoint an administrative commission with authority to assume original jurisdiction. And if that administrative commission exercises that authority, it assumes authority that previously had been a sessions?

A. It is, if it gives them that authority. But

there's a wide range of authorities of responsibility that are given.

Q. Right. The scope --

A. It could be one of them, yes.

Q. Right. The scope of powers of administrative commission is determined by the motion that creates it?

A. That's correct.

Q. Okay. And the motion that creates it could give it the power to exercise original jurisdiction, correct?

A. It could give it the power.

Q. Right. And if it's given that power and it exercises it, it, in effect, becomes and replaces the session, correct?

A. It depends if that's the power it's given.

Q. Right. This says, though, that it is within the authority of a presbytery to do that, correct?

A. Yes, it is.

Q. Okay. And synods, it turn, review the work of presbyteries, correct?

A. Yes.

Q. Okay. If you would look at G-3.0401. Actually, that caption is clipped off the page. It's actually on page 55. This pertains to functions of a synod. Page 55.

in trust for the use and benefit of the Presbyterian Church (U.S.A.).

Q. So if the synod concludes that a presbytery isn't adequately implementing the trust clause, the synod can take over the presbytery and do it for them? That's what that's saying, isn't it?

A. That's the advisory that is made.

Q. And you had testified that Mission Presbytery is the member presbytery of the Synod of the Sun, correct?

A. Yes. That's correct.

Q. And are you aware that the Synod of the Sun has previously taken over of presbytery within its jurisdiction to do just that?

A. I am aware.

MR. LUNCEFORD: Your Honor, Exhibit 47 is a published appellate decision in the reporter's system, in which this same Synod of the Sun, of which Mission Presbytery is a part, exercised original jurisdiction by appointing an administrative commission to take over a presbytery to -- in an attempt to exercise the denominations claim over local church property when the synod concluded that the presbytery wasn't being sufficiently aggressive.

THE COURT: You said that's --

MR. DE LA FUENTE: Your Honor, I'm going to object to the entire characterization of that. I appreciate Mr. Lunceford's argument of the reasoning of what happened with the synod, et cetera. So I object to the characterization and the testimony on the record by Mr. Lunceford.

I'm also going to object, again, to the relevance of stuff that happened somewhere else. The question is whether Mission Presbytery is an imminent threat and has done anything in furtherance of any of these boogie men that they're trying to put in front of you. And I'm still waiting and I haven't heard evidence, one, that Mission Presbytery intends to do that in this case.

MR. LUNCEFORD: The Court, obviously, can read the opinion for itself and determine what it says and doesn't say.

THE COURT: Is that a Court opinion?

MR. LUNCEFORD: Yes. It's a Louisiana First Circuit Court of Appeal decision, Exhibit 47.

MR. DE LA FUENTE: And I object to it being entered into evidence.

MR. LUNCEFORD: I think it's already been --

MR. WEST: No, it was not. That was one

A. Page 50.

Q. G-3.0205.

A. Yes.

Q. Okay. So with regard to, for example, the assets, the intervenors are fighting about, the monies they've contributed that have been made part at PC's estate, the session has the ability to adopt a budget and determine how those monies are going to be spent right now, right?

A. That's what it says.

Q. As a session of a PC(USA) congregation?

A. Yes.

Q. And the presbytery can't step in and isn't just stepping in and overseeing the budget and determining, no, you should give a little more here and a little more there, anything like that?

A. No.

Q. And the intervenors -- if the intervenors' injunction is granted requiring FPC to continue operating, using those assets as a body subject to the PC(USA) Constitution's Rules and Regs, would this change at all?

A. Not at all.

Q. With regard to the trust clause that Mr. Lunceford asked you about, showed you Exhibit 19,

and obligations he's asserting that presbyteries have to assert the trust clause. In this temporary injunction proceeding today, hasn't Mission Presbytery consciously chosen not to pursue an argument based on the trust clause?

A. That's true.

Q. Exhibit 19, being the advisory opinion; is this some legal requirement on Mission Presbytery, Inc.?

A. No.

Q. Is this an ecclesiastical opinion?

A. It is.

Q. Is it a -- is this one of the -- is this one of the Constitution Rules or Regulations of the PC(USA)?

A. No, it's not.

Q. Are those found entirely within here?

A. Correct.

Q. The Book of Order?

A. Yes.

Q. I'm going to have you turn to -- I believe it's G-3.102. I want you to read just the first line of G-3.102, on page 42.

A. Yes. "Councils of the church have only ecclesiastical jurisdiction for the purpose" --

Q. "Have only ecclesiastical jurisdiction"?

A. That's correct.

Q.   Is that true?

A.   That is true.

Q.   Then I want to ask you about something Mr. Lunceford asked you about, Section G-3.0303, the Relations with Sessions, on page 52.  And he actually highlighted for you Section B.  Can you read Section B for us again, so we're familiar with what we're talking about?

A.   Yes.  "Control the location of new congregations and of congregations desiring to move as well as to divide, dismiss, or dissolve congregations in consultation with their members."

Q.   All right.  I want to ask about that last phrase "in consultation with their members."

A.   Yes.

Q.   Right now, there's a temporary retraining order in place on Mission Presbytery?

A.   That is correct.

Q.   Is Mission Presbytery fully able to act in consultation with the members of FPC pursuant to that temporary restraining order?

A.   No, they're not.

Q.   Mr. Armendariz, you've seen the temporary restraining order and the list of things that they're afraid of:  Going and changing the locks and filing

34

liens and looking into Judge Gabriel's religious background and who knows what else is in that list. All those things you've seen listed. Has Mission Presbytery done a single one of those things with regard to FPC?

A. None at all.

Q. Has Mission Presbytery developed or stated any intent to do any one of those things regarding FPC?

A. No.

Q. Has Mission Presbytery been able to engage in its ecclesiastical functions of relationship with the members of FPC who are by virtue of that membership members of Mission Presbytery?

A. No.

MR. DE LA FUENTE: Pass the witness, Your Honor.

THE COURT: Mr. Lunceford?

REDIRECT EXAMINATION

QUESTIONS BY MR. LUNCEFORD:

Q. Mr. Armendariz, if the Synod of the Sun instructed Mission Presbytery to form an administrative commission to take original jurisdiction over the session of First Presbyterian Church of San Antonio, what would you do?

MR. DE LA FUENTE: I object. Calls for speculation, Your Honor.

Q.    (By Mr. Lunceford)  What would your responsibilities be on the Book of Order?

A.    There would be no responsibility in the Book of Order because it has not gone through due process.

Q.    Well, if all process due had been granted and at the end of the day, the synod, which has oversight responsibility over the presbytery, told the presbytery to replace the session of First Presbyterian Church of San Antonio, wouldn't the presbytery be obliged to obey the directive of the synod?

A.    It would be only obliged to proceed with process, but not to do so right immediately, no.

Q.    Well, forget immediately.  Suppose whatever the process is, has occurred and there is no clear process outlined, if the synod passed a resolution to instruct the presbytery to form an administrative commission to replace the session of First Presbyterian of San Antonio, what would the presbytery's response to that be?

MR. DE LA FUENTE:  I object, Your Honor. I'm going to object as calling for speculation.  If he wants to ask questions of what synod would do and what synod would be able to require, he should ask those questions of the synod, not of Mr. Armendariz.

MR. LUNCEFORD:  He's the top dog in the

presbytery. He's qualified to say what the presbytery would do.

THE COURT: I'll allow him to answer. Overrule the objection.

MR. DE LA FUENTE: Your Honor, it's entirely speculative.

A. I am the head of staff. We have a constitutional officer who's a stated clerk. The stated clerk is the polity person.

Q. (By Mr. Lunceford) Would you ignore the synod or would you obey the synod?

MR. DE LA FUENTE: I object to the question that it's argumentative and, again, calls for speculation.

MR. LUNCEFORD: It's not argumentative at all.

MR. DE LA FUENTE: They offered him two options. It's argumentative, Your Honor.

THE COURT: I'll allow it. Overrule the objection.

You may answer.

Q. (By Mr. Lunceford) Would you obey the synod or would you ignore the synod?

A. I would obey the synod only as far as to establish the process by which we would follow the

process, but it wouldn't be right away or we'll do it.

Q. If the process resulted in the synod telling the presbytery to form an administrative commission to replace the session of First Pres San Antonio, and at the end of that process that was the result, would you obey that -- would you ignore that result or would you follow it?

MR. DE LA FUENTE: Your Honor, more speculation.

THE COURT: Just so I understand your question, you said -- and I know the witness answered after a process, you're saying after due process?

Q. (By Mr. Lunceford) After whatever process you're talking about has occurred, if the decision by the synod remained and it directed the presbytery to form an administrative commission to take control of the session of First Pres San Antonio, would you ignore that or would you follow it?

A. We would not ignore it, but we would try to follow a process in order to see if we could fulfill what the synod has instructed.

Q. And if you ignored it, does the synod have the authority to form an administrative commission to take over the presbytery and deal with what presbytery is unwilling to do?

A. It has the authority.

Q. Okay. Thank you.

MR. LUNCEFORD: No further questions.

THE COURT: Mr. de la Fuente, anything else?

RECROSS-EXAMINATION

QUESTIONS BY MR. DE LA FUENTE:

Q. Mr. Armendariz, Mission Presbytery has a telephone, a mailbox, and a door, right?

A. That's correct.

Q. Has the synod come through any one of those three things and told you to do anything with regard to FPC?

A. Not at all.

MR. DE LA FUENTE: Pass the witness.

THE COURT: Mr. Lunceford, anything else?

MR. LUNCEFORD: Nothing further.

THE COURT: Mr. Armendariz, you may step down.

* - * - * - *

WILLIAM CHRISTOPHER POE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. DE LA FUENTE:

Q. Mr. Poe, could you identify yourself for the

couldn't tell whether it violated it or not. When they came forth with more specifics, we determined that it wasn't pretextual, there was no violation of the TRO, and we've not pursued it with this Court.

THE COURT: Okay, I guess Mr. de la Fuente has a question on the wording of the TRO.

I'm going to admit Exhibit 38 in evidence. Just so there's a better understanding of what's occurred.

(Defendant's Exhibit No. 38 admitted)

Q. (By Mr. De La Fuente) Mr. Poe, you just heard Mr. Lunceford say, you know, the inquiry they were asking about here was whether you followed the Book of Order, right?

A. Yes.

Q. So whether you followed the Book of Order in an ecclesiastical matter?

A. Yes, it is.

Q. They've asked for an injunction: Otherwise interfering with the -- prohibiting Mission from otherwise interfering with the normal duties and responsibilities of the officers, ministers, and employees of First Presbyterian Church of San Antonio, or the FPC San Antonio foundation, or any designees.

thereof in any way that pertains to the ownership, control, use or disposition of the real and personal property held by or in the name of First Presbyterian of San Antonio.

Do you recall that?

A. Yes.

Q. You've heard testimony that anything that affects someone holding an office of control, therefore affects their ability to control the property, right?

A. Yes.

Q. So by this -- if one or more of an officer of First Presbyterian Church violated the ordination vows, could, under this injunction, Mission Presbytery do anything about it?

A. I don't know, but I don't think so. I don't think we would.

Q. And that would be for both a mundane violation of ordination vows, right?

A. (Nods head).

Q. What about a profound violation? Same?

A. Same.

Q. What if there is an issue of -- and there is no allegation of this by the way. But what if there is an issue of, say, a significant malfeasance? Could you do anything about it?

too many negatives in that. Are you -- I didn't understand. Are you saying that there's something in the injunction that would prohibit you from communicating with the minority faction?

MR. DE LA FUENTE: I asked if it was in a way that would interfere with -- that would pertain to the ownership, control, use or disposition of the real property.

Q. (By Mr. De La Fuente) And don't the members have the authority to vote on such matters?

A. They do.

Q. Okay. FPC mentioned all kinds of ministries that it participates in; the SAMM Shelter, and the Community Assistance Ministry. Are those ministries consistent with the Mission of PC(USA)?

A. Yes, sofar as I know them.

Q. Are they allowed under the Constitution Rules and Regulations of PC(USA)?

A. Yes.

Q. Are you aware of any intent by Mission Presbytery to restrict FPC from performing any of those ministries now or in the future?

A. No.

Q. In fact, Mr. Armendariz pointed to 3.0 -- was asked about 3.0205, describing the responsibilities of

the session over preparing and adopting the budget and determining the distribution of the congregation's benevolences?

A.   Yes.

Q.   The session has that authority today?

A.   Yes, it does.

Q.   Okay.   And if the session is required to continue to treat the assets subject to the Constitution Rules and Regulations of the PC(USA), meaning as a member congregation of PC(USA) only -- we talked about that earlier, right?

A.   Uh-huh.

Q.   Okay.   Would that change anything they do under 3.0205?

A.   No, it would not.

Q.   Okay.   Have you become aware of a desire of FPC to leave the denomination?

A.   Yes.

Q.   How did you become aware of that desire?

A.   We received a letter from Mr. West inviting us to consider certain areas of negotiation.

Q.   And did those areas of negotiation include dismissing --

MR. LUNCEFORD:   Your Honor, I'm going to object to this line of questioning.   He's asking about a

# Exhibit O

Processes for use by presbyteries in responding to congregations seeking to withdraw

## I. FOCUS ON OUR OVERRIDING PRINCIPLES

### A. Who we are

The Presbyterian Church (U.S.A.) strives to be a church modeled on the body of Christ so well articulated in I Corinthians 12. That is, a church made up of many different parts, all of which are "... necessary for its mission to the world, for its building up, and for its service to God." (G-1.0100b.)

1. **We gather together in congregations.**
"... [T]he several different congregations of believers, taken collectively, constitute one Church of Christ ..." (G-1.0400)
"A particular church consists of those persons in a particular place, along with their children, who profess faith in Jesus Christ as Lord and Savior and who have been gathered for the service of God as set forth in Scripture, subject to a particular form of church government." (G-4.0103)

   a. A particular Presbyterian Church is an unincorporated association of believers created by or received into the PC(USA).
   "Each particular church of the Presbyterian Church (U.S.A.) shall be governed by this Constitution. Its officers are ministers of the Word and Sacrament, elders, and deacons. Its government and guidance are the responsibility of the session. It shall fulfill its responsibilities as the local unit of mission for the service of all people, for the upbuilding of the whole church, and for the glory of God." (G-4.0104)

   b. The corporation of a particular church is a civil body created by the state.
   "Whenever permitted by civil law, each particular church shall cause a corporation to be formed and maintained. Only members on the active roll of the particular church shall be members of the corporation and eligible for election as trustees. The elders in active service in a church who are eligible under the civil law shall, by reason of their office, be the trustees of such corporation, unless the corporation shall determine another method for electing its trustees. Any such alternate method shall provide for a nominating committee elected by the corporation, and for terms for trustees the same as are provided for elders. Any particular church which is not incorporated may select trustees from the members on the active roll of the church. The power and duties of such trustees shall not infringe upon the powers and duties of the session or of the board of deacons. (G-10.0102, G-6.0402)" (G-7.0401).

2. **Church property is at service for mission.**

   a. "The great ends of the church are the proclamation of the gospel for the of humankind; the shelter, nurture, and spiritual fellowship of the children of God; the maintenance of divine worship; the preservation of the truth; the promotion of social righteousness; and the exhibition of the Kingdom of Heaven to the world." (G-1.0200)

   b. The purpose of the Trust Clause (G-8.0201) is to support the purposes and mission of the particular church as a part of the Presbyterian Church ("

I

**EXHIBIT 12**          FPC 001253

the *Constitution* of the Church.

"All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." (G-8.0201)

## B. How we make decisions

### 1. Discerning Christ's will
Through our theology we understand that "[p]resbyters are not simply to reflect the will of the people, but rather to seek together to find and represent the will of Christ." (G-4.0301d.)

#### a. Majority rule
"Decisions shall be reached in governing bodies by vote, following opportunity for discussion, and a majority shall govern." (G-4.0301e.)

#### b. Always reforming
At the same time, the church is committed to being open to voices sharing minority opinions. At some points in our history minority views eventually became those of the majority. Thus, the *Constitution* recognizes "'The church reformed, always reforming,' according to the Word of God and the call of the Spirit." (G-2.0200)

### 2. If we disagree
Presbyterians have always celebrated and recognized significant differences of opinion on issues that matter. This ethos is currently noted in the historic language found at G-1.0305: "... [W]e also believe that there are truths and forms with respect to which men of good characters and principles may differ. And in all these we think it the duty both of private Christians and societies to exercise mutual forbearance toward each other."

#### a. How we allow dissent
The Office of the General Assembly recognizes that currently there are deep and profound differences of conviction on a variety of topics in the church. When it comes to voicing those differences, we have previously drawn a clear distinction between dissent, which is always constitutionally protected; and defiance, which is never, ever protected.[1] The *Constitution* provides ways to register disagreement and to propose change.

1) Any governing body member may surely dissent (G-9.0303) and/or protest (G-9.0304) a particular action of that body.

2) Sessions (G-10.0102p.(6)) and presbyteries (G-11.0103t.(3)) may overture higher governing bodies for changes in policies or even changes in the *Constitution* itself.

[1] See Advisory Opinion #2

2

FPC 001254

b. How we behave in disagreement

1) Our covenant demands that we strive to work together in peace and unity, even in the midst of our diversity. This foundational Presbyterian principle is found in many places within our *Constitution* (G-10.0302a.(3)(a), G-11.0413, D-1.0101, D-1.0103) The duty is always to attempt to bring the estranged member back into the covenant community. We promise to carry out that duty in our ordination vows.[2]

2) There are also times when an individual finds it impossible to go along with the majority. "... [W]hen any matter is determined by a majority vote, every member shall either actively concur with or passively submit to such determination." If an individual officer finds that his [her] "...conscience permit him [her] to do neither, he [she] shall, after sufficient liberty modestly to reason and remonstrate, peaceably withdraw from our communion *without* attempting to make any *schism*." (italics added) (Endnote 1, Chapter VI) Dissent cannot constitutionally become advocacy for defiance, nor for schism.

## II. IF SCHISM IS A RISK FOR A PARTICULAR CONGREGATION

The Office of the General Assembly is aware of Presbyterians who feel compelled not only to abandon their vows[3] and promises, but who are willing also to rend the fabric of the church and sinfully threaten the peace and unity of Christ's Church. We are concerned that some seem willing to take for themselves the *authority* to ascribe within which "certain bounds ... of the Reformed faith" (G-6.0108b.) we *all* must live. In our history this too often has led to schism, a right of no Presbyterian.[4] The term *schism* is "always interpreted in connection with and in the context of specific factual situations."[5]

When faced with information that a congregation is intent upon or at risk of departing from the PC(USA), we suggest the following measured approach:

A. Use a team to gather information.

1. This could be a team appointed by the Council (G-9.0902a., G-11.0103v., via G-9.0501a.)
"A committee is appointed either to study and recommend appropriate action or to carry out directions or decisions already made by a governing body. It shall make a full report to the governing body that created it, and its recommendations shall require action by the governing body." (G-9.0501a)

2. It could be a team from the Committee on Ministry (G-11.0503, G-11.0502c. [triennial visit], G-11.0502i.,j.)

---

[2] G-14.0207g. and G-14.0405b.(7) Do you promise to further the peace, unity, and purity of the church?
[3] G-14.0207e. and G-14.0405b.(5) Will you be governed by our church's polity, and will you abide by its discipline?
[4] Second Helvetic Confession 5.162 "all schismatic seeds should be removed." and 5.141 "Furthermore, we diligently teach that care is to be taken wherein the truth and unity of the Church chiefly lies, lest we rashly provoke and foster schisms in the Church."
[5] PCUS *Minutes* 1968, p. 108

3

FPC 001255

a. "The committee shall be open to communication at all times with the ministers, elders who are members of sessions, sessions of the presbytery, and Certified Christian Educators within the bounds of the presbytery." (G-11.0503)

b. "It shall visit with each session of the presbytery at least once every three years, discussing with them the mission and ministry of the particular church and encouraging the full participation of each session and congregation in the life and work of presbytery and of the larger church. (W-1.4002)" (G-11.0502c)

c. "It shall serve as an instrument of presbytery for promoting the peace and harmony of the churches, especially in regard to matters arising out of the relations between ministers and churches. Its purpose shall be to mediate differences and reconcile persons, to the end that the difficulties may be corrected by the session of the church if possible, that the welfare of the particular church may be strengthened, that the unity of the body of Christ may be made manifest." (G-11.0502i)

d. "It shall exercise wise discretion in determining when to take cognizance of information concerning difficulties within a church, proceeding with the following steps:" (G-11.0502j)

1) "It may take the initiative to bring the information which has come to it to the attention of the session of the church involved, counseling with the session as to the appropriate actions to be taken in correcting the reported difficulties." (G-11.0502j.(1))

2) "It may offer its help as a mediator in case the session either finds itself unable to settle the problems peaceably or takes no steps toward settlement." (G-11.0502j.(2))

3) "It may act to correct the difficulties if requested to do so by the parties concerned, or if this authority is granted by the presbytery for the specific case. When so doing, the committee shall always hold hearings which afford procedural safeguards as in cases of process, following the procedures outlined in the Rules of Discipline." (G-11.0502j.(3))

3. The team could be appointed by the presbytery trustees.

4. The team might be made up of members from each of the above bodies, and could include others as well.

B. Empower the team to conduct an Administrative Review.

1. Those conducting a special administrative review have certain constitutional authority.

a. "If a higher governing body learns at any time of any irregularity or delinquency by a lower governing body, it may require the governing body to produce any records and take appropriate action (G-12.0102n, G-12.0304, G-13.0103k, n)" (G-9.0408)

4

FPC 001256

b. Authorize the team to look at whatever records may be relevant. (i.e. how money is held, title to property, insurance documents, corporate officers, corporate articles, bylaws, charters - especially changes in any of these). Such a team should be especially careful to look for recent changes or modifications of the articles, bylaws, or deeds. The presbytery is entitled to see such changes in legal documents. (G-9.0408)

c. "In reviewing the proceedings of a lower governing body, the higher governing body shall determine, either from the records of those proceedings or from any other information as may come to its attention, whether: ... " (G-9.0409a)

   1) "The proceedings have been faithful to the mission of the whole church;" (G-9.0409a.(4))

   2) "The lawful injunctions of a higher governing body have been obeyed." (G-9.0409a.(5))

2. Authorize the team to give directives (G-9.0410) on behalf of the presbytery.

   a. "It is ordinarily sufficient for the higher governing body to record in its own proceedings, and in those under review, its approval, disapproval, or correction. If necessary, the higher governing body may direct the lower governing body to reconsider and correct an irregularity or cure a delinquency." (G-9.0410)

   b. The type of directive will depend on the issues (examples: don't call a congregational meeting, don't transfer assets, don't encumber property, don't elect new officers).

C. The team must keep all concerned parties informed.

   1. Send letter to session (wording should be measured, but firm).

   2. Send letter to all members of congregation (measured, non-threatening, explanatory; presbytery often has been "made out to be" poised to seize the property, etc.).

   3. Members of team have "one on one" conversation with the pastor. Be sure she/he understands the consequences of any prohibited actions.

   4. Communicate often with council, COM, or body that appointed on progress being made. When the team has reached some conclusions, take recommendations to presbytery for further action, if necessary.

## III. IF SCHISM IS LIKELY, USE AN ADMINISTRATIVE COMMISSION

For a congregation bent on attempting to withdraw

A. Why use an administrative commission?
"Commissions appointed by sessions, presbyteries, synods, or the Genera' ⸺ ᴵ ᴵʰ⸺ ⸺⸺ ᵇ⸺

5.

either administrative or judicial, except in the case of sessions, which may appoint only administrative commissions. The functions ordinarily entrusted to an administrative commission are: ..." (G-9.0503a)

"to visit particular churches, governing bodies, or other organizations of the church reported to be affected with disorder, and to inquire into and settle the difficulties therein, except that no commission shall have the power to dissolve a pastoral relationship unless such power has been specifically delegated to it by the appointing body;" (G-9.0503a.(4))

B. How to use the administrative commission

1. Many future difficulties can be avoided by a careful evaluation of the presbytery's goals in creating the commission and the powers the presbytery's commission will need to meet those goals.

2. Technically, an administrative commission has the full authority of a presbytery for the limited purposes for which the commission was created. (G-9.0502) This fact suggests that a presbytery should be very careful and deliberate in the authority it delegates to an administrative commission. Careful attention at this stage will be rewarded by a clear focus for the commission and an understanding of the commission's authority by the session and the congregation.

3. It is helpful to note that administrative commissions are not "all or nothing" propositions. They may be given authority to "dissolve pastoral relationships" (which must be explicitly given, G-9.0503a(4)) or may be authorized to make only recommendations to the presbytery to dissolve. Commissions may be authorized to "assume original jurisdiction in any case it determines ... the session of a particular church is unable or unwilling to manage wisely the affairs of its church ... ." In fact, many times an administrative commission may persuade a session to agree not to meet without a member of the commission present, as an alternative to assuming original jurisdiction. Then the commission can simply consult rather than govern.

4. Such administrative commissions should always be created by a written motion to the presbytery.

C. Drafting a creating motion and assurance of an "opportunity to be heard"
The careful evaluation of the problems and necessary goals will greatly aid in drafting a clear and concise creating motion. Remember that the commission takes "its marching orders" from this document; the affected session and minister get notice of precisely what is being sought from this motion. Time spent carefully crafting the motion is time well spent. Several necessary components seem clear:

1. Membership: The make up of the commission generally should be persons "known and respected" by the congregation. The commission should be representative of the presbytery as a whole.

a. How large will the commission be? A presbytery commission must have at least seven members, but can have more if the circumstances merit it.

b. What kind of skills and personalities will be necessary? This varies depending

6

FPC 001258

on what the presenting problem is. It is also helpful to note that a presbytery may remove and replace members of its commission. This may be done to give "overworked" members a break and to bring in "new blood" or it may be done to bring in new skills or gifts to the process.

c. It is our opinion that the following persons ought not be appointed to such commissions: the stated clerk, the executive presbyter, the moderator, the moderator of the Committee on Ministry, any member of the presbytery's judicial commission.

2. Powers: This is the section where the presbytery lays out what authority it has deemed its commission needs to correct the presenting difficulties.

a. If ever the commission is confused about what authority it possesses, it should not hesitate to request clarification from the presbytery.

b. We have advised that the presbytery should be clear that the commission may assume jurisdiction of the session upon some triggering event or action of the session. This usually has a dramatic effect on the behavior of all the interested parties.

c. Of course, there are clearly situations where a session already has amply demonstrated that it is "unable or unwilling" to carry out its responsibilities and where the presbytery needs to give its commission authority to act as the session in all of the G-10.0102 powers. In that situation a plan to replace individual commission members periodically should be developed at the onset.

3. Rationale: The motion should include a fairly detailed rationale section describing the history of the presbytery's intervention in the particular situation.

a. It should answer the question: why is an administrative commission necessary? (as opposed to continued Committee on Ministry intervention, for instance)

b. In our experience, the group or person seeking the appointment of an administrative commission in this circumstance needs to be prepared to answer at least three substantive questions from presbytery commissioners. Usually compelling responses to those questions is sufficient to convince the presbytery of the necessity of the appointment of an administrative commission.

4. Process: Administrative Commissions need always remember that they act in the name of the Lord. Their work is not about winning, or even bringing about change, but about restoring healthy ministry within a certain context. Commission members must always treat elders, pastors, and members with respect and patience. Emotions are high, because religion matters!

a. Most commissions will find it helpful to do some information gathering of their own. The rationale section of the empowering motion will provide much information, but there is no substitute for first hand information. This can come in the form of interviews, as well as written correspondence. A wise commission will interview all who wish to speak with them, and seek out others sugg~~~~~ ~~ ~~~~

7

FPC 001259

who do interview. It may also seek input via written materials when circumstances indicate such a forum will yield helpful feedback.

b. Once the commission determines it has sufficient information, it needs to evaluate its next steps. Sometimes the next step will be a report and recommendation to the presbytery, including suggestions for further action by other entities of the presbytery (Committee on Ministry, for instance). Sometimes it will be the removal of the pastor or the assumption of original jurisdiction as described below. "In all cases the commission must seek to assure fundamental fairness of the process. It must not only be fair; it must feel fair to those affected. ..." (see Advisory Opinion #3)

c. Commission are reminded to follow G-9.0505b(1) closely in order to guarantee fair process and afford an opportunity to be heard to all those affected. Such a hearing may happen at the presbytery meeting before the final action is taken. "When an administrative commission has been appointed to settle differences within a church, a governing body, or an organization of the church, it shall, before making its final decision, afford to all persons to be affected by the decision fair notice and an opportunity to be heard on the matters at issue. (See G-9.0503a(3), G-9.0503a(5), G-9.0505b-d) Fair notice shall consist of a short and plain statement of the matters at issue as identified by the commission and of the time and place for a hearing upon the matters at issue. The hearing shall include at least an opportunity for all persons in interest to have their positions on the matters at issue stated orally."

D. How best to move forward is dependent to some degree on who is leading the schism.

1. Ministers
Unfortunately, it is often the pastor who leads the congregation into schism. If the presbytery becomes aware of this possibility early in the process it may utilize the provisions of G-6.0502 to intervene.

a. "When a church officer, after consultation and notice, persists in a work disapproved by the governing body having jurisdiction, the governing body may presume that the officer has renounced the jurisdiction of this church." (G-6.0502)

b. The presbytery can often identify an action that would further steps toward schism and direct the minister not to do them. (Examples: instruct the minister not to call a congregational meeting to discuss schism, or direct minister not to send a letter to the congregation or an advocacy or affinity group.)

c. Presbyteries need to carefully follow the processes described in 2004 by the General Assembly in response to Item 05-02, where the Assembly adopted an outline with which to implement G-6.0502:

1) The governing body must disapprove the work of the officer (Wilson v. Presbytery of Donegal, Remedial Case 206-8, Minutes, 1994; Part I, p. 149, 11.091).

2) The governing body must notify the officer that it has disa_____ _____

8

FPC 001260

work and that he/she is prohibited from engaging in such work as an officer of the church (*Stimage-Norwood v. Presbytery of Southern New England*, Remedial Case 214-7, Minutes, 2002, Part I, p. 344).

3) If the officer engages in the prohibited work after the notice of disapproval and prohibition, the governing body must consult with the officer and notify him/her of the consequences of his/her action, i.e., that his/her persisting in the work may result in a presumption of renunciation of jurisdiction.

4) If the officer persists in the prohibited work after such consultation and notice, the governing body may presume that he/she has renounced the jurisdiction of the church. If the governing body so determines, it shall notify the officer of its decision.

5) The officer has the right to challenge the governing body's determination and to speak on the floor of the governing body in so doing. He/she also has the right to file a remedial case challenging the governing body's determination of renunciation (D-6.0100). (*Minutes*, 2004, Part I, p. 387)

d. But the Assembly drew a sharp distinction between renunciation of jurisdiction and discipline:
"The term 'work disapproved by the governing body' relates to the exercise of the vocation of a minister of the Word and Sacrament or the official conduct of church business for which a deacon or elder was elected. It does not relate to particular acts of ministry, or to behavior, that might be considered an offense under the Constitution (D-2.0203). One can be presumed to have renounced jurisdiction because of persisting in disapproved work following consultation and notice, only if the work is engaged in after the disapproval of the work and if it is persisted in following a warning of the consequences."

e. So, if a minister has *already* engaged in active advocacy of schism (denounced the PC(USA), advocated withdrawal, or somehow violated her/his G-14.0405 vows), then the presbytery must proceed to appoint an investigating committee under the terms of D-10.0102; D-10.0201.

2. Sometimes the session will also be actively engaged in schismatic activities.

a. If it is only a group of individual elders, the presbytery might decide to assume original jurisdiction over the session's G-10.0102r powers (discipline) and acting as the session, discipline those individual elders following the *Rules of Discipline*.

b. If the whole, or a majority, of the session is involved in schismatic activity, the presbytery may need to appoint an administrative commission to act in place of, or beside, the session.

c. If the presbytery has information that a declaration of schism is imminent, the empowering motion should give the commission original jurisdiction over the session's G-10.0102 authority to prevent the session from taking actions in furtherance of schism.

9

FPC 001261

d. Often it is a good idea in these settings to condition the assumption of original jurisdiction (G-11.0103s) upon some particular action of the session (i.e. calling a congregational meeting to vote on withdrawing, beginning to transfer assets, etc.)

e. In any case, the session must receive specific notice of the motion coming to the presbytery meeting that creates the administrative commission and gives the power "to assume original jurisdiction in any case in which it determines that a session cannot exercise its authority. Whenever, after a thorough investigation, and after full opportunity to be heard has been accorded to the session in question, the presbytery of jurisdiction shall determine that the session of a particular church is unable or unwilling to manage wisely the affairs of its church, the presbytery may appoint an administrative commission (G-9.0503) with the full power of a session. This commission shall assume original jurisdiction of the existing session, if any, which shall cease to act until such time as the presbytery shall otherwise direct;" (G-11.0103s.)

E. Tasks of the administrative commission: attempting to "settle the difficulties" (G-9.0503a.(4))

1. The first step is to do some fact finding of its own. At this stage the commission will normally interview session members and congregational members to determine if there is a loyal minority to protect. Usually the commission will be given information by the presbytery, but it needs to use that information to assess the level of "difficulties".

2. If the session takes the "forbidden" actions *and* if the session has had notice and an opportunity to attempt to convince the presbytery not to appoint and empower an administrative commission, the commission may decide to assume jurisdiction (G-11.0103s) because the session is "unable or *unwilling* to manage wisely the affairs of its church ...."

a. As noted above, this is *not* an "all or nothing" proposition. Choose authority carefully. Which of the session's G-10.0102 powers are the "problem"? Which, or all, does the commission need to take on?
"The session is responsible for the mission and government of the particular church. It therefore has the responsibility and power" (G-10.0102)

1) "to receive members into the church upon profession of faith, upon reaffirmation of faith in Jesus Christ, or upon satisfactory certification of transfer of church membership, provided that membership shall not be denied any person because of race, economic or social circumstances, or any other reason not related to profession of faith" (G-10.0102b.)

2) "to lead the congregation in participation in the mission of the whole Church in the world, in accordance with G-3.0000;" (G-10.0102c.)

3) "to challenge the people of God with the privilege of responsible Christian stewardship of money and time and talents, developing effective ways for encouraging and gathering the offerings of the people and assi ' ·· · ··

10

FPC 001262

offerings are distributed to the objects toward which they were contributed;" (G-10.0102h.)

4) "to establish the annual budget, determine the distribution of the church's benevolences, and order offerings for Christian purposes, providing full information to the congregation of its decisions in such matters;" (G-10.0102i.)

4) "to lead the congregation continually to discover what God is doing in the world and to plan for change, renewal, and reformation under the Word of God;" (G-10.0102j.)

5) "to instruct, examine, ordain, install, and welcome into common ministry elders and deacons on their election by the congregation and to inquire into their faithfulness in fulfilling their responsibilities;" (G-10.0102l.)

6) "to provide for the administration of the program of the church, including employment of nonordained staff, with concern for equal employment opportunity, fair employment practices, personnel policies, and the annual review of the adequacy of compensation for all staff, including all employees;" (G-10.0102n.)

7) "to provide for the management of the property of the church, including determination of the appropriate use of church buildings and facilities, and to obtain property and liability insurance coverage to protect the facilities, programs, and officers, including members of the session, staff, board of trustees, and deacons;" (G-10.0102o.)

8) "to maintain regular and continuing relationship to the higher governing bodies of the church, including" (G-10.0102p.)

a) "electing commissioners to presbytery and receiving their reports; sessions are encouraged to elect commissioners to the presbytery for at least one year, preferably two or three;" (G-10.0102p.(1))

b) "nominating to presbytery elders who may be considered for election to synod or General Assembly;" (G-10.0102p.(2))

c) "in both the above responsibilities, implementing the principles of participation and inclusiveness to ensure fair representation in the decision making of the church;" (G-10.0102p.(3))

d) "observing and carrying out the instructions of the higher governing bodies consistent with the Constitution of the Presbyterian Church (U.S.A.);" (G-10.0102p.(4))

e) "welcoming representatives of the presbytery on the occasions of their visits;" (G-10.0102p.(5))

f) "sending annually to the stated clerk of the presbytery statistical and other

11

FPC 001263

information according to the requirements of the presbytery."(G-10.0102p.(7))

9) "to serve in judicial matters in accordance with the Rules of Discipline;" (G-10.0102r.)   .

10) "to keep an accurate roll of the membership of the church, in accordance with G-10.0302, and to grant certificates of transfer to other churches, which when issued for parents shall include the names of their children specifying whether they have been baptized, and which when issued for an elder or deacon shall include the record of ordination." (G-10.0102s.)

F.  After the administrative commission has taken over:
Presbyteries are advised to remember that property disputes are about effective ministry and not merely about property law - such an approach will make all the difference. This means that a commission will normally need to be doing ecclesial activities (pastoral care, discipline, etc.) while at the same time pursuing some more temporal activities.

1.  Freeze the assets.

   a.  Real Estate - File *Lis Pendens* - Cite the trust clause (G-8.0201 as the basis.

   b.  Liquid Assets - Send letter to holder of bank and trust accounts. Tell them:

      1)  We are the Administrative Commission.

      2)  We are appointed by the Presbytery with jurisdiction over this congregation.

      3)  Quote the trust clause (G-8.0201) and note that the property is held in trust and that our *Constitution* (G-8.0601) gives the presbytery the duty to determine who "is entitled to the property."

      4)  Currently we are trying to evaluate the situation.

      5)  Please do not release or modify holdings until we have completed our ecclesiastical processes.

   c.  Building and property – change the locks and secure the grounds if necessary.

2.  The commission should try to keep the presbytery in a "defensive" secular legal posture.  (Let the schismatics seek Caesar's help.)

3. - Organize the loyal minority if the presbytery can identify one. Declare them to be the "true church" and thus entitled to the property.
"The relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery. (G-11.0103) If there is a schism within the membership of a particular church and the presbytery is unable to effect a reconciliation or a division into separate churches within the Presbyterian Church (U.S.A.), the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the Presbyterian

12

FPC 001264

Church (U.S.A.). This determination does not depend upon which faction received the majority vote within the particular church at the time of the schism." (G-8.0601)

a. It falls within the purview of the presbytery to determine whether schism exists within a congregation.[6] (G-8.0601, G-11.0103). In such a case, the presbytery determines which members represent the true church. (G-8.0601). It is the presbytery that is responsible for confronting advocates of schism. The presbytery has a number of "tools" that the *Constitution* provides:

1) With individuals the presbytery determines whether a person is attempting to "...peaceably withdraw from our communion without attempting to make any schism"[7] (which is an *individual's* right). If an individual officer advocates schism, a session or presbytery may undertake judicial process and declare such action to be an offense. (D-2.0203b) The officer may be censured, after trial.

2) If the presbytery determines that the pastor is inciting schism within a congregation, it may remove (G-11.0103n.,o.) or authorize its commission to remove (G-9.0503a.(4)) such a schismatic minister of the Word and Sacrament from service to that congregation.

3) When a session has advocated or taken action to effectuate schism the presbytery may declare such action to be irregular. (G-9.0410, D-2.0202a.)

b. These actions should be taken as a "last resort," only after all efforts at restoration and reconciliation have been undertaken. Presbyteries are strongly encouraged to visit each such officer or session so affected.

c. Use "spiritual" language (name "sin" to be "sin", use Scriptural references, call for repentance). People who desire to leave often seek to minimize the commitment to Jesus of those who represent the governing bodies of the church (such as presbytery representatives). Make sure all know this is a *church* dispute!

G. Making property decisions.

1. The presbytery may retain the property for/with a loyal minority.

2. If there is no loyal minority the presbytery may dissolve the congregation (G-8.0401, G-11.0103i) and utilize the assets, real and personal, for another mission of the presbytery.[8]

a. If there has been a "dispersal of its members, the abandonment of its work", the church property may be "applied for such uses, purposes and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed

---

[6] "It is the presbytery which determines the true and loyal congregation of a particular church in which a schism exists even if the entire congregation votes unanimously to leave the denomination (G-8.0601). This authority has been a part of Presbyterianism since its inception during the Reformation of the 16th Century." (quoted from response to Request 90-04 (2002 GA *Minutes*, 1990, p. 249))

[7] Endnote #1 to Chapter 6 of Form of Government.

[8] The GA PJC recently affirmed a presbytery's right to do so and its right to delegate the implementation to an administrative commission. Remedial Case 217-5, Session, Second Presbyterian Church, Tulsa Oklahoma v Presbytery of East Oklahoma,.

13

FPC 001265

of as the presbytery may direct." (G-8.0401)

b. The decision to dissolve and the decision as to how to utilize the assets should be made on the basis of the presbytery's strategy for Presbyterian mission within its geographical district. (G-11.0103a, G-11.0103h)

1) For instance, the presbytery could use the assets to begin a new immigrant fellowship in that community.

2) If the presbytery has no such immediate or imminent plan to advance its mission in that region, but expects it might in the future, it could enter into a long term lease with the schismatic group.

a) The presbytery will need to check state real estate law to assure that this is possible.

b) The lease should recite the presbytery's property interest in the real estate and provide that all improvements become the property of the presbytery. The lease should obligate the schismatic group to maintain and insure the property and should have a process for orderly transition of possession to the presbytery at the occurrence of some identifiable future event.

c. The presbytery may sell to the splinter group.

1) They may sell the building.

2) They might release money.

3) The decisions depend on the facts; use G-11.0103 as criteria. Again, the "yardstick" is the presbytery's "strategy for mission." "The presbytery is responsible for the mission and government of the church throughout its geographical district. It therefore has the responsibility and power" (G-11.0103)

a) "to develop strategy for the mission of the church in its area consistent with G-3.0000;" (G-11.0103a.)

b) "to coordinate the work of its member churches, guiding them and mobilizing their strength for the most effective witness to the broader community for which it has responsibility;" (G-11.0103b.)

c) "to counsel with a particular church where the various constituencies of the congregation are not represented on a session;" (G-11.0103e.)

4) The commission should be given the power to negotiate the property and dissolution decisions, but not the power to act on behalf of presbytery. See GA *Minutes*, 1995, Part I., pp.281-282, paragraph 21.128:" ... The final approval of a strategic plan, however, is a responsibility that the presbytery ought not to delegate. Included in this decision are: ... i. to divide, dismiss, or dissolve churches in consultation with their members; ...".

14

FPC 001266

## PRESBYTERIES MAY RELEASE CONGREGATIONS

A. The authority is found in G-11.0103i and G-11.0103y.

"The presbytery is responsible for the mission and government of the church throughout its geographical district. It therefore has the responsibility and power" (G-11.0103)

1. "to divide, dismiss, or dissolve churches in consultation with their members;" (G-11.0103i.)

2. "to consider and act upon requests from congregations for permission to take the actions regarding real property as described in G-8.0000;" (G-11.0103y.)

   a. The property trust clause (G-8.0201) is in favor of presbyteries.
   "All property held by or for a particular church, a presbytery, a synod, the General Assembly; or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." (G-8.0201)

   b. The presbytery has the power to decide disposition of real property. (G-8.0401) "Whenever a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have shall be held, used, and applied for such uses, purposes, and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the Presbyterian Church (U.S.A.)." (G-8.0401)

B. General Assembly approval is not required. However, the General Assembly has at times issued authoritative statements that may be helpful about this topic.

1. GA *Minutes*: 1988, p.141, paragraph 12.231b:
"A presbytery may dismiss a church with its property pursuant to G-11.0103i and G-11.0103y, provided proper consideration is given to the interests of the Presbyterian Church (U.S.A.) as provided in Chapter VIII. In particular, G-8.0201 recognizes the principle that all property by or for a particular church is held in trust for the use and benefit of the Presbyterian Church (U.S.A.). Thus the Presbyterian Church (U.S.A.) is a party in interest when a presbytery takes action with respect to a request to dismiss a church with its property. Both traditions in our present denomination have always held that church property of any kind is held in trust for the use and benefit of the denomination as a whole; even though both differed somewhat in its application of this principle to churches wishing to withdraw from the denomination. This implied principle is now explicit in our present Form of Government (G-8.0201) and was also explicitly written into both Constitutions prior to reunion."

15

**FPC 001267**

2. GA *Minutes*, 1989, p. 226, paragraph 21.194:
"When dealing with a request by a church for dismissal with its property pursuant to G-11.0103i and G-11.0103y, the presbytery is responsible for exercising the expressed trust provisions of G-8.0201 recognizing and protecting the interests of the Presbyterian Church (U.S.A.). Separate consideration should be given to the questions of dismissing the congregation, the disposal of property, and the relationships of ministers of the Word and Sacrament."

3. GA *Minutes*, 1989, p. 226, paragraph 21.195:
"Each request for dismissal should be considered in the light of the particular situation and circumstances involved. If guidelines are established, it should be done with extreme caution. Any guidelines which restrict presbytery in its deliberations and in the exercise of its responsibility and authority might be subject to question in a case of judicial process within the church. Instead of establishing guidelines a presbytery might be better advised to trust its good judgment in particular situations."

4. GA *Minutes*, 1990, p. 252, paragraph 21.270d
"3. If, after June 10, 1991, a congregation requests to be dismissed with its property, does presbytery have authority under G-11.0103i and G-11.0103y to consider and act on the request?"

5. GA *Minutes*, 1990, p. 252, paragraph 21.270k
"3. Yes. A presbytery has authority under G-11.0103i and G-11.0103y to consider and act on any request of a church to be dismissed with its property."

C. Give proper consideration to the long term effects. "Each request for dismissal should be considered in light of the particular situation and circumstances involved." (GA *Minutes*, 1989, p. 226, paragraph 21.195)

1. The "measuring stick": Would releasing the property advance "the mission and government of the church [PC(USA)] throughout its geographical district"? (G-11.0103)

2. Would releasing the property assist the presbytery "to coordinate the work of its member churches, guiding them and mobilizing their strength for the most effective witness to the broader community for which it has responsibility;"? (G-11.0103b.)

D. But a congregation may not be released to "independence"; it may only be released to another *reformed* denomination. (*Strong and Bagby vs. Synod of Mid South:* GA Minutes, PCUS, 1976, p. 92; *Anderson vs. Synod of Florida,* GA *Minutes,* PCUS, 1974, p. 119)

1. *Strong and Bagby vs. Synod of Mid South:* GA Minutes, PCUS, 1976, p. 92
" ... This leads to the second question. Assuming that some form of delegation of the dismissal power by presbytery to an administrative commission might be permissible, to what ecclesiastical bodies might presbytery authorize it to make dismissals? Clearly presbytery could not authorize a commission to effect dismissals which presbytery itself could not effect. There are constitutional limits on presbytery's power here. They were expressed in 1974 by the General Assembly in the case of *Harvard A  Anderson  ... The*

16

FPC 001268

*Synod of Florida*, Minutes of the 114th General Assembly, pp. 119-121 (1974). That case, decided after adoption of the resolution in question, held that a presbytery could not constitutionally dismiss its churches to "independency" nor to any specified body except another presbytery of this denomination or of ecclesiastical bodies with which union with this denomination is permitted by the Book of Church Order. These latter include, in addition to certain specifically identified denominations, BCO 31.1, any other ecclesiastical body "whose organization is conformed to the doctrines and order of this Church." BCO 18-6(13),(17). This case remains the law of the Church, and it would clearly prohibit the delegation by presbytery (even were delegation generally permissible) of carte blanche power to an administrative commission to dismiss to ecclesiastical bodies not falling within the stated category. Whether another ecclesiastical body does fall within the general classification mentioned is itself a matter of judgment which must be determined by the dismissing authority as a precondition to dismissal. No such determination was formally made by the Presbytery of East Alabama in this case, nor did it require either its administrative commission or the sessions or congregations of its churches to make any such determination. In this broader respect also, the action of the presbytery is in violation of the law of the denomination as declared in the *Anderson* case. . . ." (*Minutes*, PCUS, 1976, Part I, *Strong and Bagby vs. Judicial Commission of the Synod of the Mid-South*, pp. 94-95)

2. *Anderson vs. Synod of Florida*, GA *Minutes*, PCUS, 1974, p. 119
" ... This policy likewise forbids the dismissal of a church without specifying where it goes. An "independent" or "congregational" Presbyterian church is an anomaly which runs counter to the notion that we area "family" of churches and dismissal must therefore be made to another church within the family group. We hold, therefore, that BCO § 16-7(8) restricts a presbytery in dismissing a church to the necessity of doing so to another ecclesiastical jurisdiction and forbids dismissal to independency.

"Accordingly, the preliminary judgment of the Permanent Judicial Commission is that the Presbytery of Florida erred in dismissing the three churches to independent status. We therefore affirm the action of the Synod of Florida sustaining the report of its Judicial Commission and denying Mr. Gwaltney's complaint thereto.

"A presbytery clearly has the constitutional right to dismiss a church to another presbytery. Complaint of W.H. Sory and J.B. Long us. Presbytery of Eastern Texas, Digest of the Acts and Proceedings of General Assembly of Presbyterian Church U.S., 1861-1965, Judicial Case No.44, 324-25 (1966). We further hold that a presbytery can dismiss a church to the ecclesiastical bodies with which union is permitted. These bodies include churches within our own denomination, the United Presbyterian Church of the United States, the Reformed Church in America, (BCO § 311) or any other ecclesiastical body "whose organization is conformed to the doctrines and order of this church." BCO § 18-6(13), (17). Although presbytery has great latitude in the exercise of its dismissal jurisdiction, it does not have an absolute and unlimited power. The Florida Presbytery had no constitutional right to dismiss the three churches to independent status.

"Accordingly, the proper procedure for any Presbytery to which request is hereafter made for dismissal "to independency," or without any designation, or to any institution other than one described in this opinion is to decline to entertain the request as lying beyond its constitutional powers. ...." (*Anderson vs. Synod of Florida*, GA *Minutes*, PCUS, 1974, p.119)

17

FPC 001269

E. If a congregation is dissolved, its records belong to the presbytery and the presbytery should take care to assure that it has control of those records before dissolving or releasing a congregation. (G-9.0406)

F. *Article 13* (Procedure For Dismissal of a Congregation with its Property) is no longer applicable. The period for a decision of congregation to depart with its property has expired.

V. Finally, the Office of the General Assembly reminds the church that not once in our history has schism *ever* advanced the Gospel, but rather, *always* has diminished it. The Reunion Assembly of 1869 noted: Reunion "buries the suspicions and rivalries of the past, with the sad necessity of magnifying our differences in order to justify our separation. It banishes the spirit of division, the natural foe of true progress. In this union are seen the outflashing of a divine purpose to lead us on to greater self-sacrifice and a more entire consecration to the evangelization of the world. God has elevated us to this commanding position, that we may see his glory, and in the strengthened faith it inspires devote our united resources more directly and efficiently to the salvation of men [and women]."[9]

Prepared by: The Department of Constitutional Services
The Office of the General Assembly
Mark Tammen
September 2005

---

[9] Digest, Part II, p. 1333

18

FPC 001270

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK COMMUNICATIC





Presbyterian Church (U.S.A.)

*This is a legal strategy memorandum. Do not copy or circulate. Call Eric Graninger, General Counsel, at 1-888-728-7228, x 5369 if you have questions.*

# CHURCH PROPERTY DISPUTES:
## A RESOURCE FOR THOSE REPRESENTING PRESBYTERIAN CHURCH (U.S.A.) PRESBYTERIES AND TRUE CHURCHES IN THE CIVIL COURTS

|       |                                                                                                              | Page |
|-------|--------------------------------------------------------------------------------------------------------------|------|
| I.    | Introduction                                                                                                 | 1    |
| II.   | State-by-State Church Property Review, the Basics, and Some Strategies.                                       | 2    |
| III.  | Presenting the Presbyterian Church (U.S.A.) as a Hierarchical Church.                                         | 5    |
| IV.   | Presenting the Property Trust Clause.                                                                         | 9    |
| V.    | Presenting Factors that Show the Connection between the Presbyterian Church (U.S.A.) and the Church at Issue. | 11   |
| VI.   | Overview of U.S. Supreme Court Cases.                                                                         | 13   |
| VII.  | Other Resources.                                                                                             | 25   |

## I.    Introduction

This resource is written by the Office of Legal Services for those representing the interests of presbyteries and true churches as identified by the presbyteries. It is written for both attorneys and non-attorneys. Involve the presbytery attorney early on if a dispute related to church property is developing. The attorney will be able to advise the presbytery in light of the applicable law and the particular facts presented.

A companion piece to this memorandum is the resource prepared by the Constitutional Services Department of the Office of the General Assembly. That resource discusses the factors and strategies presbyteries should consider as church property matters arise within the governing bodies of the church. By contrast, this resource focuses upon church property disputes within the civil courts.

Finally this memo uses "Presbyterian Church," "Presbyterian Church (U.S.A.)," and "PCUSA" interchangeably and in reference to various time periods. Only where the specific point being made relates to a particular predecessor denomination is that denomination named.

1

FPC 001271

This memo also uses the terms "schism" and "schismatics." The PCUSA *Constitution* refers to schisms.

## II. State-by-State Church Property Review, the Basics, and Some Strategies

*State-by-State Church Property Review*

The Office of Legal Services has prepared a state-by-state (plus Puerto Rico and Washington, D.C.) summary of church property law. In response to the U.S. Supreme Court's 1979 *Jones v. Wolf* decision, each state forged its own particular mechanisms for deciding church property disputes. Begin with the church property review and the pertinent cases for your state. It is important to understand the rules your state has adopted. Of course, the actual cases and any statutes should be read to determine how they apply to the facts presented. Be certain to involve the presbytery attorney. Only an attorney licensed in your state and representing the presbytery's interests can give the full services needed. If your state's property review is not attached at the end of this memorandum, call Eric Graninger, General Counsel, at 1-888-728-7228, ext. 5369 to secure a copy.

*The Basics*

Pursuant to the *Jones v. Wolf* decision, most states will apply one of three mechanisms for deciding church property disputes. The first two are the most common:

1.  Hierarchical deference rule: Where the local church is part of a larger hierarchical church, the court will defer to the decision of the highest church governing body that has considered the matter. The court will award the property control pursuant to that decision.

2.  Neutral principles doctrine: The court reviews the language of property deeds, the local church charters, state statutes concerning church property, and the provisions of the denominational constitution concerning the ownership and control of church property.

3.  Presumptive majority representation, defeasible upon a showing that the identity of the local church is to be determined by other means: The majority vote of the congregation is presumed to control, except in a hierarchical church the majority rule may be overcome where the church charter or denominational constitution has established a property trust or other means to decide the dispute.

*Some Strategies*

• After you have determined the pertinent rules for deciding church property disputes in your state, strategies for the case can be implemented. For example, if your state follows a basic hierarchical deference rule, then it will be most important to demonstrate the PCUSA as a hierarchical church and show the court the central authority

2

**FPC 001272**

of the presbytery in making church property and related decisions. If your state applies the neutral principles doctrine, then it will be important to note all hierarchical references in the deeds, the local church charter, and especially to emphasize the church property trust and the central authority of the presbytery under Chapter VIII of the *Book of Order*, the property chapter. If your state applies the third option, it is an uphill battle. The *Book of Order* property chapter and other provisions showing the authority of presbytery will be especially important. Sections III, IV, and V of this memorandum set forth provisions that should be useful to you in proving the presbytery's case to the court.

- Secure the property (both real and personal) of the local church. File an affidavit of property trust on the real estate. The affidavit is filed on the public records for the purpose of warning all persons the title to the real property is in dispute. The affidavit is for the purpose of preserving the rights of the presbytery and true church pending the dispute. Moreover, send a letter to all banks and other institutions that hold accounts for the particular church. Inform the institution:

  - The presbytery has jurisdiction over the local church and its assets
  - About the property clause and other pertinent property chapter provisions
  - That issues are pending
  - That no assets be released or their title changed pending further notice from the presbytery; make this a directive to the institution

- Put the presbytery's and the local church's insurance companies on notice. Where the presbytery and true church are in the position of defendants, insurance may respond with coverage or a defense. This is a very important benefit because it covers attorneys fees. Be sure to notify the insurance company promptly as the dispute arises. Most insurance policies require prompt notice or coverage may be denied or limited. Note, however, you do **not** want to use the insurance company's standard attorneys in cases such as this. Press hard on the insurance company to accept an attorney of the presbytery's choosing. This should be an attorney familiar with such cases and/or PCUSA polity. Let the insurance company and the attorney work out the fee arrangement.

- The Office of the Stated Clerk of the General Assembly has some funds available to assist presbyteries when a church is in schism or its property is being used contrary to the *Constitution*. If you are interested in the availability of these funds, the presbytery's stated clerk should make contact with the Office of the General Assembly, Department of Constitutional Services.

- If you initiate the lawsuit, name the defendants as schismatics in the complaint and the caption. This will regularly remind the court of what the central issue is before it (the presbytery's authority to determine the true church) and the fact the court must defer to the ecclesiastical decisions of the church governing body. Example: "Presbytery of Middle Wyoming v. The Schismatic and Purported Covenant Presbyterian Church of Landsburgh."

3

FPC 001273

- If the case law is favorable to the presbytery in your state, file a motion for summary judgment as soon as practicable. It is not helpful to allow the schismatics to develop a record when the presbytery has already taken its actions and, under the polity, the result is known. Where the law of your state is firm for the presbytery, move forward with a motion for summary judgment. Knowing they cannot interfere in ecclesiastical disputes, many judges will look favorably upon a motion for summary judgment to dispose of such cases.

- Where members and/or ministers have renounced the jurisdiction of the church, point out to the court this means they have left the membership of the church and, so, do not have standing to represent the local Presbyterian church in a civil court.

- Where the schismatic faction has failed to appeal the rulings of the presbytery, point this out to the court. This is important for at least two interrelated reasons: First, it reminds the court the PCUSA is a church of successive governing bodies that have the responsibility and power to review the decisions of a lower governing body. When local church members disagree with the actions of the presbytery, they have a fundamental right to appeal those rulings to the synod and, ultimately, to the General Assembly. Second, civil courts are familiar with the doctrine of exhaustion of administrative remedies. In the civil form of this doctrine, a party must exhaust *all* available agency administrative remedies and appeals before it turns to the civil courts for relief. Because this is a common concept in the civil law, judges should understand this is a reason to dismiss the case as against the schismatics because they failed to exhaust their remedies within the church court system. Properly applied, this concept conserves judicial resources and keeps civil courts out of controversies not proper for their determination.

- Determine the religious background of your judge. The judge's religious background will likely influence the way the presbytery's case is viewed, at least initially. For example, a judge from a hierarchical church (Presbyterian, Episcopalian, Methodist, Roman Catholic) will understand there is an authority above the local church. For a judge from an episcopal system, it is very helpful to say, "The presbytery is the bishop." That type of straightforward statement fundamentally informs a judge who is knowledgeable of an episcopal system. In contrast, if the judge is from an independent or congregational background (Baptist), then it may be more challenging to educate the judge on the wide range of authority a presbytery has over a particular church, especially in regards to property matters.

- Use affidavits and church-recognized experts to demonstrate the polity of the PCUSA. Case law severely restricts civil courts from making ecclesiastical decisions. Civil courts are required to defer to the religious body in ecclesiastical, doctrinal, and polity decisions. Because of these factors, it is important to present the *Book of Order* and other ecclesiastical materials via an affidavit. See sections III, IV, and V for the various matters that could be presented to the civil court. An affidavit should be issued by a middle governing body officer or a General Assembly officer. Using a General

4

FPC 001274

Assembly officer will reemphasize the hierarchical nature of the PCUSA to the court. Also, G.2.e of the Standing Rules of the General Assembly charge the General Assembly Stated Clerk with the responsibility of giving advisory opinions concerning the meaning of the PCUSA Constitution. The Office of Legal Services can assist with the types of affidavits you need in your case. Again, the substance of the affidavit will likely contain the information set out in Sections III, IV, and V of this memorandum. The opening provisions of the affidavit should provide:

- The affiant's name. Use reverend if applicable.
- The title of the affiant and how long they have worked in that position.
- All degrees and the institutions from which received.
- Note if a minister, year of ordination, presbytery membership.
- Either set out all of the provisions that are of import in the body of the affidavit or state something like the following: "I have reviewed the Statement of Facts contained in the Brief in Support of the Presbytery of_____'s Motion for Summary Judgment in this action. Based upon my personal knowledge and expertise, that Statement of Facts is true and correct, and I incorporate it into this affidavit by reference."

- Keep the original church name and corporation within the PCUSA. At the end of the process, either the presbytery itself or the true congregation loyal to the presbytery should retain the original church's name and corporate entity. This is for two reasons: First, it reduces confusion because the long-existing PCUSA church remains PCUSA. Second, present endowments and future estates will be in the original name of the local church. Keeping the name and corporation with the true church (or the presbytery) loyal to PCUSA should ensure these funds remain secure.

III.    Presenting the Presbyterian Church (U.S.A.) as a Hierarchical Church

Certainly, the Presbyterian Church (U.S.A.) (PCUSA) does not refer to itself as a hierarchical church. When speaking to a civil court, however, it is important to use the language the court uses. The courts distinguish between independent or congregational churches on the one hand and hierarchical churches on the other. Firmly present the PCUSA to the court as a hierarchical church. This section focuses upon the factors to demonstrate to the court the PCUSA is hierarchical:

- The United States Supreme Court has consistently recognized the Presbyterian Church as hierarchical: *Watson v. Jones, Mary Elizabeth Blue Hull*, and *Jones v. Wolf*; cite to these decisions. (See Section VI) The courts in many states have made similar rulings.

- Secondary legal resources recognize the Presbyterian Church as hierarchical:

  - *Determination of Property Rights Between Local Church and Parent Church Body: Modern View*, 52 ALR3d 324, 334 (listing the Presbyterian Church as

5

FPC 001275

hierarchical with control over local church property), and 417 ("Although the Presbyterian form of church government is without question hierarchical, there has been a considerable amount of litigation over the right of local Presbyterian churches to withdraw from the general church and retain the use and control of local church property. [T]his right is uniformly denied, on the ground that the local Presbyterian church stands in a hierarchical relationship to the general church, with respect to property matters as in other areas." (Footnotes omitted)). Although this law report is dated (1974), its description of the Presbyterian Church as hierarchical is apt.

- *Hands Off! Civil Court Involvement in Conflicts Over Religious Property*, 98 Colum. L. Rev. 1843 (1998). This article recognizes the PCUSA as hierarchical. Id. at 1878. See Section VII.

- Of course, the *Book of Order* is replete with provisions that demonstrate the hierarchical nature of the PCUSA. This part of the memorandum sets out some of the best polity examples of the hierarchical nature of the PCUSA.

*The four-level system of governing bodies shows the hierarchical structure of the PCUSA. PCUSA has four levels of governing bodies; each higher governing body has the power to review and change the actions of the lower governing body.*

- The PCUSA is a body of Reformed Christians who have agreed to conduct their worship, discipline, governance, and other religious activities in conformity with the then current version of the *PCUSA Constitution*. The *Constitution* consists of the *Book of Confessions* (Part I) and the *Book of Order* (Part II). (G-1.0500) The *Book of Order* includes the Rules of Discipline, the Directory for Worship, and the Form of Government, a detailed formal structure of the church. The *Book of Order* sets forth the ecclesiastical polity of the church. (G-1.0300) The abbreviations used for these three sections are D, W, and G, respectively.
- There are four governing bodies of the PCUSA: session of the church, presbytery, synod, and General Assembly. (G-9.0101) All governing bodies are united by the nature of the church and share rights and duties under the Constitution. Though separate and independent, the governing bodies have such mutual relations that the act of one of them is the act of the whole church performed by it through the appropriate governing body. The jurisdiction of each governing body is limited by the express provisions of this *Constitution*, with powers not mentioned being reserved in the presbyteries, and with the acts of each governing body subject to review by the next higher governing body. (G-9.0103)

*The property chapter shows the hierarchical nature of the PCUSA. All property is held in trust for the PCUSA. The presbytery has ultimate authority over local church property and, in the case of a schism, declares which faction is the true church. See Section IV for a full discussion of the property trust.*

6

FPC 001276

- All property, both real and personal, no matter how it is titled or held, is held in trust for the PCUSA. (G-8.0201)
- The presbytery is authorized to take control of a local church's property 1) when the church is dissolved by the presbytery or extinct, (G-8.0401); 2) when the church property is being used contrary to the PCUSA Constitution, (G-8.0301); 3) when the church is in schism. (G-8.0600)
- When a schism arises, it is the presbytery that declares which faction is the true church; that determination does not rely upon which faction received the majority vote of the congregation. (G-8.0601)
- When a church seeks to encumber or lease its property, it must secure the permission of the presbytery. (G-8.0501, 8.0502)

*The presbytery's authority over ministers shows the hierarchical nature of the PCUSA. A local church cannot call a minister without the act of presbytery; a presbytery installs a minister in the local church; only the presbytery can dissolve the relationship between a minister and the particular church.*

- The presbytery is an expression of the PCUSA within a certain district; it consists of all the ministers and churches within that district. (G-11.0101)
- The presbytery is responsible for the mission and government of the church throughout its geographical district. (G-11.0103)
- The presbytery has the responsibility and power to ordain, receive, dismiss, install, remove, and discipline ministers. (G-11.0103n)
- Ordination of a minister is an act of the presbytery. (G-14.0101)
- The relationship between a minister and a local church is established by the presbytery. (G-11.0103o) A call (employment of a minister) occurs only through the presbytery. (G-14.0507) The presbytery examines the minister and determines whether to proceed with installation. (G-14.0507b) If it does decide to proceed, the presbytery appoints a time and place for the installation service. (G-14.0509b) The presbytery conducts the installation service and installs the minister in the local church. (G-14.0510)
- A presbytery's committee on ministry visits regularly and consults with each minister in the presbytery. (G-11.0502a)
- While the minister or the church may request dissolution of the pastor-church relationship, only the presbytery is authorized to terminate the relationship between a local church and its minister. (G-14.0601, 14.0602, 14.0603) Only the presbytery can unilaterally terminate the minister's relationship with the church. (G-11.0103o) Neither the minister nor the congregation may unilaterally do so.

*Other seminal provisions show the hierarchical nature of the PCUSA. The presbytery is the key governing body and has broad authority over the local church. Only a presbytery can organize, receive, unite, divide, dismiss, and dissolve a local church; the presbytery directs per capita apportionments to the particular churches; it reviews and corrects the church session's minutes.*

7

FPC 001277

- The particular church carries a vital responsibility in the mission of the church. Congregations serve as essential mission arms of the presbytery and of the larger church. (G-7.0102)
- When a particular church is organized by a presbytery, the organizing members sign a covenant to live and work together as disciples of Jesus Christ, and serve as a part of the body of Christ in this place according to the principles of faith, mission, and order of the PCUSA. (G-7.0201) The presbytery continues its work with the church as it elects presbyters, secures pastoral leadership, coordinates its work with other churches, secures bylaws in conformance with the *PCUSA Constitution*, and strengthens the mission of the congregation in the larger life of the denomination. (G-7.0202b)
- A particular church of the PCUSA can be organized only by the authority of a presbytery and shall function under provisions of the *Constitution*. (G-7.0101)
- The presbytery's committee on ministry visits each church session at least once every three years, discussing the mission and ministry of that church and encouraging its full participation in the life and work of the presbytery and the larger church. (G-11.0502c)
- Only the presbytery is authorized to divide, dismiss, or dissolve churches. (G-11.0103i)
- The presbytery organizes new churches and receives and unites churches. (G-11.0103h)
- The presbytery controls the location of new churches and those that desire to move. (G-11.0103j)
- To ensure a congregation is following the guiding principles of Reformed worship (W-1.4001), the presbytery shall have oversight and review of the ministry of congregations and discuss the quality and standards of worship and the fruit it is bearing in the Life of God's people as they proclaim the gospel, its joy, and justice. (W-1.4002)
- Both pastors and the session are accountable to the presbytery in its exercise of constitutional supervision of members. (W-1.4008)
- The presbytery may direct per capita apportionments to the churches within its bounds. (G-9.0404d)
- The church session shall meet when directed to do so by the presbytery. (G-10.0201)
- Presbyterian polity is interdependent: Each governing body shall participate through representatives with governing bodies above and below concerning mission priorities, budgeting, administration, etc. (G-9.0404a, b)
- Records are the property of the governing body that created them. When, however, congregations, presbyteries, or synods are dissolved, the records will be held by the next higher governing body. (G-9.0406)
- The local church's minutes shall be available to the presbytery upon request. (G-10.0301)
- At least annually, each governing body shall have its minutes reviewed by the next highest governing body. If a lower governing body fails to send up its records for review, the higher governing body shall order them produced by a specified time. (G-9.0407c) Review shall include that the proceedings have been in accordance with the *Constitution* and faithful to the whole church and that the lawful injunctions of a higher governing body have been obeyed. (G-9.0409a) A higher governing body can order the production of a lower governing body's records at any time it learns of an irregularity or delinquency. (G-9.0408) A higher governing body may direct a lower body to

8

FPC 001278

reconsider, correct, and cure an irregularity or delinquency. (G-9.0410) This may also be done by judicial process. (G-9.0411)

- When a particular church is dissolved, the presbytery shall take possession of its records, assert jurisdiction over the church members, and grant them certificates of transfer to other churches. (G-10.0302b.(2))
- Each particular church of the PCUSA is governed by the *Constitution*. Its officers are ministers, elders, and deacons. Its government and guidance are the responsibility of the session. It shall fulfill its responsibilities as the local unit of mission for the service of all people, for the upbuilding of the whole church and for the glory of God. (G-4.0104)
- Principles of Presbyterian Government are set out at G-4.0300. The PCUSA adheres to the basic principles of Presbyterian polity:

  - The particular churches of the PCUSA wherever they are, taken collectively, constitute one church; (G-4.0301a)
  - This church shall be governed by presbyters (ministers and elders); (G-4.0301b)
  - These presbyters shall come together in governing bodies (traditionally called judicatories or courts) in regular gradation; (G-4.0301c)
  - A higher governing body shall have the right of review and control over a lower one and shall have power to determine matters of controversy upon reference, complaint, or appeal; (G-4.0301f)

- The church session is responsible for maintaining regular and continuing relationship to higher PCUSA governing bodies by electing commissioners to presbytery, nominating elders who may be considered for election to synod or General Assembly, and observing and carrying out the instructions of higher governing bodies consistent with the *Constitution.* (G-10.0102p)

- Presbyterian Unity: The nature of Presbyterian order is such that it shares power and responsibility. The system of governing bodies, whether they have authority over one or many churches, sustains such mutual relationship with the structures as to express the unity of the church. (G-4.0302)

## IV. Presenting the Property Trust Clause

Chapter VIII of the Book of Order is titled The Church and Its Property. This relatively brief chapter is central in church property cases. It sets out the core provisions that will operate when a church property dispute is presented. Read this chapter for the exact language. It will be invaluable as the issues are presented to the court. These provisions and the presbytery's actions in regards to them should be clearly and vigorously presented to the court. Note the provisions are straightforward and in clear language a civil court should be able to review and enforce without making any ecclesiastical determinations of its own. Moreover, via affidavits (see Section II, above), the stated clerk of the presbytery, synod, or the General Assembly can provide the court with statements as to what these provisions mean. The following is a summary:

9

FPC 001279

- G-8.0100: Decisions Regarding Property. Decisions pertaining to church property, their review, and correction are made according to the *PCUSA Constitution*, citing particularly to G-1.0400, each governing body's decision is subject to review and appeal to the next higher governing body.
- G-8.0201: Property is Held in Trust. This all-encompassing property trust applies to both real and personal property, no matter where it is held within the PCUSA and by whatever governing bodies, trustees, associations, or corporations.
- G-8.0301: Property Used Contrary to the Constitution. Whenever the property of a particular church ceases to be used as a particular church of the PCUSA in accordance with the *Constitution*, then such property shall be held, transferred, or sold as provided by the presbytery.
- G-8.0401: Property of Church Dissolved or Extinct. Whenever a particular church is formally dissolved by presbytery, or has become extinct, such property shall be held, used, sold, or disposed of as the presbytery directs.
- G-8.0501: Selling or Encumbering Church Property. Only after the presbytery grants written permission may a particular church sell, mortgage, or otherwise encumber its property, or acquire property subject to an encumbrance or condition.
- G-8.0502: Leasing Church Property. Only after the presbytery grants written permission may a particular church lease its sanctuary or lease any of its property for more than five years.
- G-8.0601: Property of Church in Schism. The relationship of the PCUSA to a particular church can only be severed by a constitutional action on the part of the presbytery. If there is a schism in a particular church and the presbytery is unable to effect a reconciliation or a division into separate churches within the PCUSA, then the presbytery shall declare which faction is the true church within the PCUSA and thereby determine which one of the factions is entitled to the property. This determination does not depend upon which faction received the majority vote within the particular church.
- G-8.0701: Exceptions. At the time of reunion in 1983, both the United Presbyterian Church in the United States of America (UPCUSA) and the Presbyterian Church in the United States (PCUS) had express property trust clauses in their respective constitutions. The PCUS did not, however, have a provision similar to G-8.0500, restricting the encumbering or leasing of church property. G-8.0701 gave churches in the former PCUS the option to opt out of G-8.0500 if a majority of the congregation voted to do so and notified the presbytery prior to June 10, 1991. Check the presbytery records for such opt outs. Bear in mind, churches that exercised this option only opted out of G-8.0500; they could not and did not opt out of the property trust clause (G-8.0201) or the balance of Chapter VIII. Neither the UPCUSA nor the PCUS ever had provisions whereby a congregation could unilaterally leave with the church property.

10

FPC 001280

*Brief history of the property trusts*

Prior to 1981 in the UPCUSA and 1982 in the PCUS, the two major Presbyterian Church denominations did not have express property trusts in their constitutions. They did not need them. The 1871 U.S. Supreme Court ruling in *Watson v. Jones* referred to property held by trustees of a particular Presbyterian church as in trust for the persons who by the *Presbyterian Church Constitution*, usages, and laws are entitled to that use. The *Watson* Court then went on to hold that, as a hierarchical church, once the highest governing body of the Presbyterian Church had ruled on the matter, the civil courts would enforce that ruling as to the property control. *Watson's* hierarchical deference rule did not require or even suggest an explicit property trust provision; it upheld the traditional polity of review by successive governing bodies of the Presbyterian Church.

In *Mary Elizabeth Blue Hull* in 1969, the U.S. Supreme Court announced the neutral principles doctrine but did not define it. In 1979, in *Jones v. Wolf*, the Supreme Court defined the neutral principles doctrine and instructed denominations and others on how to meet this new standard: "Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church,..... And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." 443 U.S. at 606. Both the UPCUSA, effective 1981, and the PCUS, effective 1982, followed the Supreme Court's instructions to the letter, adopting express property trusts in favor of the denomination and in language that could be clearly and simply applied by civil courts. Where opponents point out that the property deeds contain no express trust language and/or the local church was formed prior to the trust language being expressly set out in the *Book of Order*, point out the chronology of U.S. Supreme Court decisions and the clear instructions presented by the Court in *Jones v. Wolf*. The property trust clauses did not create new rules. They simply codified the Presbyterian Church practice into the *Constitution.* An affidavit may be helpful in this regard.

V.   Presenting Factors that Show the Connection between the PCUSA and the Church at Issue

Because of the polity, local Presbyterian churches have a wide variety of strong connections to the presbytery and the denomination. This section sets out many of those connections that should be examined, documented, and, perhaps, presented to the civil court. Once again, review the church property cases in your particular state. If they consider factors such as those set out below, then these should be presented to the court as additional evidence of the hierarchical and connectional relationships. If they do not consider such factors and the case law is otherwise strong for the presbytery's position, then it is probably wise not to bring these factors into the case because they may invite the court to examine matters not relevant to that state's church property analysis. Also, some of these factors could cut against the presbytery; so, if these matters are not usually considered under the case law of your state, it may be best to leave them aside. If these factors are presented, a middle governing body or General Assembly officer can present them to the court via an affidavit (see Sec. II).

11

FPC 001281

Most of the documentation for these factors will be in the records of the presbytery. Some will be in session minutes and some with the General Assembly. Have the presbytery stated clerk or other presbytery official gather these records. They will know best where to search and this will save on attorney expenses. Factors to consider:

- Copy of the deed. Does it contain a property trust? The name Presbyterian? Adherence to the *PCUSA Constitution*? Belonging to the Presbytery of ____? Synod of ____? For Presbyterian worship and governance?
- Copy of corporate articles and bylaws. Same questions as above. Does it state the *PCUSA Constitution* is the charter, serves as the bylaws?
- Did the corporate articles, bylaws, or other documents forbid the church from subordinating itself to higher church governing bodies? If not, note to the court the local church was free to subordinate itself and did so pursuant to the *Presbyterian Church Constitution*.
- Formation of the church. Did the presbytery create the church? Did the denomination create the church? Did those who formed the church petition to join the presbytery? Who were the original formers? Were they Presbyterians? Were the first or subsequent ministers Presbyterian? Is there a covenant document? What do the presbytery minutes state?
- Property dealings. Did the church at any time act under the property chapter whereby the presbytery approved loans, mortgages, leases, etc.?
- Decades or centuries of Presbyterian membership. Demonstrate to the court it is the presbytery that keeps the faith with Presbyterians who, in the past, gave their monies, work, and hope to create a Presbyterian church in this place to perpetuate the faith of the Presbyterian Church. Document the long periods of time this church has been a member of the presbytery and prior denominations. It is improper and unfair to let present members "break the chain" between founding Presbyterians of the past and those of the future.
- Worship activities. Are the worship activities of the local church consistent with those of the general church? This factor is challenging with the PCUSA because of the diversity in worship styles.
- Calling pastors. The presbytery plays the key role in ministers taking calls and leaving churches. Via the minutes and files, demonstrate these in regards to this particular church. Show the succession of Presbyterian ministers approved by the presbytery. Did the presbytery install any of the ministers in the church building? Laying on of hands? Document work with committees on ministry and pastor nominating committees. Show if the church wanted a minister but the presbytery refused and, so, the minister was not called. Did most ministers attend Presbyterian-related seminaries? Were most ministers members of presbytery? At the time of schism, was the minister one installed by the presbytery?
- Use of church governing bodies and officers to assist the local church. Show how this church, its ministers, or members have initiated the use of presbytery officers, committees, or appeals in the past, or have been compelled to do so.

12

FPC 001282

- Denominational listing. The General Assembly publishes a list of all member churches. Secure the page showing this listed church for all of the years it has been with the denomination.
- Tax exempt status. A federal group tax exemption ruling is held by the PCUSA for all churches, middle governing bodies, and the General Assembly. This ruling includes all those listed in the General Assembly publication. Secure a statement from the Legal Office that this particular church is part of the denomination and, so, in PCUSA's group tax exempt ruling.
- Insurance. Many churches are insured under presbytery master insurance policies. If applicable, show this.
- Use of the names and symbols of the denomination or predecessor denominations. Is this church known in the community as part of the denomination? Did it use the denominational symbols on its sign, stationery, etc.? Does the cornerstone include the name Presbyterian?
- Constitutional questions. Did officers (G-14.0207) and ministers (G-14.0405b) of the church answer the constitutional questions set forth in the *Book of Order*, including the agreement to be bound by our church's polity and discipline?
- Participation in higher governing bodies. Did elders and ministers participate in presbytery, synod, or General Assembly meetings? Other meetings of the higher governing bodies?
- Presbytery and higher governing bodies at the church. Did the church ever host meetings of higher governing bodies? Did presbytery or any of its committees ever hold meetings in this particular church? Did presbytery officers ever visit the church? Preach at the church?
- Hymnals and other publications. Did the church use hymnals or other publications produced by the Presbyterian Church?
- Did the church ever receive any grants or loans from the presbytery or a higher governing body? Is there a loan in effect at the present time?
- Mission programs. Did members participate in mission programs sponsored by higher governing bodies? Attend camps or conference centers owned or sponsored by the presbytery or the synod?
- Finances. Did the church send any collections or per capita funds to the presbytery or higher governing bodies? Did the church participate in any of the special offerings (One Great Hour of Sharing? Pentecost Offering?)
- Review of minutes. Did the church submit its minutes for review and approval by the presbytery (G-9.0407c)? Did the presbytery ever correct the minutes?
- When it threatened to leave, did the local church notify the presbytery or higher governing bodies, thereby demonstrating its knowledge that it is related to higher bodies?

## VI. Overview of U.S. Supreme Court Cases

There are seven important U.S. Supreme Court cases which relate to church property disputes. They date from 1871 to 1979. This section provides a summary of those cases: their underlying facts and the important rulings the Court issued. The Court's 1979 *Jones v. Wolf* decision was the last opinion of the Supreme Court on this topic. All seven cases are

13

FPC 001283

summarized here because of how one builds upon the other. It is important to have a working knowledge of all of these cases because the various states have, at the invitation of the *Jones v. Wolf* Court, applied a variety of ways to decide church property disputes. Some hearken back to the 1871 *Watson v. Jones* case. Others decline to go beyond 1979. In some states, the law is not favorable to presbyteries because the state courts have misapplied a U.S. Supreme Court case. In these instances, it is especially important to be familiar with these cases because you may ask the court to correct state law.

In all of these cases, the Supreme Court issued cautionary language about the civil courts interfering with the ecclesiastical law and polity of churches. These opinions also set forth some of the leading First Amendment language about the autonomy of churches and the circumscribed authority of civil courts in how they handle various church disputes. Because of the extensive quotation of the various opinions, this section constitutes about half of the entire memorandum. Use this language to remind the state court of the U.S. Supreme Court's various rulings in favor of hierarchical churches.

## *Watson v. Jones* (1871) 80 U.S. 679, 20 L.Ed. 666

> Key Points: Court draws a bright line between congregational and hierarchical churches. Civil courts will determine church property control as follows: In a congregational church, the determination will be by majority vote of the congregation or an authorized local church board. In a hierarchical church, the determination will be by the highest church governing body that has ruled on the matter. Civil courts must accept the rulings of such church bodies, not engage in ecclesiastical decisions themselves. This is known as the hierarchical deference rule.

Facts: During the Civil War, the Walnut Street Presbyterian Church in Louisville, Kentucky split over the issue of slavery. A majority of the congregation was anti-slavery with a slim pro-slavery majority in control of the session and the trustees. In August of 1865, the pro-slavery session proposed to re-engage a pro-slavery minister who was rejected by the congregation; the session called him anyway. Some members asked the synod to intervene (likely the presbytery was dealing with its own split). In January of 1866, a synod committee visited the church "with power to call a congregational meeting for the purpose of electing additional ruling elders, calling a pastor, or choosing a stated supply, and doing any other business competent to a congregational meeting that may appear to them, the said congregation, necessary for their best interests." The pro-slavery session and trustees refused to open the church; the congregation organized itself on the sidewalk and elected additional elders, all anti-slavery. The pro-slavery contingent retained control and refused any participation by the newly elected elders. The presbytery, synod, and General Assembly (dealing with their own splits) all issued rulings in regards to this church. Ultimately, the anti-slavery General Assembly recognized the authority of the anti-slavery middle governing bodies, newly elected elders, and session. Still excluded from church operations, the anti-slavery elders recognized by the higher church judicatories filed suit in the Louisville civil court for control of the property. The local court ruled in favor of the anti-slavery elders as recognized by the higher governing bodies. The Kentucky Court of Appeals ruled the General Assembly and middle governing bodies acted beyond church law and

14

FPC 001284

held in favor of the pro-slavery contingent. Ultimately, a related case came before the U.S. Supreme Court.

Rulings: The Court notes the various parts of the *Presbyterian Church Constitution* (Confessions of Faith, Form of Government, Book of Discipline, and Directory for Worship). It notes and explains the membership and powers of the ascending series of four church judicatories, now known as governing bodies: church sessions, presbyteries, synods, and the General Assembly.

In determining the rightful owner in church property disputes, the Court sets forth three alternatives for decision making. The second and third are the most important:

1. When the property by deed, will, or other instrument has express terms devoted to the teaching, support, or spread of a specific form of religious belief, that will be enforced. 80 U.S. at 722.

2. When the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority, then the determination will be by majority vote of the congregation or an authorized board of the local church. Id.

3. When the property is held by a religious congregation or body that is a subordinate member of some general church organization in which there are superior ecclesiastical tribunals, with a general and ultimate power of control more or less complete in some supreme judicatory; then the determination will be by the highest church judicatory that has ruled on the matter. Id.

Thus, *Watson v. Jones* established what is known as the hierarchical deference rule: In hierarchical churches (ex. Presbyterian, Episcopal, Methodist), the civil courts will defer to the ruling of the highest church judicatory that considers the matter. The court will make its property control ruling on the basis of the church judicatory ruling. By contrast, in congregational or independent churches (ex. Baptist), the civil court will defer to the majority vote of the local congregation or authorized board and award the property accordingly.

The *Watson v. Jones* Court authored pivotal language still widely used in a variety of cases concerning churches:

- As to the rule of hierarchical deference: "[W]henever the questions of discipline, or of faith or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." 80 U.S. at 727.
- As to the right of denominations to organize themselves and the authority of their ecclesiastical rulings: "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does

15

FPC 001285

not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary associations to assist in the expression and dissemination of any religious doctrine and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." Id. at 728-29.

- As to the inability of civil courts to make ecclesiastical determinations: "Nor do we see that justice would be likely to be promoted by submitting those [ecclesiastical] decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest of minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all those bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so." Id. at 729.

Case Comments: It is important to note the Presbyterian Church did not have a property trust clause in its *Constitution* at this time. It did not need one. Presbyterian polity clearly established (as it does now) the authority of presbyteries in relation to the particular churches and the successive authority of every higher governing body. Even without a trust clause in the deed or the church constitution, the *Watson v. Jones* Court recognized the property was held in trust "for the use of the persons who by the constitution, usages, and laws of the Presbyterian body are entitled to that use." 80 U.S. at 720. Noting that the trustees do not personally own the property but act as fiduciaries, the Court referred to the "true body of the church" and the "mode which is authorized by the canons of the general church ...." Id. at 721.

With this ruling, the United States Supreme Court provided a bright line rule as to how church property disputes would be determined by the civil courts. With its polity and the hierarchical deference rule established, the Presbyterian Church was secure in making its own determinations and where those had civil ramifications (ex. property ownership) knowing they would be enforced. The hierarchical deference rule was firmly in place for almost a century.

16

FPC 001286

_Gonzalez v. Roman Catholic Archbishop_ (1929) 280 U.S. 1, 74 L.Ed. 131, 50 S.Ct. 5

> Key Points: Not a church property case but establishes an exception that later comes into play in such cases: Generally, the decisions of church tribunals, even those affecting civil rights, are binding on the civil courts. But there will be an exception where the civil court finds fraud, collusion, or arbitrariness.

Facts: In this case, Gonzalez sued the Archbishop of Manila to compel him to appoint Gonzalez a chaplain. Gonzalez would be the beneficiary of a trust if he were named chaplain. The archbishop refused.

Rulings: The U.S. Supreme Court upheld the archbishop's sole discretion in making the appointment decision but it added, in dicta (language not necessary for the ruling), that a civil court could review decisions of church judicatories for fraud, collusion, or arbitrariness. "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." 280 U.S. at 16.

Case Comments: This exception for fraud, collusion, or arbitrariness is sometimes claimed in church property cases against the presbytery or other church governing bodies. Arbitrariness is the most typical claim. These arguments are rarely successful because of the natural inclination of courts to stay clear of ecclesiastical decisions and the internal operations of church tribunals (see _Serbian Eastern Orthodox Diocese v. Milivojevich_, below, limiting the arbitrariness exception).

_Kedroff v. St. Nicholas Cathedral_ (1952) 344 U.S. 94, 97 L.Ed. 120, 73 S.Ct. 143

> Key Points: Court holds New York's law removing Russian Orthodox churches from the authority of the patriarch in Moscow unconstitutional. The rulings in _Watson v. Jones_ and _Gonzalez v. Roman Catholic Archbishop_, although not decided under the First Amendment, are recognized for their free exercise bases.

Facts: During the Cold War, New York passed a law placing all Russian Orthodox churches in that state under the jurisdiction of the Russian Orthodox Church in America rather than the Orthodox Church in Russia with its patriarch in Moscow.

Rulings: The U.S. Supreme Court determined this was unconstitutional and that the First Amendment's free exercise clause required the churches to remain under the jurisdiction of Moscow. The _Kedroff_ Court focused upon _Watson v. Jones_ and cited _Gonzalez_, noting the freedom for religious organizations these opinions radiate. 344 U.S. at 116.

17

FPC 001287

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church (1969) 393 U.S. 440, 21 L.Ed.2d 658, 89 S.Ct. 601*

Key Points: Court holds Georgia's departure-from-doctrine rule unconstitutional under the First Amendment because it compels civil courts to determine what are the substantial original tenets of the church and whether or not they have been abandoned. Civil courts must not decide church property cases by resolving controversies over religious practice and doctrine. The Court announces but does not define the neutral principles of law doctrine, those principles developed for use in all property disputes.

Facts: Two Presbyterian churches in Savannah, Georgia voted to withdraw from the Presbyterian Church in the United States and reconstitute themselves as an autonomous Presbyterian organization. Their complaints included, variously, the ordination of women; pronouncements on social matters; support of the removal of Bible reading in the schools; teachings alien to the Confessions; membership in the National Council of Churches of Christ; etc. The two ministers renounced the jurisdiction of the church and so did many elders. The presbytery established an administrative commission but conciliation failed. The commission acknowledged the departure of the local leadership and proceeded to take control of the property until new leadership could be appointed. The dissident church members did not appeal within church judicatories. Instead, they filed suit in civil court to enjoin the presbytery and higher governing bodies from trespassing.

At this time, Georgia statutory law employed the departure-from-doctrine rule. This rule provided that when a Georgia church was a member of a hierarchical denomination, a trust in favor of the denomination would be enforced "conditioned upon the general church's adherence to its tenets of faith and practice existing when the local church affiliated with it and ... an abandonment of, or departure from, such tenets is a diversion from the trust, which the civil courts will prevent." 393 U.S. at 444 (Footnote 3, quoting the Georgia statute and the Georgia Supreme Court). At trial, the jury determined the denomination had engaged in a "fundamental or substantial abandonment of the original tenets and doctrines of the [Presbyterian Church] so that the new tenets and doctrines are utterly variant from the purposes for which the [Presbyterian Church] was founded." 393 U.S. at 443-44. The local churches were awarded the property under the departure-from-doctrine rule. This judgment was affirmed by the Georgia Supreme Court.

Rulings: The U.S. Supreme Court declared the departure-from-doctrine rule unconstitutional under the first amendment:

- "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." 393 U.S. at 449.
- "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free

18

FPC 001288

development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." Id.

- "[T]he departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to religion. Plainly, the First Amendment forbids civil courts from playing such a role." Id. at 450.

In rejecting the departure-from-doctrine rule, the Supreme Court established the neutral principles doctrine but did not clearly define it: "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." Id. at 449. Interestingly, the *Mary Elizabeth Blue Hull* Court called upon churches to structure their relationships according to these neutral principles but did not set out what they were: "States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." Id.

Case Comments: This lack of definition invited more church property cases. Ultimately, the Supreme Court was compelled to define what it meant by neutral principles.

*Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, (1970) 396 U.S. 367, 24 L.Ed.2d 582, 90 S.Ct. 499*

> Key Points: Court dismisses an appeal (and thereby leaves the lower court's ruling in place) where the Maryland Court of Appeals applies neutral principles and decides a church property dispute by examining statutory law regarding church corporations holding property, deeds, church corporate articles, and the constitution of the general church. In a concurring opinion, three ways of satisfying neutral principles are set out: 1) The hierarchical deference rule as long as the civil courts do not make any polity or doctrine determinations; 2) The formal title doctrine where deeds, corporate articles, state law, and the denomination's constitution are examined; 3) States can adopt special statutes concerning church property as long as they do not interfere in church doctrine or polity.

Facts: Two local churches in Maryland sought to secede from the general church. In an earlier opinion, 393 U.S. 528 (1969), the U.S. Supreme Court directed the Maryland Court of Appeals to reconsider the case in light of the Court's *Mary Elizabeth Blue Hull* opinion (establishing the neutral principles doctrine but not defining it). When the case returns, the Maryland court has examined state statutory law governing the holding of property by religious corporations, deed language, charters of the church corporations, and provisions in the denominational church constitution to determine ownership of the property. The denominational church constitution did not have a trust clause. The Maryland Court of Appeals awarded the property to the seceders. On appeal back to the U.S. Supreme Court, the Court dismissed the

19

FPC 001289

case in one paragraph stating the Maryland court had resolved the matter without inquiring into religious doctrine and, so, no substantial federal question was presented. This case is a harbinger of how neutral principles will operate.

Concurring opinion: Three justices join a concurring opinion (authored by Justice Brennan, the author of the *Mary Elizabeth Blue Hull* opinion) suggesting the neutral principles doctrine can be met in three different ways:

1.  The *Watson v. Jones* hierarchical deference rule: Churches with a congregational polity decide property ownership by majority vote. Churches in a hierarchical polity decide property ownership by the highest church authority that has ruled on the dispute at issue. But the opinion cautions the *Watson* approach can only be used if the appropriate church governing body can be determined without resolution of doctrinal questions or extensive religious policy inquiry. 396 U.S. at 370.

2.  The formal title doctrine: Courts can determine property ownership by looking at deeds, reverter clauses, general state corporation laws, and general church constitutions. But the opinion cautions that civil courts cannot apply such documents if they are conditioned upon departure from doctrine (the rule struck down in *Mary Elizabeth Blue Hull*). Id.

3.  States can pass special statutes regarding church property arrangements as long as they do not interfere in doctrine; both doctrine and ecclesiastical policy must be left to church governing bodies. Id.

*Serbian Eastern Orthodox Diocese v. Milivojevich*, (1976) 426 U.S. 696, 49 L.Ed.2d 151, 96 S.Ct. 2372

> Key Points: The Illinois Supreme Court reinstated a defrocked Orthodox bishop, reunited three dioceses into one, and returned control of the diocese's property to the defrocked bishop, all by applying the ecclesiastical law and polity of the church. The Supreme Court held this was an unconstitutional rejection of the decisions of the highest church tribunal. Such church tribunal decisions are binding on civil courts. Moreover, the Illinois court's reliance on the arbitrariness exception was misplaced. The arbitrariness exception cannot be used by a civil court to reexamine the decisions of the highest church tribunal on matters of church laws and regulations. The arbitrariness exception is thereby limited.

Facts: Various disputes led to the Serbian Orthodox bishop of the American-Canadian diocese (Milivojevich) being defrocked by the mother church's Holy Synod and Holy Assembly. The diocese was also divided into three new dioceses with new bishops named. The defrocked bishop sued in Illinois court to be reinstated as bishop, have the reorganization of the dioceses declared invalid, and have all properties secured in him. The Illinois Supreme Court performed a detailed review of church law and determined the actions of the mother church, in applying its own church law and polity, were procedurally and substantively defective. Therefore, the actions were arbitrary, invalid, and reversed.

20

FPC 001290

Rulings: The U.S. Supreme Court reversed the Illinois Supreme Court:

- The Supreme Court notes this case is essentially not a church property dispute, but a religious dispute which under Supreme Court precedent is for ecclesiastical, not civil, tribunals. 426 U.S. at 709.
- The Illinois Supreme Court rested its decision "upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute and impermissibly substitutes its own inquiry into church polity and resolutions based upon those disputes." Id. at 708.
- "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. Id. at 709.
- As to the arbitrariness exception set forth but not defined in *Gonzalez* and *Mary Elizabeth Blue Hull*, it does not allow for the review performed by the Illinois Supreme Court: "[N]o 'arbitrariness' exception–in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations–is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Id. at 713.
- "Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." Id. at 714-15.
- The Court criticized the Illinois court on a variety of matters, including its rejection of the expert testimony presented by the mother church's expert witnesses. Id. at 718 (See also footnote 10).
- "In short the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the constitution requires that civil courts accept their decisions as binding upon them." Id. at 724-25.

Case Comments: In addition to the very strong language restricting a civil court's power to interpret church law, this is the case to use if your opponents make a claim of arbitrariness against the actions of the presbytery.

21

FPC 001291

*Jones v. Wolf* (1979) 443 U.S. 595, 61 L.Ed.2d 775, 99 S.Ct. 3020

---

Key Points: No longer is the hierarchical deference rule of *Watson v. Jones* the only way to determine church property disputes. Indeed, states may adopt any one of various approaches to settle church property disputes. The Court identifies three: 1) Neutral principles where the court examines statutory law on churches holding property, church corporate articles, deeds, and the provisions of the denomination's constitution. The Court explicitly calls upon denominations to modify their constitutions to provide for express trusts and states the civil courts will be bound to enforce them; 2) Hierarchical deference remains an option to determine church property disputes even though it is not the only option; 3) A presumptive rule of majority representation may be used as long as it is defeasible upon some showing that the identity of the local church is to be determined by some other means (ex. local church charter or denomination's constitution can provide that church is to be identified by higher governing body). Since *Jones v. Wolf*, no other church property cases have been taken by the U.S. Supreme Court. This ruling allows state courts to use multiple mechanisms to decide such cases and they do.

---

Facts: Various disputes brought the Vineville Presbyterian Church in Macon, Georgia to a congregational meeting. By a margin of 164 to 94, the congregation voted to leave the Presbyterian Church in the United States and join the Presbyterian Church in America. The Augusta-Macon Presbytery of the PCUS appointed a commission that eventually ruled the minority faction constituted the "true congregation." The presbytery commission withdrew all authority from the majority faction. The majority faction took no part in the commission's work and did not appeal its decisions. The minority faction brought suit in civil court to gain control of the property. The Georgia courts applied "neutral principles of law" and ruled for the majority.

Rulings: The United States Supreme Court sets out what it means by the neutral principles of law doctrine.

- The Court recognizes the PCUS has a generally hierarchical or connectional form of government as contrasted with the congregational form. As in other Presbyterian cases, the Court notes the ascending levels of four governing bodies, with each subject to the review and control of the next higher governing body. 443 U.S. at 597-98.
- In applying its version of neutral principles, the Georgia courts reviewed property deeds, state statutes concerning implied trusts, church corporate charters, and the *Presbyterian Church Constitution.* In none of these documents did the court discern a trust in favor of the denomination. On this basis, the Georgia courts ruled in favor of congregational majorities. Id. at 600-01.

22

FPC 001292

- By contrast, in a schism involving a United Methodist church, the Georgia court found the *United Methodist Constitution* contained an express trust in favor of the denomination. On that basis, the court awarded the property to the denominational church. Id. at 600-01.
- The Supreme Court noted the state has a legitimate interest in the peaceful resolution of church property disputes and the civil courts are open to make determinations of church property ownership. Id. at 602.
- The Supreme Court explicitly stated "the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" Id. at 602 (quoting the concurring opinion in *Maryland & Virginia Churches*, emphasis in original). This multiplicity approach became very important as states around the country began to apply church property rules in a variety of ways.
- Having stated that any of various approaches could be used, the Court went on to identify three possible approaches:

1. The neutral principles approach is used where a court reviews the language of deeds, the terms of local church charters, state statutes concerning church property, and the provisions of the general church constitution concerning the ownership and control of church property. Id. at 603.

Case Comments: Obviously, this neutral principles approach disadvantaged hierarchical churches, in part, as compared to their prior status under *Watson v. Jones*. No longer were civil courts mandated to follow the hierarchical deference rule in church property cases. Significantly, the *Jones v. Wolf* Court set out the mechanism by which denominations could reinstate their former position: "Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine ownership in the event of schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of its members." Id. at 603-04.

Even more explicitly, "At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." Id. at 606. Having noted how these matters could be resolved, the Court called upon "'States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.'" Id. at 604 (quoting *Mary Elizabeth Blue Hull*).

23

FPC 001293

In response to this instruction by the U.S. Supreme Court, both the United Presbyterian Church in the United States of America, effective in 1981, and the Presbyterian Church in the United States, effective in 1982, adopted new chapters of the *Constitution* setting out express trusts on church property; their operations, the fact that presbytery determines the true church, and the like. In light of the Court's new neutral principles ruling, these constitutional amendments returned the Presbyterian Church to the same status it had held since the *Watson v. Jones* decision in 1871.

2. The hierarchical deference rule of *Watson v. Jones* remains one of the approaches approved by the Supreme Court to decide church property disputes. The U.S. Supreme Court notes that "Georgia law requires that 'church property be held according to the terms of the church government,' and provides that a local church affiliated with a hierarchical religious association 'is part of the whole body of the general church and is subject to the higher authority of the organization and its laws and regulations.'" Id. at 608-09. Noting that this brings in the Presbyterian Church *Book of Order*, the Supreme Court cautions that civil courts must not "usurp the function of the commission appointed by the Presbytery, which already has determined that petitioners [the minority faction] represent the 'true congregation' of the Vineville church. Therefore, if Georgia law provides that the identity of the Vineville church is to be determined according to the 'laws and regulations' of the PCUS, then the First Amendment requires that the Georgia courts give deference to the presbyterial commission's determination of that church's identity." Id. at 609.

Case Comments: The Supreme Court stated the hierarchical deference is not required by the First Amendment. Id. at 605. Some mistakenly read this to suggest that hierarchical deference was being abandoned but it is clear from this case, *Maryland and Virginia Churches*, and other cases that the rulings in *Watson v. Jones* are alive and well. Nowhere has the Court ever overruled *Watson v. Jones*; to the contrary, it has been repeatedly cited in the Supreme Court's case law.

3. The presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, is identified as an option. This rule, of course, puts the Presbyterian Church (and other hierarchical churches) at an immediate disadvantage because it ignores the fundamental and historic church polity that a presbytery identifies the true church, not a majority vote of the congregation. In effect, this rule, improperly applied, violates the free exercise of religion clause by turning the Presbyterian Church into an association of congregational or independent churches. Significantly, the Supreme Court noted that a presumptive rule of majority representation was proper where it was "defeasible upon a showing that the identity of the local church is to be determined by some other means." Id. at 607. The Court notes the various ways the presumptive majority rule can be trumped: "Most importantly, any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing, in the corporate charter or the constitution of the general church, that the identity of the local church is to be

24

established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it." Id. at 607-08.

Case Comments: As noted above, the Presbyterian Church took the Court's advice and adopted both an express property trust and clear statements about the authority of the presbytery in property matters (see Sec. IV).

## VII. Other Resources

Law review articles are written by law professors, students, and practitioners. Typically, they have an academic focus and analyze principles in a particular area of law. In a state where church property case law is basically settled, law review articles will probably have little effect. If, however, the state has little or no case law or conflicting decisions, a law review article may be of more interest to the court. This section summarizes a few relatively recent articles. There are many others. The first resource listed below, however, is an annotated law report which discusses this area of law generally with a particular focus on cases nationwide.

- *Determination of Property Rights Between Local Church and Parent Church Body: Modern View*, 52 ALR3d 324, 334 (listing the Presbyterian Church as hierarchical with control over local church property), and 417 ("Although the Presbyterian form of church government is without question hierarchical, there has been a considerable amount of litigation over the right of local Presbyterian churches to withdraw from the general church and retain the use and control of local church property. [T]his right is uniformly denied, on the ground that the local Presbyterian church stands in a hierarchical relationship to the general church, with respect to property matters as in other areas." (Footnotes omitted)). Although this law report is dated (1974), its description of the Presbyterian Church as hierarchical is apt. It also discusses Presbyterian Church cases at section 25 of the annotation.

- *Hands Off! Civil Court Involvement in Conflicts Over Religious Property*, 98 Colum. L. Rev. 1843 (1998). Although the author criticizes the hierarchical deference approach, he notes it continues to be valid within U.S. Supreme Court jurisprudence and applied in many states, and he recognizes the Presbyterian Church as hierarchical. Id. at 1878. A review of some Presbyterian cases is provided, id. at 1898-1901, but some date from before *Jones v. Wolf*. Citing an Iowa Supreme Court case, he notes the 1981 property trust amendment to the *Book of Order* was not a new principle but rather clarified the uncertainty created by *Jones v. Wolf*. Id. at 1901.

- *Property Disputes and Religious Schisms: Who is the Church?*, 9 St. Thomas L. Rev. 319 (1997). This author endorses hierarchical deference and criticizes neutral principles. One of his main points is that one is bound by the rules of the church joined. "The Episcopal and Presbyterian churches trace their existence to the English Reformation. Thus, their polity, doctrine, and structure were established long before affiliation by the contemporary members. New membership in any existing organization implies

25

FPC 001295

acceptance of the organization's existing rules." Id. at 354. Most of the article is devoted to reviews of U.S. Supreme Court cases and several state cases.

- *Religious Property Disputes and Intrinsically Religious Evidence: Towards a Narrow Application of the Neutral Principles Approach,* 35 Vill. L. Rev. 949 (1990). This author criticizes the hierarchical deference approach, analyzes the Episcopal Church, and a particular Kentucky Supreme Court case. He proposes a very narrow neutral principles approach whereby only secular documents are considered (deeds, corporate articles) and not general church constitutions. This proposal is contrary to the Supreme Court's guidance in *Jones v. Wolf.*

- *Civil Court Resolution of Property Disputes Among Religious Organizations,* 39 Am. U. L. Rev. 513 (1990). This is the most useful law review article reviewed. Although the author criticizes hierarchical deference and favors neutral principles, his case analyses are very helpful. He divides cases into three categories and identifies those cases in each: Hierarchical deference approach; Hybrid neutral principles and deference approach; and Strict neutral principles approach. These summaries are quite useful to the litigator who wants to know how other states handle certain church property issues.

- *The Need for an Exclusive and Uniform Application of "Neutral Principles" in the Adjudication of Church Property Disputes,* 32 St. Louis U. L. J. 263 (1987). This is another useful article. Although it criticizes the hierarchical deference approach, it provides a good review of cases, especially those ruling on Presbyterian Church and Episcopal Church property disputes. In addition, it provides a good review of core Presbyterian Church polity, especially the property trust. Most importantly, this article explicitly notes the Presbyterian Church, in response to the *Jones v. Wolf* Court, adopted clear and binding provisions in regards to church property:

  - "National churches themselves may eliminate most of the uncertainty in the application of neutral principles by adopting constitutional provisions which will unequivocally demonstrate that the property of local churches is held in trust for the national church." Id. at 313.
  - "PCUS and UPCUSA have adopted such provisions in the wake of *Jones v. Wolf.* [I]t seems clear that under either the polity or neutral principles approach a court must hold that the national church controls local property. Indeed, the adoption of such provisions will likely decrease the volume of church property litigation. Local churches will recognize that an express trust in favor of the national church will compel summary judgment in favor of the national church." Id. at 314.
  - "[A] denomination that wishes to optimize its chances of prevailing in property litigation would be well advised to adopt an unequivocal declaration of express trust as found in the constitutions of the [Episcopal and Presbyterian churches]." Id. at 314-15.

26

FPC 001296

* *Church Property Disputes: Churches as Secular and Alien Institutions,* 55 Fordham L. Rev. 335 (1986). The author criticizes all existing church property doctrines and proposes his own: Courts should review secular legal documents (deeds, corporate articles) solely. Footnote 4 in this article lists many other law review articles on the topic.

Copyright. 2001, 2002, and 2005 Presbyterian Church (U.S.A.), A Corporation.

Rev. 12/2005

27

FPC 001297